In the

# UNITED STATES COURT OF APPEALS
for the Seventh Circuit

## No. 23-3155

UNITED STATES OF AMERICA,

**Plaintiff-Appellant,**

v.

GLEN PRINCE,

**Defendant-Appellee.**

On Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 22 CR 240 — Robert W. Gettleman, *Judge.*

# BRIEF AND SHORT APPENDIX
# OF THE UNITED STATES

MORRIS PASQUAL
Acting United States Attorney
  for the Northern District of Illinois
219 South Dearborn Street, 5th Floor
Chicago, Illinois  60604
(312) 353-5300

DEBRA RIGGS BONAMICI
Assistant United States Attorney
Criminal Division Counsel

GEORGIA N. ALEXAKIS
Assistant United States Attorney
Chief of Appeals, Criminal Division

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................. iii

JURISDICTIONAL STATEMENT ....................................................... 1

ISSUE PRESENTED FOR REVIEW ..................................................... 1

STATEMENT OF THE CASE ............................................................... 1

    Offense Conduct and Charges ........................................................... 1

    District Court's Order Dismissing Indictment ............................... 3

        District Court's Analysis of Second Amendment's Plain Text ............... 3

        District Court's Analysis of the Nation's Historical Tradition of Categorically Disarming "Individuals Who Have Demonstrated That They Cannot Be Trusted To Obey the Law" ................................ 5

        District Court's Analysis of Historical Laws Authorizing Capital Punishment and Estate Forfeiture for Certain Felonies ........................ 7

        District Court's Analysis of Defendant's As-Applied Constitutional Challenge ................................................................ 8

SUMMARY OF ARGUMENT ............................................................... 9

STANDARD OF REVIEW .................................................................. 10

ARGUMENT ..................................................................................... 10

    I.    Background ............................................................................... 10

        A.    Legislative History of 18 U.S.C. § 922(g)(1) ................... 10

        B.    Supreme Court Precedent Concerning Prohibitions on Felons' Possession of Firearms ....................................... 13

    II.    Analysis .................................................................................. 16

        A.    Felons' Possession of Firearms Is Not Protected Under the Second Amendment's Plain Text ................................ 18

1. Felons Are Not Among "the People" Protected by the Second Amendment. ................................................................. 18

2. The Right To Bear Arms Extends Only to Law-Abiding Individuals. ................................................................. 20

3. This Circuit's Precedent Does Not Extend the Second Amendment's Protections to Felons. ........................... 25

B. Section 922(g)(1) Is Part of This Nation's Historical Tradition of Firearms Regulation and Thus Constitutional Under the Second Amendment. ....................................................... 28

1. Categorical Disarmament of Those Considered Untrustworthy Adherents to the Law. ......................... 29

England. ....................................................................... 29

Colonial America. ....................................................... 31

Revolutionary War. ................................................... 35

Ratification Debates. ................................................. 37

2. Felony Punishment Laws. .......................................... 38

3. Section 922(g)(1) Is Sufficiently Similar to Historical Traditions of Disarming Untrustworthy Adherents to the Law and Felony Punishment. ....................................... 40

4. The Historical Record Specifically Supports Disarming "Dangerous" Individuals, a Group That Includes Defendant. ................................................................. 51

CONCLUSION ............................................................................... 57

# TABLE OF AUTHORITIES

## CASES

*Atkinson v. Garland*, 70 F.4th 1018 (7th Cir. 2023) ...............................*passim*

*Austin* v. *United States*, 509 U.S. 602 (1993) ................................... 21

*Avery v. Everett*, 18 N.E. 148 (N.Y. 1888) ........................................ 22

*Barrett v. United States*, 423 U.S. 212 (1976) ................................ 55

*Binderup v. Attorney Gen. of the U.S.*, 836 F.3d 336 (3d Cir. 2016) ......... 10, 11

*Bucklew v. Precythe*, 139 S. Ct. 1112 (2019) ..................................... 21

*Calero-Toledo* v. *Pearson Yacht Leasing Co.*, 416 U.S. 663 (1974) ................ 21

*Clark v. Community for Creative Non-Violence*, 468 U.S. 288 (1984)............ 17

*Consolino v. Towne*, 872 F.3d 825 (7th Cir. 2017) ........................................ 17

*Dickerson v. New Banner Institute, Inc.*, 460 U.S. 103 (1983) ........................ 54

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ...............................*passim*

*Friedman v. City of Highland Park, Ill.*, 784 F.3d 406 (7th Cir. 2015) .......... 44

*Huddleston v. United States*, 415 U.S. 814 (1974) ......................... 11, 12, 43, 44

*In re Deming*, 10 Johns. 232 (N.Y. 1813) ........................................... 21

*Kaemmerling v. Lappin*, 553 F.3d 669 (D.C. Cir. 2008) ................................ 54

*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019) ...........................................*passim*

*Konigsberg v. State Bar of Cal.*, 366 U.S. 36 (1961)....................................... 17

*Lewis v. United States*, 445 U.S. 55 (1980).................................... 11, 12, 43, 54

*Logan v. United States*, 552 U.S. 23 (2007).................................................... 13

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) .................................... 14, 23

*Medina v. Whitaker*, 913 F.3d 152 (D.C. Cir. 2019)...............................*passim*

*New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022)............*passim*

*New York State Rifle & Pistol Ass'n, Inc. v. City of New York*, 140 S. Ct. 1525 (2020) .................................................................................... 13, 14

*Range v. Attorney Gen. of the U.S.*, 69 F.4th 96 (3d Cir. 2023) ...............*passim*

*Richardson v. Ramirez*, 418 U.S. 24 (1974)....................................................... 19

*Scarborough v. United States*, 431 U.S. 563 (1977) ........................................ 12

*Spencer v. Kemna*, 523 U.S. 1 (1998) ................................................................ 19

*United States v. Agee*, No. 21-CR-350, 2023 WL 6443924 (N.D. Ill. Oct. 3, 2023) .................................................................................................... 33

*United States v. Alaniz*, 69 F.4th 1124 (9th Cir. 2023).................................... 53

*United States v. Ball*, No. 22-CR-00449, 2023 WL 8433981 (N.D. Ill. Dec. 5, 2023).................................................................................................... 42

*United States v. Brady*, No. 1:22-CR-47, 2023 WL 7553859 (N.D. Ind. Nov. 13, 2023).................................................................................................... 16

*United States v. Collette*, 630 F. Supp. 3d 841 (W.D. Tex. 2022) ................... 28

*United States v. Coombes*, 629 F. Supp. 3d 1149 (N.D. Okla. 2022).............. 22

*United States v. Drake*, No. 23-CR-21, 2023 WL 8004876 (N.D. Ind. Nov. 16, 2023).................................................................................................... 44

*United States v. Dubois*, --- F.4th ----, 2024 WL 927030 (11th Cir. March 5, 2024).................................................................................................... 16

*United States v. Foljatar*, 980 F.3d 897 (3d Cir. 2020) ................................... 53

*United States v. Gates*, No. 22-CR-397, 2023 WL 5748362 (N.D. Ill. Sept. 6, 2023)................................................................................................ 16, 44

*United States v. Gonzalez*, No. 22-1242, 2022 WL 4376074 (7th Cir. Sept. 22, 2022).................................................................................................... 52

*United States v. Hardy*, No. 23-CR-129, 2023 WL 6795591 (N.D. Ill. Oct. 13, 2023).................................................................................................... 16

iv

*United States v. Ieliot Jackson*, No. 21-CR-175, 2023 WL 8601498 (N.D. Ill. Dec. 12, 2023) ....................................................................... 16

*United States v. Jackson*, 69 F.4th 495 (8th Cir. 2023) ...........................*passim*

*United States v. Javion Johnson*, No. 22-CR-254, 2023 WL 7284848 (E.D. Wis. Nov. 3, 2023) ......................................................................... 16

*United States v. Johnson*, 42 F.4th 743 (7th Cir. 2022) ................................. 10

*United States v. Kelly*, No. 22-CR-37, 2022 WL 17336578 (M.D. Tenn. Nov. 16, 2022) ........................................................................................ 46

*United States v. Khiry Jackson*, No. 20-CR-298, 2023 WL 7160921 (N.D. Ill. Oct. 31, 2023) ........................................................................ 16

*United States v. King*, No. 23-CR-143, Dkt. 51 (N.D. Ill. Nov. 17, 2023) ....... 51

*United States v. Lane*, No. 3:23CR62, 2023 WL 5663084 (E.D. Va. Aug. 31, 2023) ........................................................................................ 28

*United States v. Meza-Rodriguez*, 798 F.3d 664 (7th Cir. 2015) ...... 4, 25, 26 28

*United States v. Pope*, 613 F.3d 1255 (10th Cir. 2010) .................................. 56

*United States v. Posey*, 655 F. Supp. 3d 762 (N.D. Ind. 2023)........................ 27

*United States v. Price*, 656 F. Supp. 3d 772 (N.D. Ill. 2023) .......................... 16

*United States v. Quailes*, No. 1:21-CR-0176, 2023 WL 5401733 (M.D. Pa. Aug. 22, 2023)................................................................................... 56

*United States v. Reggie Johnson*, No. 18-CR-458, 2023 WL 6690388 (N.D. Ill. Oct. 12, 2023) ................................................................... 16, 51

*United States v. Rice*, 662 F. Supp. 3d 935 (N.D. Ind. 2023)......................... 16

*United States v. Sitladeen*, 64 F.4th 978 (8th Cir. 2023)................................ 27

*United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010).............................. 11, 55

*United States v. Sloat*, No. 3:22-CR-30017, 2023 WL 8455112 (S.D. Ill. Dec. 6, 2023)........................................................................................ 16

*United States v. Thompson*, No. 21-CR-284, Dkt. 58 (N.D. Ill. Feb. 21, 2024) ................................................................................................ 44, 46

*United States v. Tooley*, 717 F. Supp. 2d 580 (S.D. W. Va. 2010) .................. 22

*United States v. Vaughns*, 22-CR-636, 2023 WL 8258575 (N.D. Ill. Nov. 29, 2023) ................................................................................................ 51

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990) ......................... 18, 28

*United States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010) .............................. 26

*United States v. Yancey*, 621 F.3d 681 (7th Cir. 2010) ........................ 6, 26, 54

*Vincent v. Garland*, 80 F.4th 1197 (10th Cir. 2023) ...................................... 16

*Voisine v. United States*, 579 U.S. 686 (2016) ............................................... 19

*Yahnke v. Kane County, Ill.*, 823 F.3d 1066 (7th Cir. 2016) ........................... 17

## CONSTITUTIONAL PROVISIONS

U.S. Const. pmbl ............................................................................................ 27

U.S. Const., art. I ........................................................................................... 27

U.S. Const., amend. II ..................................................................................... 18

U.S. Const., amend. XIV .................................................................................. 19

U.S. Const., amend. XVII ................................................................................ 28

## STATUTES

18 U.S.C. § 921(a)(20) ................................................................. 12, 13, 48

18 U.S.C. § 922(g) .................................................................... *passim*

18 U.S.C. § 924(e) ......................................................................... 1, 2

18 U.S.C. § 925(c) ................................................................ 13, 48, 51

18 U.S.C. § 3231 .................................................................................. 1

18 U.S.C. § 3731 .................................................................................. 1

28 U.S.C. § 1291 .................................................................................. 1

## RULE

Federal Rule of Criminal Procedure 12 ........................................... 56

## OTHER AUTHORITIES

*1 The Laws of Maryland, With the Charter, The Bill of Rights, the Constitution of the State, and its Alterations, The Declaration of Independence, and the Constitution of the United States, and its Amendments* (1811) ..................... 39

*1 The Public Acts of the General Assembly of North Carolina* (1804)............ 36

1 William Blackstone, *Commentaries on the Laws of England* (1765) ........... 21

1 W. & M., Sess. 1, c. 15, in 6 *The Statutes of the Realm* (1688) .................... 29

1 W. & M., Sess. 2, c. 2, in 6 *The Statutes of the Realm* (1688) ...................... 31

2 Bernard Schwartz, *The Bill of Rights: A Documentary History* (1971) ...........

........................................................................................ 22, 23, 37

*2 Statutes at Large of Pennsylvania from 1682 to 1801* (1896) ...................... 39

*3 Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay* (1878) ........................................................................................ 39

3 Joseph Story, *Commentaries on the Constitution of the United States* (1833) ............................................................................................... 19

*4 Journals of the Continental Congress 1774-1789* (1906) ............................. 35

4 William Blackstone, *Commentaries on the Laws of England* (1769) ............... ........................................................................................ 20, 21, 39, 40

*5 The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay* (1886) ................................................................. 36

*7 Records of the Colony of Rhode Island and Providence Plantations in New England* (1862) ............................................................................. 36

*9 The Statutes at Large; Being A Collection of All the Laws of Virginia* (1821) ............................................................................................... 36

*9 The Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature* (1821) ............................................. 39

*9 The Statutes at Large of Pennsylvania from 1682 to 1801*(1903) ................ 36

*Acts and Laws of The English Colony of Rhode Island and Providence-Plantations in New-England in America* (1767) ......................................... 39

*Acts of the General Assembly of the State of New-Jersey at a Session Begun on the 27th Day of August, 1776* (1777) ................................................. 36

Ann Fairfax Withington & Jack Schwartz, *The Political Trial of Anne Hutchinson*, 51 New Eng. Q. 226 (1978) ............................................... 32

Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277 (2014) ........................................................................................... 21

David Thomas Konig, *"Dale's Laws" and the Non-Common Law Origins of Criminal Justice in Virginia*, 26 Am. J. Legal Hist. 354 (1982) ................... 40

Edmund S. Morgan, *The Case Against Anne Hutchinson*, 10 New Eng. Q. 635 (1937) ........................................................................................... 32

James F. Cooper, Jr., *Anne Hutchinson and the "Lay Rebellion" Against the Clergy*, 61 New Eng. Q. 381 (1988) ................................................... 32

Joseph Blocher & Catie Carberry, *Historical Gun Laws Targeting "Dangerous" Groups and Outsiders*, *in* NEW HISTORIES OF GUN RIGHTS AND REGULATION: ESSAYS ON THE PLACE OF GUNS IN AMERICAN LAW AND SOCIETY (Blocher, J. et al. eds.) (forthcoming) .................................... 34

Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Firearms*, 20 Wyo. L. Rev. 249 (2020) .................... 32

N.C. Declaration of Rights of 1776 § XVII, *in* THE COMPLETE BILL OF RIGHTS: THE DRAFTS, DEBATES, SOURCES, AND ORIGINS (Neil Cogan ed., 2d ed., 2014) .......................................................................... 36

Pa. Declaration of Rights of 1776 § XIII, *in* THE COMPLETE BILL OF RIGHTS: THE DRAFTS, DEBATES, SOURCES, AND ORIGINS (Neil Cogan ed., 2d ed., 2014) .......................................................................... 37

Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* (2006) .................................................. 33

Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms* (2008) ........................................................................ 38

*The Popular Sources of Political Authority: Documents on the Massachusetts Constitution of 1780* (Oscar Handlin & Mary Handlin eds. 1966).................. 22

*The Public Records of the Colony of Connecticut From May, 1775 to June, 1776* (1890) ......................................................................................... 35

Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* (1868)............. ......................................................................................... 19, 38

# JURISDICTIONAL STATEMENT

Defendant Glen Prince was charged with one count of unlawfully possessing a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). R. 1, 28.[1] In an order entered on November 2, 2023, the district court dismissed that count after concluding that § 922(g)(1) is facially unconstitutional under the Second Amendment. R. 73 (RSA 1-22). On November 8, 2023, the government timely filed a notice of appeal from the district court's order. R. 75.

The district court had jurisdiction pursuant to 18 U.S.C. § 3231. This Court has jurisdiction pursuant to 18 U.S.C. § 3731 and 28 U.S.C. § 1291.

# ISSUE PRESENTED FOR REVIEW

Whether 18 U.S.C. § 922(g)(1), which prohibits a person from possessing a firearm or ammunition if he has been convicted of "a crime punishable by imprisonment for a term exceeding one year," on its face violates the Second Amendment.

# STATEMENT OF THE CASE

### *Offense Conduct and Charges*

According to the government's evidence, on September 3, 2021, defendant Glen Prince approached three individuals on a Chicago Transit

---

[1] Citations to the Original Electronic Record on Appeal are to "R.," followed by the document number. Citations to the required short appendix are to "RSA," followed by the page number. The government has also prepared and filed a separate two-volume appendix that contains the historical and secondary sources cited in this brief.

Authority ("CTA") train, brandished a firearm, and robbed them at gunpoint, stealing, among other items, a transit payment card known as a Ventra card. RSA 1. Over the next 10 days, defendant used the Ventra card to travel on the CTA, and Chicago police tracked activity on the card. *Id.* On September 12, 2021, at approximately 11:28 p.m., defendant swiped the Ventra card at a CTA station, and proceeded to smoke a cigarette on the station's platform, which is against a local ordinance. *Id.* Officers arrested defendant just after midnight, on September 13, 2021, and recovered a loaded semi-automatic firearm from his waistband. *Id.* at 1-2; R. 1; R. 52 at 2.

Based on these events, on April 25, 2022, defendant was indicted with one count of violating 18 U.S.C. § 922(g)(1), which prohibits a person from possessing a firearm or ammunition if he has been convicted of "a crime punishable by imprisonment for a term exceeding one year." R. 1. Defendant also was indicted under 18 U.S.C. § 924(e), the Armed Career Criminal Act, which imposes a 15-year mandatory minimum term of imprisonment on individuals who violate § 922(g) and who previously have been convicted, three times, of violent felonies or serious drug offenses committed on occasions different from one another. *Id.*; R. 28. Defendant's previous convictions include convictions for armed robbery and aggravated battery. R. 48 at 5; R. 49 at 5; R. 52 at 2.

### District Court's Order Dismissing Indictment

On August 17, 2023, defendant moved to dismiss the indictment, arguing that, in light of *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), § 922(g)(1) is unconstitutional under the Second Amendment, both on its face and as applied to him. R. 45. After reviewing the government's response (R. 52), the district court agreed with the government that a historical tradition supported categorically disarming groups who were not trusted to follow the law, or "pose[d] some other danger to the political community if armed." RSA 15-16. It concluded, however, that the historical record and § 922(g)(1) did not reflect comparable burdens on the disarmed, and on this ground struck down § 922(g)(1) as facially unconstitutional. *Id.* at 16-17.

### District Court's Analysis of Second Amendment's Plain Text

The district court first considered whether the Second Amendment's plain text protects the right of felons to keep and bear arms. RSA 7-9. The court determined that it did, writing that "the government has not met its burden to prove that felons are excluded from 'the people' whose firearm possession is presumptively protected by the plain text of the Second Amendment." *Id.* at 9. The court rejected the government's position that, consistent with language employed in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *Bruen*, the right to keep and bear arms does not extend to felons, but only to "law-abiding, responsible citizens" who are "members of the political community." *Id.* at 7.

Although the district court acknowledged the Supreme Court's "repeated use of such qualified language as 'law abiding citizens'" in its Second Amendment jurisprudence, it concluded that other aspects of the Court's discussions support a more expansive reading of the Amendment's plain text. RSA 8-9. The district court pointed to language in *Heller* stating that "'the people' as used throughout the Constitution 'unambiguously refers to all members of the political community, not an unspecified subset.'" *Id.* at 8 (citing *Heller*, 554 U.S. at 580). It also relied on Justice Alito's concurrence in *Bruen*, which stated that the opinion "decides nothing about who may lawfully possess a firearm," and on the Supreme Court's reference in *Heller* to felon-dispossession statutes as "*presumptively* lawful.'" *Id.* at 9 (citing *Bruen*, 597 U.S. at 72, and *Heller*, 554 U.S. at 627 n.26).

The district court further relied on *United States v. Meza-Rodriguez*, 798 F.3d 664 (7th Cir. 2015), and in particular, this Court's assertion that "[w]hile some of *Heller*'s language does link Second Amendment rights with the notions of 'law-abiding citizens' and 'members of the political community,' those passages did not reflect an attempt to define the term 'people.'" RSA 9 (citing *Meza-Rodriguez*, 798 F.3d at 669).

***District Court's Analysis of the Nation's Historical Tradition of Categorically Disarming "Individuals Who Have Demonstrated That They Cannot Be Trusted To Obey the Law"***

Having concluded that the Second Amendment protects a felon's right to possess firearms, the district court next considered whether § 922(g)(1) nonetheless is constitutional because it "is part of this nation's historical tradition of firearm regulation." RSA 10. The court's analysis focused on whether § 922(g)(1), relative to historical regulations, "impose[s] a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 10-11 (citing *Bruen*, 597 U.S. at 26-29). The court considered two types of historical regulations that the government argued were sufficiently analogous to § 922(g)(1): "(1) laws that categorically disqualified 'untrustworthy' adherents to the law from possessing firearms, and (2) laws that authorized capital punishment and estate forfeiture for certain felonies." *Id.* at 11; *see also id.* at 12-16, 18-21.

Regarding the first category of regulations, the district court surveyed, among other items: 17th-century English laws disarming nonconformist Protestants and Catholics based on a determination that "nonconformist groups would not participate in the Church of England, which was headed by the King of England, as a matter of law" and that "Catholics could not be trusted to obey English law and its sovereign unless they renounced their faith" (RSA 12); American colonial laws disarming Catholics, "in addition to

5

enslaved people and Native Americans" (*id.* at 13-14); "loyalty oath requirements [that] allowed states to strip the right to keep and bear arms from anyone"—including "free, Christian, white colonists (*i.e.*, the core of the political community)"—"who failed or refused to take an oath throughout colonial America and the Revolutionary War" (*id.* at 14-15); and "additional efforts to disarm individuals for crimes and danger to the public during the Founding and the ratification debates" (*id.* at 15). Based on this historical support, the court was "persuaded that the text, history, and tradition of firearm-dispossession statutes demonstrate[] that the legislature has the authority to categorically regulate firearm possession by individuals who have demonstrated that they cannot be trusted to obey the law, or pose some other danger to the political community if armed." *Id.* at 15-16. The court continued:

> The record shows that these categorical regulations are not isolated instances, and the Seventh Circuit has already determined that "Congress enacted the [categorical] exclusions in § 922(g)(1) to keep guns out of the hands of presumptively risky people." *United States v. Yancey*, 621 F.3d 681, 683 (7th Cir. 2010). The record shows that the legislature has a longstanding tradition of justifying exclusion from the right to keep and bear arms based on its assessment of that group's risk to the rule of law, whether based on mental health, criminal record, loyalty, or character.

*Id.* at 16 (alteration in original).

The district court found, however, that although § 922(g)(1) and its historical predecessors might be comparably justified, the government had failed to "provid[e] evidence of a dispossession statute with a 'comparable

burden' to § 922(g)(1)." RSA 16. The court characterized § 922(g)(1) as a "*permanent* prohibition on firearm possession by felons, which can be lifted only by expungement, federal pardon, or other method of restoring civil rights that lifts the underlying offense from a 'conviction' under § 922(g)." *Id.* at 16-17; *see also id.* at 17 n.5 (reasoning that "once a felony conviction is expunged, the individual is no longer a felon with a 'crime punishable by imprisonment for a term exceeding one year' and, therefore, not covered by § 922(g)(1)"). The court observed that "loyalty oath laws, which are the strongest analogue to § 922(g)(1), allowed individuals deemed 'untrustworthy' to regain their right to keep and bear arms by swearing an oath to a state or the United States, or by renouncing their faith," but found that "there is no similar opportunity under § 922(g)(1) for felons to regain their rights after demonstrating their ability to abide by the rule of law." *Id.* at 17.

### District Court's Analysis of Historical Laws Authorizing Capital Punishment and Estate Forfeiture for Certain Felonies

The district court separately evaluated the government's argument analogizing § 922(g)(1) to a historical tradition of authorizing capital punishment and estate forfeiture for certain felonies. RSA 18-21. The court found that these laws "are not comparably justified and do not impose a comparable burden" to § 922(g)(1) because, with respect to capital punishment, "certain severe offenses were *not* punishable by death or life imprisonment"

and, with respect to estate forfeiture, although "the offender was stripped of his then-existing estate, including any firearms, he could presumably repurchase arms upon successfully serving his sentence and reintegrating into society." *Id.* at 19 (citing *Range v. Attorney Gen. of the U.S.*, 69 F.4th 96, 127-28 (3d Cir. 2023) (Krause, J., dissenting)) (cleaned up).

The court further reasoned that capital punishment and estate forfeiture were "punishments" for felony offenses, whereas disarmament under § 922(g)(1) represents a "consequence" for one's status as a felon. RSA 19-21. For this reason, too, the court viewed the historical record as "distinct" from its modern-day counterpart. *Id.* at 20.

### District Court's Analysis of Defendant's As-Applied Constitutional Challenge

Finally, the district court rejected defendant's argument that § 922(g)(1) is unconstitutional as applied to him. RSA 16. The court "reject[ed] the notion that history calls for an individualized assessment of risk, or a distinction between violent and nonviolent felonies." *Id.* It wrote that "[t]he record clearly demonstrates that across-the-board disqualifications from gun ownership are a part of this nation's traditional approach to gun regulation." *Id.*; *see also id.* at 18 (noting "dangers in constructing legislation that would invite courts to 'consider the particular facts of every case'") (quoting *Atkinson v. Garland*, 70 F.4th 1018, 1027 (7th Cir. 2023) (Wood, J., dissenting)).

## SUMMARY OF ARGUMENT

Under the Second Amendment, § 922(g)(1) is constitutional on its face. By its plain text, the Second Amendment does not protect a felon's right to keep and bear arms. "The people" who enjoy that right have never been understood to include individuals, such as felons, who have forfeited their membership in the political community. Instead, as history shows, and as the Supreme Court has stated time and again, the Second Amendment's protections extend only to "law-abiding, responsible citizens."

Section 922(g)(1) is constitutional under this nation's historical tradition of firearms regulation as well. By enacting § 922(g)(1), Congress sought to curb crime by keeping firearms from those with criminal backgrounds. This objective has grown only more pressing over time, as the "dramatic technological changes" contemplated by *Bruen* have increased both the number of available firearms and their destructive nature. Because this nation's historical tradition encompasses the categorical disarmament of untrustworthy adherents to the law, as well as penalties for felonies that subsumed disarmament, § 922(g)(1) is sufficiently analogous with that tradition to satisfy *Bruen*.

The district court here properly recognized the parallel justifications behind § 922(g)(1) and historical disarmament laws. Its decision to strike down § 922(g)(1)—and, in so doing, to part ways with more than 600 contrary rulings

from courts around the country—hinged on the serious misconception that, unlike its historical predecessors, § 922(g)(1) permanently disarms felons. Because the district court's reasoning errs in this regard, this Court should vacate the judgment and remand for further proceedings.

## STANDARD OF REVIEW

This Court reviews a district court's decision concerning the constitutionality of a statute de novo. *See United States v. Johnson*, 42 F.4th 743, 746 (7th Cir. 2022).

## ARGUMENT

### I.    Background

#### A.    Legislative History of 18 U.S.C. § 922(g)(1)

Federal statutes banning felons from possessing firearms were first enacted in the early 20th century. In 1932, Congress passed a law imposing restrictions on the possession of machine guns, sawed-off shotguns, and certain other weapons in the District of Columbia. *See Binderup v. Attorney Gen. of the U.S.*, 836 F.3d 336, 390 (3d Cir. 2016) (Fuentes, J., concurring in part). That law also made it illegal for any "person who has been convicted in the District of Columbia or elsewhere of a crime of violence [to] own or have in his possession a pistol, within the District." *Id.* In 1938, Congress enacted the Federal Firearms Act, which more broadly disqualified felons convicted of "crimes of violence" from "receiving" firearms or ammunition that had been

shipped in interstate commerce. *Id.*; *see also United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010). "[T]he ban on possession by *all* felons was not enacted until 1961." *Skoien*, 614 F.3d at 640 (citing Pub. L. 87–342, 75 Stat. 757, as extending "the disqualification to all persons convicted of any 'crime punishable by imprisonment for a term exceeding one year,' the current federal definition of a 'felony'"). In 1968, Congress changed the "receipt" element from the 1938 law to "possession" and enacted, through the Omnibus Crime Control and Safe Streets Act of 1968, § 922(g)(1) in its current form. *Id.*

The Omnibus Act "was enacted in response to the precipitous rise in political assassinations, riots, and other violent crimes involving firearms, that occurred in this country in the 1960's." *Lewis v. United States*, 445 U.S. 55, 63 (1980). "[C]oncerned with the widespread traffic in firearms and with their general availability to those whose possession thereof was contrary to the public interest," Congress "determined that the ease with which firearms could be obtained contributed significantly to the prevalence of lawlessness and violent crime in the United States." *Huddleston v. United States*, 415 U.S. 814, 824 (1974); *United States v. Jackson*, 69 F.4th 495, 504-05 (8th Cir. 2023) (Congress found that "only through adequate Federal control over interstate and foreign commerce in these weapons" could "this grave problem be properly dealt with") (quoting Pub. L. No. 90-351, § 901(a)(3), 82 Stat. 225, 225). Through its 1968 legislation, "Congress sought . . . to keep guns out of the

hands of those who have demonstrated that 'they may not be trusted to possess a firearm without becoming a threat to society.'" *Lewis*, 445 U.S. at 63 (quoting *Scarborough v. United States*, 431 U.S. 563, 572 (1977)). Its "principal purpose . . . was to curb crime by keeping firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency." *Huddleston*, 415 U.S. at 824 (internal citation and quotation marks omitted).

Under § 922(g)(1), a person is prohibited from possessing a firearm in or affecting commerce if he has been convicted of a "crime punishable by imprisonment for a term exceeding one year." 18 U.S.C. § 922(g)(1). The provision is subject to exceptions. It does not cover offenses "pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices." 18 U.S.C. § 921(a)(20)(A). It does not cover state offenses that are "classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less." *Id.* § 921(a)(20)(B). And it does not cover convictions that have "been expunged, or set aside or for which a person has been pardoned or has had civil rights restored . . . unless such pardon, expungement, or

restoration of civil rights expressly provides that the person may not . . . possess . . . firearms." *Id.*[2]

## B. Supreme Court Precedent Concerning Prohibitions on Felons' Possession of Firearms.

In *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008), the Supreme Court held that the Second Amendment protects the individual "right of law-abiding, responsible citizens" to possess handguns in the home for self-defense. Consistent with that conclusion, *Heller* cautioned that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill," and it described those restrictions as "presumptively lawful regulatory measures." *Id.* at 626, 627 n.26. *Heller* incorporated that understanding into its holding, ruling that the plaintiff was entitled to possess a handgun only if he was "not disqualified from the exercise of Second Amendment rights"—meaning, among other things, that he was "not a felon." *Id.* at 631, 635. That "exception[]," *Heller* explained, had "historical justifications," which the Supreme Court would have "time enough to expound upon" "if and when" the exception came "before" it. *Id.* at 635. *See also New*

---

[2] Until 1992, Congress also allowed a felon to obtain relief from § 922(g)(1)'s bar to possessing a firearm by demonstrating to the Bureau of Alcohol, Tobacco, Firearms and Explosives that "the circumstances regarding the disability, and [his] record and reputation, are such that [he] will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest." 18 U.S.C. § 925(c). Since 1992, Congress effectively has suspended that provision by prohibiting the use of federal funds to process applications for relief. *See Logan v. United States*, 552 U.S. 23, 28 n.1 (2007).

York State Rifle & Pistol Ass'n, Inc. v. City of New York, 140 S. Ct. 1525, 1540-41 (2020) (*Heller* "recognized that history supported the constitutionality of some laws limiting the right to possess a firearm," including laws "prohibiting possession by felons and other dangerous individuals") (Alito, J., joined by Thomas and Gorsuch, JJ., dissenting).[3]

Two years later, in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Supreme Court extended *Heller* to state and local governments. In so doing, it "repeat[ed] [its] assurances" that *Heller* "did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons.'" *Id.* at 786 (quoting *Heller*, 554 U.S. at 626-27). *McDonald* added: "Despite municipal respondents' doomsday proclamations, incorporation does not imperil every law regulating firearms." *Id.*

In *Bruen*, the Supreme Court again emphasized that the right to keep and bear arms belongs to "law-abiding, responsible citizens." 597 U.S. at 26 (quoting *Heller*, 554 U.S. at 635). Although *Bruen* did not explicitly decide "who may lawfully possess a firearm or the requirements that must be met to buy a gun," *id.* at 72 (Alito, J., concurring), it characterized the holders of Second Amendment rights as "law-abiding" citizens no fewer than 14 times. For

---

[3] The majority in *New York State Rifle & Pistol Association* concluded that petitioners' Second Amendment claim was rendered moot after New York amended the challenged firearms regulation. 140 S. Ct. at 1526.

example, *Bruen* concluded that the New York statute at issue "prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms," *id.* at 71; explained that the Second Amendment "'elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense," *id.* at 26 (quoting *Heller*, 554 U.S. at 635); and instructed courts to identify historical analogues to modern firearm regulations by assessing "how and why the regulations burden a law-abiding citizen's right to armed self-defense," *id.* at 29.[4]

In the same vein, Justice Kavanaugh, writing separately and joined by Chief Justice Roberts, stated that "longstanding prohibitions on the possession of firearms by felons" remain "presumptively lawful." *Id.* at 81 (cleaned up). In his concurrence, Justice Alito likewise explained that *Bruen* did not "disturb[] anything that [the Court] said in *Heller* or [*McDonald*] about restrictions that may be imposed on the possession or carrying of guns." 597 U.S. at 72 (internal citation omitted). *See also id.* at 129-30 (Breyer, J., joined by Sotomayor and Kagan, JJ., dissenting) (same). In other words, six Justices in *Bruen* emphasized that prohibitions on felons' possession of firearms are presumptively constitutional.

---

[4] *See also Bruen*, 597 U.S. at 9, 15, 30-31, 33 n.8, 38 & n.9, 60, 70.

Post-*Bruen*, nearly every federal court to have addressed the constitutionality of § 922(g)(1)—in more than 600 separate rulings to date—has concluded that the statute is constitutional. This number includes rulings from three appeals courts. *See United States v. Dubois*, --- F.4th ----, 2024 WL 927030 (11th Cir. March 5, 2024); *Vincent v. Garland*, 80 F.4th 1197 (10th Cir. 2023); *Jackson*, 69 F.4th at 495.[5] *But see Range v. Attorney Gen. of the U.S.*, 69 F.4th 96 (3d Cir. 2023) (en banc) (holding § 922(g)(1) unconstitutional as applied to an individual with a 1995 conviction under a misdemeanor statute criminalizing the making of a false statement to obtain food stamps).

## II. Analysis

Under *Bruen*, courts assess constitutional challenges to firearms laws using "a test rooted in the Second Amendment's text, as informed by history." 597 U.S. at 19. Under that test, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 24. Under *Bru*en, defendant bears the burden of establishing

---

[5] This number also includes rulings from approximately 29 district courts in this Circuit. *See, e.g.*, *United States v. Price*, 656 F. Supp. 3d 772 (N.D. Ill. 2023); *United States v. Rice*, 662 F. Supp. 3d 935 (N.D. Ind. 2023); *United States v. Gates*, No. 22-CR-397, 2023 WL 5748362 (N.D. Ill. Sept. 6, 2023); *United States v. Reggie Johnson*, No. 18-CR-458, 2023 WL 6690388 (N.D. Ill. Oct. 12, 2023); *United States v. Hardy*, No. 23-CR-129, 2023 WL 6795591 (N.D. Ill. Oct. 13, 2023); *United States v. Khiry Jackson*, No. 20-CR-298, 2023 WL 7160921 (N.D. Ill. Oct. 31, 2023); *United States v. Javion Johnson*, No. 22-CR-254, 2023 WL 7284848 (E.D. Wis. Nov. 3, 2023); *United States v. Brady*, No. 1:22-CR-47, 2023 WL 7553859 (N.D. Ind. Nov. 13, 2023); *United States v. Sloat*, No. 3:22-CR-30017, 2023 WL 8455112 (S.D. Ill. Dec. 6, 2023); *United States v. Ieliot Jackson*, No. 21-CR-175, 2023 WL 8601498 (N.D. Ill. Dec. 12, 2023).

that particular conduct—his possession of a firearm—is protected by the Second Amendment's plain language. *See Bruen*, 597 U.S. at 24-25 (analogizing to the First Amendment); *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984) ("Although it is common to place the burden upon the Government to justify impingements on First Amendment interests, it is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies."); *Consolino v. Towne*, 872 F.3d 825, 829 (7th Cir. 2017) ("[I]n proving a First Amendment claim, the initial burden is on the plaintiff to demonstrate that his conduct was constitutionally protected.") (quoting *Yahnke v. Kane County, Ill.*, 823 F.3d 1066, 1070-71 (7th Cir. 2016)) (alteration in original).

If defendant meets this burden, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* (citing *Konigsberg v. State Bar of Cal.*, 366 U.S. 36 50, n.10 (1961)).

The district court erred when applying this test. The Second Amendment does not presumptively protect a felon's right to possess firearms. Felons do not fall within "the people" protected by the Second Amendment, and their "right . . . to keep and bear Arms" therefore is not "infringed" by § 922(g)(1).

Even if a felon's right to possess firearms were presumptively protected by the Second Amendment, § 922(g)(1) would remain constitutional because it is consistent with our nation's historical tradition of firearms regulation.

## A. Felons' Possession of Firearms Is Not Protected Under the Second Amendment's Plain Text.

Under the Second Amendment, "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. By its plain text, the amendment does not cover felons disqualified from possessing firearms under § 922(g)(1). Felons are not among "the people" protected by the Second Amendment, and the Second Amendment historically has been understood as protecting only law-abiding individuals. This Circuit's precedent does not hold otherwise.

### 1. Felons Are Not Among "the People" Protected by the Second Amendment.

"The people" is "a term of art employed in select parts of the Constitution" to refer to "a class of persons who are part of a national community." *Heller*, 554 U.S. at 580 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). Although *Heller* began with the "strong presumption that the Second Amendment right . . . belongs to all Americans," it ultimately limited the right to "members of the political community." *Id*.

The Second Amendment's background illuminates the reasons for that limitation. The Founders codified the right to bear arms because they regarded

18

a "citizens' militia" as an important "safeguard against tyranny." *Heller*, 554 U.S. at 600. Justice Story, for instance, described the right to bear arms as the "palladium of the liberties of a republic" and explained that it "enable[s] the people to resist and triumph over" the "usurpation and arbitrary power of rulers." 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1890, at 746 (1833). It makes sense that a right codified to enable the polity to "resist tyranny," *Heller*, 554 U.S. at 598, would be limited to its members.

These members do not include felons. Because they have forfeited their membership in the political community, felons are not among "the people" protected by the Second Amendment. *Cf. Voisine v. United States*, 579 U.S. 686, 715 (2016) (Thomas, J., dissenting) (tying *Heller*'s approval of felon disarmament to the understanding that certain individuals "are beyond the scope of the 'People' protected by the Second Amendment"). States have long denied felons the rights of members of the polity—including the right to vote, *see* U.S. Const. amend. XIV, § 2; *Richardson v. Ramirez*, 418 U.S. 24, 41-56 (1974); the right to hold public office, *see Spencer v. Kemna*, 523 U.S. 1, 8-9 (1998); and the right to serve on juries, *see id.*; *Medina v. Whitaker*, 913 F.3d 152, 160 (D.C. Cir. 2019). As a leading 19th-century scholar explained, "the felon" has "been almost universally excluded" from "the people in whom is vested the sovereignty of the State." Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States*

*of the American Union* 28-29 (1868); *see also Heller*, 554 U.S. at 616 (relying on Cooley's "massively popular 1868 Treatise" for historical support).

> **2.    The Right To Bear Arms Extends Only to Law-Abiding Individuals.**

Apart from the Second Amendment's textual limitation of the right to bear arms to "the people," the right has historically been understood to extend only to law-abiding persons. It thus does not extend to felons.

In England before the founding, felons had no right to keep and bear arms. The standard penalty for a felony was death. *See* 4 William Blackstone, *Commentaries on the Laws of England* 98 (1769). That punishment extended even to non-violent felonies, such as smuggling, *id.* at 155; fraudulent bankruptcy, *id.* at 156; violating quarantine, *id.* at 162; forging a marriage license, *id.* at 163; and cutting down a cherry tree, *id.* at 4. A felon awaiting execution would be held in prison—where he would have no access to arms. *See id.* at 131 (discussing a statute making it unlawful to provide "any arms" to a "prisoner in custody for treason or felony"). A conviction would also usually result in the escheat of the felon's estate and the forfeiture of all his goods and chattels—including, of course, his arms. *See id.* at 379-82. A convicted felon, finally, was deemed "already dead in law" even before his execution. *Id.* at 373-74.

Early Americans accepted that legislatures had the power to subject felons to similar deprivations. Thus, "death was 'the standard penalty for all serious crimes' at the time of the founding." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1122 (2019) (citation omitted). As in England, the death penalty extended even to non-violent crimes, such as forgery and horse theft. *See Medina*, 913 F.3d at 158. Many states also subjected certain felons to the complete forfeiture of their estates or their goods and chattels. *See* Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277, 332 nn. 275-276 (2014) (collecting statutes). And at least some States enacted statutes carrying forward the common-law doctrine of civil death. *See, e.g.*, *In re Deming*, 10 Johns. 232, 233 (N.Y. 1813).

Those punishments were justified by the belief that a person can lose his legal rights by violating "his part of the [social] contract." 4 Blackstone 375. Capital punishment, for example, was justified on the ground that the right to life can be "forfeited for the breach of th[e] laws of society." 1 William Blackstone, *Commentaries on the Laws of England* 129 (1765). The confiscation of felons' estates was likewise justified on the ground that "property was a right derived from society which one lost by violating society's laws." *Austin* v. *United States*, 509 U.S. 602, 612 (1993); *see Calero-Toledo* v. *Pearson Yacht Leasing Co.*, 416 U.S. 663, 682 (1974) ("[A] breach of the criminal law . . . was felt to justify denial of the right to own property."). And

civil death was justified on the ground that someone who has committed a felony should no longer possess "any rights growing out of organized society." *Avery v. Everett*, 18 N.E. 148, 155 (N.Y. 1888) (Earl, J., dissenting).

Some founding-era sources expressly recognized that the right to bear arms extended only to law-abiding individuals. In 1780, for example, the Town of Williamsburg, Massachusetts, adopted a resolution proclaiming: "we esteem it an essential privilege to keep Arms in Our houses for Our Own Defence and *while we Continue honest and Lawfull Subjects of Government* we Ought Never to be deprived of them." *The Popular Sources of Political Authority: Documents on the Massachusetts Constitution of 1780*, at 624 (Oscar Handlin & Mary Handlin eds. 1966) (emphasis added). And Anti-Federalists at the Pennsylvania ratifying convention proposed a bill of rights that, among other things, forbade "disarming the people, or any of them, *unless for crimes committed*, or real danger of public injury from individuals." *See* 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 627, 665 (1971) (emphasis added).[6] Given these historical sources, "it is difficult to conclude that the

---

[6] *Heller* described Pennsylvania's minority proposal as "highly influential," 554 U.S. at 604, likely because, as another court has explained, "it represents the view of the Anti-federalists—the folk advocating for very limited federal power, opposing the Constitution generally, but advocating for a strong Bill of Rights," *see United States v. Coombes*, 629 F. Supp. 3d 1149, 1158 (N.D. Okla. 2022) (citing *United States v. Tooley*, 717 F. Supp. 2d 580, 590 (S.D. W. Va. 2010)). *Coombes*, quoting *Tooley*, continued: "Even these advocates of broad individual and state rights viewed the right to possess and carry arms as limited—particularly from those who had committed crimes or were a danger to the public." *Id.*

public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms." *Medina*, 913 F.3d at 158.

Furthermore, by proposing that the Second Amendment not extend to those who had committed crimes and also not extend to those whose actions present a "real danger of public injury," the Pennsylvania proposal reflected a historical understanding of the right to bear arms as belonging only to the law-abiding and only to groups deemed responsible enough to be entrusted with firearms. Those categories of individuals would necessarily exclude felons. *See also infra* at 51-55 (discussing historical tradition of disarming dangerous individuals).

Supreme Court caselaw regarding the scope of Second Amendment rights reinforces this reading. As noted earlier, *Heller*, *McDonald*, and *Bruen* all explained that the Second Amendment codified a "right of law-abiding, responsible citizens" and that "longstanding prohibitions on the possession of firearms by felons" were "presumptively lawful." *E.g.*, *Heller*, 554 U.S. at 626-27 & n.26, 635; *McDonald*, 561 U.S. at 786; *Bruen*, 597 U.S. at 26, 29, 71-72, 81. Two additional aspects of *Bruen* confirm that a person's status as non-law-abiding resolves the threshold question of whether the Second Amendment extends to them.

First, *Bruen* addressed whether petitioners there were law abiding when addressing the Second Amendment's textual scope, not when addressing historical precursors supporting the challenged firearms regulation. 597 U.S. at 31-32. *Bruen* observed that the parties did not dispute "that petitioners Koch and Nash—two ordinary, law-abiding, adult citizens—are part of 'the people' whom the Second Amendment protects." *Id.* (citing *Heller*, 554 U.S. at 580). *Bruen* thus signaled that the Second Amendment covered petitioners *because* they were undisputedly law-abiding, responsible citizens.

Second, *Bruen* stated that its reasoning should not "be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes," which "do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right." 597 U.S. at 38 n.9 (citing *Heller*, 554 U.S. at 635); *see also id.* at 80 (Kavanaugh and Roberts, JJ., concurring) ("[T]he 43 States that employ objective shall-issue licensing regimes for carrying handguns for self-defense may continue to do so."). Those regimes require background checks and set "narrow, objective, and definite standards" meant to ensure "that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens." *Id.* at 38 n.9 (internal quotation marks omitted). By writing that those regimes remain broadly constitutional, *Bruen* strongly implied that the Second Amendment's text excludes people, like felons, who are not law-abiding. Otherwise, the objective criteria of most shall-

issue states disqualifying applicants for licenses—and thus preventing them from bearing arms—would be presumptively unlawful and could survive only through case-by-case, historical inquiries. *Bruen* suggested no such thing.

### 3. This Circuit's Precedent Does Not Extend the Second Amendment's Protections to Felons.

*United States v. Meza-Rodriguez,* 798 F.3d 664 (7th Cir. 2015), does not alter the above analysis. In *Meza-Rodriguez,* this Court concluded that unauthorized non-U.S. citizens with substantial connections to the country can invoke the Second Amendment's protections. *Id.* at 669-72. *Meza-Rodriguez* said nothing about whether felons were entitled to the same protections. Instead, *Meza-Rodriguez* acknowledged that "*Heller*'s language does link Second Amendment rights with the notions of 'law-abiding citizens' and 'members of the political community.'" *Id.* at 669 (citing *Heller*, 554 U.S. at 580, 625). Although *Meza-Rodriguez* explained that it was "reluctant to place more weight on these passing references than the [*Heller*] Court itself did," *id.*, because *Meza-Rodriguez* was written pre-*Bruen*, it did not have the benefit of *Bruen's* recurrent use of—not just passing reference to—the phrase "law-abiding citizens" to describe the Second Amendment's scope. *See Atkinson*, 70 F.4th at 1023 (recognizing that *Meza-Rodriguez* "analyzed the scope of the Second Amendment right before *Bruen*" and this Court has "not returned to the issue since then").

*Meza-Rodriguez* cannot be viewed as this Court's definitive guidance on the scope of "the people" for another reason as well. Four years after *Meza-Rodriguez*, this Court reviewed a Second Amendment challenge to § 922(g)(1). *See Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019). In so doing, the *Kanter* majority expressly contemplated upholding § 922(g)(1) using the same theory of "civic virtue" relied upon in *United States v. Yancey*, 621 F.3d 681 (7th Cir. 2010) (per curiam), to uphold the constitutionality of 18 U.S.C. § 922(g)(3), which prohibits habitual drug users from possessing firearms. *See Kanter*, 919 F.3d at 445-46. Under that theory, felons are not part of "the people" protected by the Second Amendment because, historically, they were considered "unvirtuous citizens" who, on that basis, could be disarmed. *See Yancey*, 621 F.3d at 684-85 ("[M]ost scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'") (citing *United States v. Vongxay,* 594 F.3d 1111, 1118 (9th Cir. 2010)). *Kanter* "ultimately demurred on reaching such a conclusion and resolved the case at the second step of the pre-*Bruen* Second Amendment framework," but its very consideration of *Yancey*'s civic-virtue approach reflects that *Meza-Rodriguez*

did not settle the meaning of "the people." *See United States v. Posey*, 655 F. Supp. 3d 762, 770-71 (N.D. Ind. 2023); *see also Kanter*, 919 F.3d at 447.[7]

Finally, interpreting "the people" for purposes of the Second Amendment as limited to members of the political community—and thus, as excluding felons whose convictions have not been expunged or whose right to keep and bear arms has not been restored—is consistent with how that same phrase is used in other constitutional provisions setting forth rights that come with membership in the polity. For example, felons were not among "the People" who adopted the Constitution, *see* U.S. Const. pmbl.; and are not among "the People" who are entitled to elect members of Congress, *see id.* art. I, § 2; cl. 1;

---

[7] In her *Kanter* dissent, then-Judge Barrett concluded that a particular felon fell within the Second Amendment's scope, reasoning that "history and tradition" are to be used "to identify the scope of the legislature's power to take . . . away" the right to keep and bear arms, not to "say that certain *people* fall outside the [Second] Amendment's scope." 919 F.3d at 452-53. *Bruen* says otherwise, however: It instructs courts to consider whether "the Second Amendment's plain text covers an individual's conduct," as well the legislature's power to regulate that individual's conduct. 597 U.S. at 24. *See also United States v. Sitladeen*, 64 F.4th 978, 986-87 (8th Cir. 2023) ("*Bruen* does not command us to consider only 'conduct' in isolation and simply assume that a regulated person is part of 'the people.'").

*id.* amend XVII, cls. 1-2. *See Meza-Rodriguez*, 798 F.3d at 670; *United States v. Collette*, 630 F. Supp. 3d 841, 848-49 (W.D. Tex. 2022).[8]

So, too, where *Heller* and *Bruen* referred to those whose rights were protected by the Second Amendment as "members of the political community" and "law-abiding" citizens, felons disarmed under § 922(g)(1) are not among "the people" entitled to keep and bear arms.

## B.    Section 922(g)(1) Is Part of This Nation's Historical Tradition of Firearms Regulation and Thus Constitutional Under the Second Amendment.

Even if the Second Amendment protects felons' possession of firearms, § 922(g)(1) remains constitutional because it "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 597 U.S. at 19. Two types of laws are pertinent to that historical tradition: laws categorically disarming groups considered untrustworthy adherents to the

---

[8] To be sure, *Meza-Rodriguez* understood *Heller* as implying that "the people" must have the same meaning throughout the Bill of Rights. 798 F.3d at 669-70 (discussing *Verdugo-Urquidez*, 494 U.S. at 265, which defined "the people"—for purposes of the Fourth Amendment—as "persons who are part of a national community"). The members of the *Heller* Court, however, appear to have understood *Heller* differently. In his dissent in *Heller*, Justice Stevens noted that by defining "the people" in the Second Amendment as the "members of the political community," the majority "reads the Second Amendment to protect a 'subset' significantly narrower than the class of persons protected by the First and Fourth Amendments." 554 U.S. at 644. "And it is not as if the *Heller* majority was unaware of *Verdugo-Urquidez*'s 'national community' definition—the *Heller* majority directly quoted it in the sentence immediately following where it announced that 'the people' in the Second Amendment means only those in the '"political community."' *See United States v. Lane*, No. 3:23CR62, 2023 WL 5663084, at *12 (E.D. Va. Aug. 31, 2023).

law; and laws punishing felons. These laws, which began in England and continued through the founding era, demonstrate that targeting non-law-abiding persons for disarmament is an apt analogy to modern-day felony dispossession.

The government details these laws next. It then analyzes how they satisfy *Bruen*'s historical-inquiry directive, as set forth by the Supreme Court, 597 U.S. at 26-29, and how they answer the questions posed by this Court in *Atkinson*, 70 F.4th at 1023-24.

### 1. Categorical Disarmament of Those Considered Untrustworthy Adherents to the Law.

*England.* In late 17th-century England, legislatures enjoyed the authority to disarm classes of people who, in their view, could not be relied upon to obey the rule of law. *See Bruen*, 597 U.S. at 20 (relying on "English history dating from the late 1600s" to interpret the Second Amendment). In 1689, for example, the English government passed a law disarming Catholics who refused to make declarations renouncing their faith. 1 W. & M., Sess. 1, c. 15, in 6 *The Statutes of the Realm* 71-73 (1688). This "Act for the better securing the Government by disarming Papists and reputed Papists" provided that a Catholic individual could not "have or keepe in his House or elsewhere" any "Arms[,] Weapons[,] Gunpowder[,] or Ammunition (other than such necessary Weapons as shall be allowed to him by Order of the Justices of the

Peace . . . for the defence of his House or person)." *Id.*; *see also Jackson*, 69 F.4th at 502. Enacted shortly after the Glorious Revolution of 1688—when Protestant King William and Queen Mary succeeded Catholic King James II—this statute reflected the new government's perception that Catholics who refused to renounce their faith (and allegiance to the Pope) could not be trusted to obey English law. *Range*, 69 F.4th at 121-22 (Krause, J., dissenting); *Jackson*, 69 F.4th at 502. This prohibition was not based on a theory that all Catholics were, in fact, dangerous; rather, the categorical disarmament was based on concerns with a group's propensity to disobey the sovereign and the risk that presented to the social order. *Range*, 69 F.4th at 121-22 (Krause, J., dissenting); *Kanter*, 919 F.3d at 457 (Barrett, J., dissenting) (relying on sources concluding that "[the English] Parliament disarmed Catholics because the Protestant majority found them 'untrustworthy'" and therefore posed a threat).

Such untrustworthiness, not demonstrated danger, as a reason for categorical disarmament has other roots in English history. For instance, "[f]ollowing the tumult of the English Civil War, the restored Stuart monarchs disarmed nonconformist (*i.e.*, non-Anglican) Protestants," even though such nonconformists included pacifist denominations like the Quakers. *See Range*, 69 F.4th at 120-21 (Krause, J., dissenting) (collecting sources). Such groups "often refused to take mandatory oaths acknowledging the King's sovereign authority over matters of religion" and, as a result, "Anglicans accused

nonconformists of believing their faith exempted them from obedience to the law." *Id.* Their commitment to non-violence did not spare their guns. *See Jackson*, 69 F.4th at 504 ("Not all persons disarmed under historical precedents . . . were violent or dangerous persons" and yet they were disarmed nonetheless).

Finally, the 1689 English Bill of Rights—the Second Amendment's predecessor—"enshrined basic civil liberties" but also Parliament's right to limit them. *See Bruen*, 597 U.S. at 44-45 (cleaned up); *Heller*, 554 U.S. at 593; *Atkinson*, 70 F.4th at 1031 (Wood, J., dissenting). It specified that "*Protestants* may have Arms for their Defence suitable to their Conditions *and as allowed by Law.*" 1 W. & M., Sess. 2, c. 2, in 6 *The Statutes of the Realm* 143 (1688) (emphases added); *see also Jackson*, 69 F.4th at 502; *Atkinson*, 70 F.4th at 1031 (Wood, J., dissenting). "Englishmen had never before claimed . . . the right of the individual to arms." *Bruen*, 597 U.S. at 44-45 (internal quotation marks and citation omitted). And yet when they first formally claimed that right, the English ensured that Parliament retained the power to arm one class of the population and to disarm another based on concerns that the latter class, as a whole, would not abide by the law. *See Atkinson*, 70 F.4th at 1031 (Wood, J., dissenting).

***Colonial America.*** The American colonies also disarmed classes of people "whom the authorities believed could not be trusted to obey the law."

*See Range*, 69 F.4th at 122 (Krause, J., dissenting); *see also id.* at 122-24 & nn.50-70 (collecting sources). Examples include the Virginia Company's 1624 disarmament of Richard Barnes, who disrespected authorities through "opprobrious" and "base and detracting speeches concerning the Governor," *id.* at 122; Massachusetts' disarmament in the 1630s of supporters of an outspoken preacher "not because those supporters had demonstrated a propensity for violence," but because "authorities concluded their conduct evinced a willingness to disobey the law," *id.* at 123;[9] Virginia's disarmament in the 1640s of "nonconformist Protestants . . . due to their rejection of the King's sovereign power over religion," *id.*; and the colonies' disarmament (in 1696 and during the Seven Years' War of 1756-1763) of Catholics and Moravians, "a group of nonconformist Protestants from modern-day Germany," *id.* at 123-24.[10]

Decisions to disarm these groups were "not in response to violence"; indeed, Moravians "were—as they are today—committed pacifists who owned weapons for hunting instead of fighting." *Id.* at 124. The groups instead were

---

[9] *See also* Edmund S. Morgan, *The Case Against Anne Hutchinson*, 10 New Eng. Q. 635, 637-38, 644, 648 (1937)); Ann Fairfax Withington & Jack Schwartz, *The Political Trial of Anne Hutchinson*, 51 New Eng. Q. 226, 226 (1978); James F. Cooper, Jr., *Anne Hutchinson and the "Lay Rebellion" Against the Clergy*, 61 New Eng. Q. 381, 391 (1988).

[10] *See also* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Firearms*, 20 Wyo. L. Rev. 249, 263 (2020).

disarmed based on their apparent "willingness to disobey the law"; seeming "[o]pposition to the king"; and "perceived unwillingness to adhere to the King's sovereign dictates." *Id.* at 123-24 (alteration in original). Moreover, "[t]hose restrictions are telling because they were imposed at a time when, before the advent of the English Bill of Rights, the charters of Virginia and Massachusetts provided unprecedented protections for colonists' firearm rights." *Id.* at 122.

Undoubtedly, today the disarmament of religious minorities would be understood as abhorrent, reprehensible, and a violation of the Equal Protection Clause—as would the categorical disarmament of Blacks and Native Americans, another practice pervasive in our country's historical tradition that is clearly contrary to its fundamental values.[11] But, considered solely for the limited purpose of the historical inquiry required by *Bruen*, these laws nonetheless "reveal conclusively the scope of governmental power that was understood to exist at the time the Second Amendment was adopted." *Atkinson*, 70 F.4th at 1035 (Wood, J., dissenting); *see also Jackson*, 69 F.4th at 503; *Range*, 69 F.4th at 122 n.50; *United States v. Agee*, No. 21-CR-350, 2023 WL 6443924, at *8 (N.D. Ill. Oct. 3, 2023) (noting that "the right to equal

---

[11] *See*, *e.g.*, *Atkinson*, 70 F.4th at 1035 & n.2 (Wood, J., dissenting) (citing "laws that disarmed persons found guilty of treason and members of native tribes"); Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* 28-29 (2006) ("Laws disarming groups such as slaves, freed blacks, Indians, and those of mixed-race ancestry were common.").

protection . . . was not interpreted as applying to federal laws until the mid-20th century, well after the ratification of the Second Amendment"); RSA 13 (district court here recognized that "[o]f course, the legislature is now rightfully prohibited from banning firearm possession" based on, among other protected characteristics, race and religion, "but these historical regulations are relevant to understanding the right to keep and bear arms").

"[O]ne can accept that the Framers denied firearms to groups they thought to be particularly dangerous (or unvirtuous, or irresponsible) without sharing their conclusion about which groups qualify as such." *See* Joseph Blocher & Catie Carberry, *Historical Gun Laws Targeting "Dangerous" Groups and Outsiders* at 12, *in* NEW HISTORIES OF GUN RIGHTS AND REGULATION: ESSAYS ON THE PLACE OF GUNS IN AMERICAN LAW AND SOCIETY (Blocher, J. et al. eds.) (forthcoming).[12] Blocher and Carberry continue:

> The historical approach resolves that gap through analogical reasoning: by suggesting that our modern prohibition is based on a principle that the Framers endorsed, even if they did not apply it to [a particular group]. But to fully understand the scope of the regulatory authority the Framers thought they had, one must actually consider the gun laws that they did pass, even if we would reject those laws (perhaps for other constitutional reasons) today.

---

[12] Available at ssrn.com/abstract=3702696 or dx.doi.org/10.2139/ssrn.3702696 (last visited March 12, 2024) as well as in the government's appendix.

*Id.* at 12-13.

***Revolutionary War.*** Throughout the Revolutionary War, legislatures continued to pass disarmament laws targeting those who failed to demonstrate loyalty to the emerging American government.

A 1775 Connecticut law provided that any person convicted of "libel[ing] or defam[ing]" any acts or resolves of the Continental Congress or the Connecticut General Assembly "made for the defence or security of the rights and privileges" of the colonies "shall be disarmed and not allowed to have or keep any arms." *The Public Records of the Colony of Connecticut From May, 1775 to June, 1776*, at 193 (1890) (1775 Conn. Law). In 1776, the Continental Congress recommended that colonial governments disarm those who were "notoriously disaffected to the cause of America" or who simply "have not associated" with the colonial governments in the war effort. *4 Journals of the Continental Congress 1774-1789*, at 205 (1906) (resolution of March 14, 1776). At least six colonies enacted legislation in this vein. *See Jackson*, 69 F.4th at 503 (pointing to Massachusetts, Virginia, Pennsylvania, Rhode Island, North Carolina, and New Jersey); *see also Atkinson*, 70 F.4th at 1034 (Wood, J., dissenting) ("During the American Revolution, several states passed laws

providing for the confiscation of weapons owned by persons who refused to swear an oath of allegiance to the state or to the United States.").[13]

A common feature of these laws was to require oaths of loyalty to the government and to strip anyone who failed or refused to take the oath of the right to bear arms. *See, e.g.*, 1776 Mass. Law at 479-81; 1776 R.I. Law at 566-67; 1777 N.C. Law at 229-31; 1777 Pa. law; at 111-13; 1777 Va. Law at 281-82. Many of these laws provided that failing or refusing to take the oath resulted in forfeiture of a bundle of additional political rights, including the rights to vote, serve on juries, and hold public office, *ibid.*, further reinforcing the longstanding connection between these political rights and arms-bearing. *Supra* at 19-20. North Carolina's and Pennsylvania's laws are particularly informative because the year before they were enacted, these states adopted constitutional provisions protecting the individual right to bear arms. *Heller*, 554 U.S. at 601; *see* N.C. Declaration of Rights of 1776 § XVII, *in* THE COMPLETE BILL OF RIGHTS: THE DRAFTS, DEBATES, SOURCES, AND

---

[13] *See also 5 The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay*, at 479-84 (1886) ("1776 Mass. Law"); *7 Records of the Colony of Rhode Island and Providence Plantations in New England*, at 567 (1862) ("1776 R.I. Law"); *1 The Public Acts of the General Assembly of North Carolina*, at 231 (1804) (1777 N.C. law); *Acts of the General Assembly of the State of New-Jersey at a Session Begun on the 27th Day of August, 1776*, at 90 (1777); *9 The Statutes at Large of Pennsylvania from 1682 to 1801*, at 112-13 (1903) ("1777 Pa. Law"); *9 The Statutes at Large; Being A Collection of All the Laws of Virginia*, at 282 (1821) ("1777 Va. Law").

ORIGINS 277-78 (Neil Cogan ed., 2d ed., 2014); Pa. Declaration of Rights of 1776 § XIII, *in* THE COMPLETE BILL OF RIGHTS, *supra*, at 278.

***Ratification Debates.*** The history behind the Second Amendment's adoption provides additional persuasive evidence that the Founders understood the right to keep and bear arms as compatible with legislative authority to disarm groups who could not be trusted to follow the law.

This evidence includes the Pennsylvania Antifederalists' proposed constitutional amendment, referenced earlier, which explicitly recognized that criminal activity and the concomitant risk of public injury provided grounds for disarmament. *Supra* at 22-23; *Medina*, 913 F.3d at 158-59 (explaining the proposal reflected that "criminals . . . were proper subjects of disarmament"). At the Massachusetts convention, Samuel Adams similarly proposed an amendment providing that the Constitution shall "never [be] construed . . . to prevent the people of the United States, who are peaceable citizens, from keeping their own arms." Schwartz, *supra* at 675, 681. And in New Hampshire, the convention recommended an amendment providing that "Congress shall never disarm any Citizen unless such as are or have been in Actual Rebellion." *Id.* at 758, 761.

To be sure, the Second Amendment, as adopted, does not explicitly reference disarmament based on commission of a crime. But the proposals' existence supports the proposition that it was "obvious" to the Founders that

persons who committed crimes would properly be subject to disarmament laws. *See* Cooley, *supra*, at 29; Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms* 273 (2008) (writing that the Founders "did not object to the lack of an explicit exclusion of criminals from the individual right to keep and bear arms" during the debates over "what became the Second Amendment" because this limitation "was understood"). Moreover, this Court has directed courts and litigants to examine "proposals emerging from the states' constitutional ratifying conventions" when assessing the constitutionality of § 922(g)(1). *See Atkinson*, 70 F.4th at 1023.

### 2. Felony Punishment Laws.

As described earlier, in England, felons had no right to keep and bear arms; instead, the standard penalty for a felony was death, and estate forfeiture was a common punishment as well. As also described above, early

Americans followed suit. *Supra* at 20-21.[14] Because the traditional punishment for serious crimes was death, early legislatures had little occasion to enact laws explicitly disarming persons convicted of such crimes. *See Range*, 69 F.4th at 126-27 (Krause, J., dissenting) ("[T]he ubiquity of the death penalty suggests that the Founding generation would have had no objection to imposing on felons the comparatively lenient penalty of disarmament.").

They did, however, enact laws disarming persons who had committed certain offenses that were not punishable by death. For example, an English statute provided that a person could not "keep arms" if he had been "convicted in a court of law of not attending the service of the church of England." 4

---

[14] *See also 2 Statutes at Large of Pennsylvania from 1682 to 1801*, at 12 (1896) (1700 Pennsylvania law punished any person convicted of "wilfully firing any man's house, warehouse, outhouse, barn or stable" with estate forfeiture and lifelong imprisonment); *id.* at 178 (1705 Pennsylvania law punished a person convicted of rape with estate forfeiture); *1 The Laws of Maryland, With the Charter, The Bill of Rights, the Constitution of the State, and its Alterations, The Declaration of Independence, and the Constitution of the United States, and its Amendments*, at 79 (1811) (1715 Maryland law punished anyone convicted of "corruptly embezzling, impairing, razing, or altering any will or record" with forfeiture of "all his goods and chattels, lands and tenements"); *Acts and Laws of The English Colony of Rhode Island and Providence-Plantations in New-England in America*, at 33-34 (1767) (1743 Rhode Island law provided that any person convicted of forging or counterfeiting bills of credit "suffer the Pains of Death" and any person knowingly passing a counterfeit bill be imprisoned, pay double damages, and "forfeit the remaining Part of his Estate (if any he hath) both real and personal, to and for the Use of the Colony"); *3 Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay*, at 545 (1878) (1750 Massachusetts law provided that rioters who refused to disperse "shall forfeit all their lands and tenements, goods and chattles"); *9 The Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature*, at 302-03 (1821) (1777 Virginia law required estate forfeiture for anyone convicted of forging or counterfeiting, or presenting for payment a wide range of forged documents).

Blackstone 55. When the Virginia Company punished Barnes for his "base" and "opprobrious" speech, they ordered him "disarmed" and declared him ineligible to exercise "any priviledge or freedom" in the colony. *See* David Thomas Konig, *"Dale's Laws" and the Non-Common Law Origins of Criminal Justice in Virginia*, 26 Am. J. Legal Hist. 354, 371 (1982). And Connecticut used disarmament as a form of punishing those convicted of "libel[ing] or defam[ing]" certain colonial resolutions. *Supra* at 35.

### 3. Section 922(g)(1) Is Sufficiently Similar to Historical Traditions of Disarming Untrustworthy Adherents to the Law and Felony Punishments.

The laws summarized above satisfy *Bruen*'s directive that, when the constitutional analysis cannot end with the Second Amendment's plain text, courts must identify "historical precursors" "analogous enough" to a modern regulation before that modern regulation can "pass constitutional muster." 597 U.S. at 30. Simply put: The plain text of the Second Amendment aside, § 922(g)(1) is constitutional on its face because the statute is sufficiently analogous to historical traditions of categorically disarming untrustworthy adherents to the law and punishing felons through death and estate forfeiture.

*Bruen* did not provide courts with "an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment." *Id.* at 29. Still, it directed courts to treat as "*central* considerations," "whether modern and historical regulations impose a comparable burden on the right of

armed self-defense and whether that burden is comparably justified." *Id.* (cleaned up); *see also id.* ("*Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense"). *Bruen* further explained that "analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check." *Id.* at 30. Although "courts should not uphold every modern law that remotely resembles a historical analogue," *Bruen* stressed that "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* (emphases in original). It continued: "So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

In applying this reasoning to New York's proper-cause requirement for public carry licenses—the firearm prohibition at issue in *Bruen*—the Supreme Court concluded that New York's requirement addressed a societal problem that existed in the 18th century ("handgun violence, primarily in urban areas"). *Id.* at 27 (cleaned up). It further found that New York was unable to identify a historical precursor "distinctly similar" to the modern regulation: a broad prohibition on the public carry of commonly used firearms for personal defense, or a limitation of the right to public carry to law-abiding citizens who had demonstrated a special need for self-defense. *Id.* at 38. Importantly, *Bruen*

did not find this conclusion fatal to the state's case. "[T]he lack of a distinctly similar historical regulation"—while "*relevant* evidence that the challenged regulation is inconsistent with the Second Amendment"—was not dispositive. *Id.* at 26-27 (emphasis added). Instead, *Bruen* compared the various justifications for, and burdens imposed by, the historical analogues offered by New York to the challenged firearm regulation. *See generally id.* at 38-70. *accord United States v. Ball*, No. 22-CR-00449, 2023 WL 8433981, at *8 (N.D. Ill. Dec. 5, 2023).[15]

Here, § 922(g)(1) can be understood as addressing a "general societal problem that has persisted since the 18th century" in that the statute categorically disarms untrustworthy adherents to the rule of law—namely, felons. *See Atkinson*, 70 F.4th at 1023. Through its passage, "Congress sought . . . to keep guns out of the hands of those who have demonstrated that they may not be trusted to possess a firearm without becoming a threat to society."

---

[15] *See also Bruen*, 597 U.S. at 50 (rejecting respondents' efforts to rely on post-Ratification public-carry restrictions because "none of these restrictions imposed a substantial burden on public carry analogous to the burden created by New York's restrictive licensing regime"); *id.* at 55 (rejecting respondents' efforts to analogize New York's proper-cause requirement to "surety statutes that required certain individuals to post bond before carrying weapons in public" because "[t]hese laws were not *bans* on public carry, and they typically targeted only those threatening to do harm"); *id.* at 64-65 (acknowledging that "one can analogize" the "reasonable grounds" standard articulated in postbellum Texas cases with New York's proper-cause requirement); *id.* at 68-69 (rejecting reliance on territorial laws prohibiting public carry of firearms "[a]bsent any evidence explaining *why* these . . . prohibitions" were considered legal).

*See Lewis*, 445 U.S. at 63 (cleaned up). In that regard, § 922(g)(1) is sufficiently analogous to English, colonial, and early American laws categorically disarming groups perceived to present a risk to public safety through non-adherence to the law, rather than as a response to specific acts of crime or violence.

At the same time, § 922(g)(1) also addresses "unprecedented societal concerns" that, under *Bruen*, warrant a "more nuanced approach." 597 U.S. at 27. As stated earlier, Congress enacted the statute to address proliferation of gun violence, including a "precipitous rise in political assassinations, riots, and other violent crimes involving firearms," and the enormous consequences of those crimes. *See Lewis*, 445 U.S. at 63. This was a "regulatory challenge[] posed by firearms" different from the challenges that "preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Bruen*, 597 U.S. at 27. During earlier eras and the modern day both, legislators were motivated to keep firearms from those who could not be trusted to use them in accordance with the law. But § 922(g)(1) reflects a focus on the heightened nature of these concerns in the 1960s, with Congress determining that "the widespread traffic in firearms," "their general availability," and the "ease with which firearms could be obtained" had contributed "significantly to the prevalence of lawlessness and violent crime in the United States." *Huddleston*, 415 U.S. at 824. In other words, by the 1960s, a problem faced in some fashion in the 18th

century had developed into a substantially more urgent challenge. And it was this modern-day evolution that drove Congress to enact § 922(g)(1) and related regulations in an effort "to curb crime by keeping firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency." *Id.*

As multiple district courts post-*Bruen* have observed, the concerns of the 1960s have only been amplified over the ensuing decades. The "rapid" advances in firearms technology have "far outstripp[ed] the firearms-related problems that legislatures had to address in 1791." *See Gates*, 2023 WL 5748362, at *8 (writing that "[m]odern firearms can fire multiple rounds without reloading, whereas most guns available in 1791 'could not fire more than one shot without being reloaded'" and that "[m]odern firearms manufacturers can produce firearms at greater volumes than those in 1791") (quoting *Friedman v. City of Highland Park, Ill.*, 784 F.3d 406, 410 (7th Cir. 2015)). *Accord United States v. Drake*, No. 23-CR-21, 2023 WL 8004876, at *7 (N.D. Ind. Nov. 16, 2023); *United States v. Thompson*, No. 21-CR-00284, Dkt. 58 at 3 (N.D. Ill. Feb. 21, 2024) ("The twentieth-century problem of gun violence is different in scale and kind from the perceived risk to the social order from firearms at the founding.").

Viewed through this modern-day lens, the nation's tradition of firearms regulation supplies historical analogues sufficiently similar to satisfy *Bruen*. That history tells us that (1) across relevant eras, legislatures categorically

disarmed groups who they feared would not adhere to the law, and such a categorical prohibition specifically appeared in the English precursor to the Second Amendment; (2) the Ratification Debates reflect no meaningful founding-era disputes regarding the lawfulness of categorically disarming criminals, despite express language to that effect in influential American precursors to the Second Amendment, thus demonstrating that the Founders understood the right to bear arms to be compatible with such broad legislative authority; and (3) under English common law and throughout early American history, convicted felons were subject to capital punishment, estate forfeiture, and so-called "civil death," demonstrating that disarmament was subsumed within those greater punishments.

Although not all these predecessor laws applied specifically to felons, *Bruen* reminded courts that "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*" and "[s]o even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." 597 U.S. at 30. Moreover, the lack of an identical historical statute—particularly where there is no indication that a felon-disarmament proposal was "rejected on constitutional grounds," *id.* at 27—in no way suggests that the founding generation would have viewed § 922(g)(1) as violating the Second Amendment. Founding-era legislatures cannot be

presumed to have legislated to the full limits of their constitutional authority. *See United States v. Kelly*, No. 22-CR-37, 2022 WL 17336578, at *2 (M.D. Tenn. Nov. 16, 2022) (A "list of the laws that *happened to exist* in the founding era is . . . not the same thing as an exhaustive account of what laws would have been theoretically *believed to be permissible* by an individual sharing the original public understanding of the Constitution."); *see also Thompson*, 21-CR-00284, Dkt. 58 at 3 ("Founding era legislators likely had no reason to use felon status as a proxy for armed risk; they used other categories to accomplish their regulatory goals.").

Furthermore, the collected historical record does not represent "isolated instances of regulation." *See Atkinson*, 70 F.4th at 1024. Rather, the laws underlying this record are rooted in English common law and were adopted across the colonies before the Second Amendment's ratification. They thus supply a sufficient historical tradition to support the constitutionality of § 922(g)(1). *Contra Bruen*, 529 U.S. at 46 (doubting that "*three* colonial regulations could suffice to show a tradition of public-carry regulation"). As Judge Wood wrote in her dissent in *Atkinson*:

> Even under the English Declaration of Rights, no one thought anything of disarming people who were not loyal to the Crown, or who had committed serious crimes (called felonies), or who had abused their gun rights (often by poaching on lands to which they had no right). This history and tradition follows an unbroken line from long before the Constitution was written, through the 17th and 18th centuries up to the present day.

70 F.4th at 1037-38.

Indeed, although the district court here disagreed with the government's reliance on felony punishment laws to establish a historical tradition sufficiently comparable to § 922(g)(1) (RSA 18-21), it otherwise was "persuaded that the text, history, and tradition of firearm-dispossession statutes demonstrate[] that the legislature has the authority to categorically regulate firearm possession by individuals who have demonstrated that they cannot be trusted to obey the law, or pose some other danger to the political community if armed," *id.* at 15-16. Put another way, consistent with numerous other courts in this Circuit and around the country, the district court concluded that historical predecessors offered by the government and § 922(g)(1) shared sufficiently comparable justifications to satisfy a substantial step in *Bruen*'s historical inquiry. *See Bruen*, 597 U.S. at 29 (directing courts to consider "*why* the regulations burden a law-abiding citizen's right to armed self-defense") (emphasis added).

The district court parted ways with the government on whether § 922(g)(1) imposed a *burden* comparable to the burden imposed by its historical predecessors. The district court's decision to strike down § 922(g)(1) wholesale turned on what it perceived as a mismatch between the purportedly permanent nature of § 922(g)(1)'s disarmament and what the court construed as the founding era's temporary disarmament regimes, courtesy of laws that

"allowed individuals deemed 'untrustworthy' to regain their right to keep and bear arms by swearing an oath to a state or the United States, or by renouncing their faith." RSA 17. On this point, the district court's analysis is misguided in three ways.

*First*, the district court erroneously brushed aside the myriad ways in which § 922(g)(1)'s prohibition on firearm possession can be rendered non-permanent. As noted earlier, § 922(g)(1) explicitly excludes from disarmament felons whose convictions have been pardoned or expunged, who have received executive clemency, or whose civil rights have been restored. *See, e.g.*, 18 U.S.C. §§ 921(a)(20) and 925(c); *Atkinson*, 70 F.4th at 1035 n.3 (Wood, J., dissenting). As a result of these limits, § 922(g)(1)'s restrictions are rendered non-permanent. The district court here acknowledged only some, and not all, of these carve-outs to § 922(g)(1) and went on to distinguish them from historical "loyalty oath laws" on dubious grounds. RSA 17.

In particular, the district court considered it significant that the exemptions provided by § 922(g)(1) removed individuals from the statute's purview altogether, whereas "loyalty oath laws" were embedded within some of the historical disarmament laws themselves. RSA 17. The court did not explain why a distinction between the precise mechanisms by which individuals were (and are) made exempt from disarmament is material to *Bruen*'s methodology. Nor did it explain why it was appropriate to compare a

modern-day disarmament law with a historical restoration-of-rights provision, especially without also fully considering the modern-day law's restorative aspects. Similarly, the district court described § 922(g)(1) as giving felons "no . . . opportunity" akin to the opportunity presented by loyalty oath laws to "demonstrat[e] their ability to abide by the rule of law." *Id.* Yet, the district court failed to recognize that restoration of civil rights, expungement, pardon, and clemency—exemptions embedded within § 922(g)(1)—generally reflect an assessment that a felon has regained the ability to abide by the law, just as loyalty oath laws reflected an assessment that a person who later swears allegiance is more likely to follow the law.[16]

*Second*, the district court failed to account for the fact that, owing to laws historically subjecting convicted felons to capital punishment and estate forfeiture, the loss of the right to bear arms often was permanent. *See Range*, 69 F.4th at 129 (Krause, J. dissenting) (noting that the "longstanding practice of forfeiture . . . resulted in a permanent loss of firearms for those felons convicted of capital offenses or sentenced to life imprisonment"). Thus, even assuming that § 922(g)(1) did not already include rights-restoration provisions

---

[16] The district court also strongly signaled that it would take no issue with a version of § 922(g)(1) that "categorically prohibit[ed] felons from possessing a firearm for a term of years" (RSA 18), despite the fact that such a version of § 922(g)(1) would give a felon no power to reclaim his right to bear arms before some hypothetical time limit expired.

sufficiently comparable to loyalty oath laws, that omission would not render § 922(g)(1) unconstitutional where, historically, disarmament could be entirely without recourse. The district court responded to this set of historical evidence, in large part, by discounting it altogether, characterizing it as a "punishment" for a felony rather than as a "consequence" of one's status as a felon and thus different from § 922(g)(1). RSA 19-20. But *Bruen* made no such consequence/punishment distinction. Instead, it instructed courts to consider only whether a modern firearms regulation imposes a "comparable *burden* on the right of armed self-defense." *Bruen*, 597 U.S. at 29 (emphasis added). In this regard as well, therefore, the district court revealed itself as searching for a "historical twin," rather than a suitable analogue. And, importantly, the existence of laws subjecting felons to blanket penalties necessarily encompassing but not limited to disarmament—which rendered redundant any law specifically providing for disarmament—rebuts any suggestion that the Second Amendment historically was understood to prohibit such laws.

*Third*, the district court elected to view the historical tradition of felony punishment laws as wholly distinct from the historical tradition of categorically disarming those deemed to be untrustworthy adherents to the law. That choice, too, represented an unsound application of *Bruen*, which instructed courts to consider the historical record as a whole, not in artificially constructed silos. Although the tradition of categorically stripping certain

groups of their right to bear arms and the tradition of felony punishment, standing alone, each establishes § 922(g)(1)'s facial constitutionality, taken together, these traditions clearly demonstrate that certain groups of individuals falling outside of the law-abiding citizenry were subjected to permanent disarmament. The district court's failure to recognize this historically rooted phenomenon renders its analysis profoundly suspect.[17]

### 4. The Historical Record Specifically Supports Disarming "Dangerous" Individuals, a Group That Includes Defendant.

In *Atkinson*, this Court directed district courts, when assessing the constitutionality of § 922(g)(1), to consider whether there existed "broader historical analogues to § 922(g)(1) . . . including, but not limited to, laws

---

[17] Numerous jurists have disagreed that § 922(g)(1) is unconstitutional based on its purportedly permanent nature. *See, e.g.*, *Atkinson*, 70 F.4th at 1035 n.3 (Wood, J., dissenting) (writing that "relief from disability is possible through executive clemency" and noting that although "Congress has never chosen to activate" the § 925(c) mechanism, an analysis of § 922(g)(1)'s constitutionality "does not depend on its existence"); *Reggie Johnson*, 2023 WL 6690388, at *8 ("[L]ike the historical examples, convicted felons today may regain their Second Amendment rights under rare circumstances showing that they can be considered trustworthy members of society."); *United States v. King*, No. 23-CR-143, Dkt. 51 at 2-3 (N.D. Ill. Nov. 17, 2023) ("Even assuming that actual practices at the time of the founding show that once wrongdoers had paid their debts to society, the colonists forgave them and welcomed them back into the fold, . . . . so too may a felon regain his right to possess firearms even after that right has been restricted under § 922(g)(1), specifically through expungement or pardon.") (cleaned up); *United States v. Vaughns*, 22-CR-636, 2023 WL 8258575, at *7 (N.D. Ill. Nov. 29, 2023) (rejecting "characterization of Section 922(g)(1) as having no exceptions" because "felons may regain their right to possess firearms if they were pardoned or their convictions were expunged" and because "[t]he statutory scheme also leaves open the possibility for felons to see administrative relief and regain their right to bear arms").

disarming 'dangerous' groups other than felons." 70 F.4th at 1023. Here, the district court correctly rejected a "distinction between violent and nonviolent felons" and concluded that lawmakers had "a longstanding tradition of justifying exclusion from the right to keep and bear arms based on [their] assessment of [a] group's risk to the rule of law, whether based on mental health, criminal record, loyalty, or character." RSA 16. The district court's error was in concluding that § 922(g)(1)'s categorical prohibition was not sufficiently analogous to historical laws.

Some courts and commentators have observed that disarming dangerous or violent individuals remains consistent with American tradition. As the Eighth Circuit wrote in *Jackson*: "While the better interpretation of the history may be debatable"—namely, whether history supports disarmament of all non-law-abiding citizens regardless of any demonstrated "propensity for violence," or, conversely, only of those "deemed more dangerous than a typical law-abiding citizen"—"either reading supports the constitutionality of § 922(g)(1) as applied to [defendant] and other convicted felons." 69 F.4th at 502. *See also United States v. Gonzalez*, No. 22-1242, 2022 WL 4376074, at *2 (7th Cir. Sept. 22, 2022) ("[W]hether a government can forbid *violent* felons from possessing a firearm has not been meaningfully questioned by courts to date."). Indeed, some judges and commentators have maintained (incorrectly in the government's view) that *only* dangerous felons may be disarmed. *See, e.g., Kanter*, 919 F.3d

at 454-58 (Barrett, J., dissenting) (concluding that "founding-era legislatures categorically disarmed groups whom they judged to be a threat to public safety"); *United States v. Foljatar*, 980 F.3d 897, 914 (3d Cir. 2020) (Bibas, J., dissenting) ("[T]he limit on the Second Amendment right was pegged to dangerousness, not some vague notion of 'virtue.'").

Courts and judges to have considered the historical tradition of disarmament through a lens of dangerousness or violence have consistently observed that legislatures had the power to disarm categorically based solely on the determination that a group presented a *risk* to the public were it to be armed, not based on whether a group, or its individual members, had engaged in specific past acts of criminality. *See, e.g.*, *Jackson*, 69 F.4th at 504 ("Legislatures historically prohibited possession by categories of persons based on a conclusion that the category as a whole presented an unacceptable *risk* of danger if armed.") (emphasis added); *Kanter*, 919 F.3d at 458 (Barrett, J., dissenting) ("[F]ounding-era legislatures categorically disarmed groups whom they judged to be a *threat* to public safety.") (emphasis added); *United States v. Alaniz*, 69 F.4th 1124, 1130 (9th Cir. 2023) ("The analogues show a longstanding tradition of enhancing a defendant's sentence for the increased *risk* of violence created by mere possession of a firearm during the commission of certain crimes.") (emphasis added).

In this regard, § 922(g)(1) remains consistent with a historical tradition of categorically limiting the right to keep and bear arms, where courts have recognized that felons as a group are more likely to present risks of future danger or violence to the public. As the majority explained in this Court's *Kanter* decision: "[P]rohibiting even nonviolent felons . . . from possessing firearms is substantially related to [the government's] interest in preventing gun violence" where an empirical connection exists even "between nonviolent offenders . . . and a risk of future violent crime." 919 F.3d at 448-49.[18] *See also Yancey*, 621 F.3d at 685 ("[M]ost felons are nonviolent, but someone with a felony conviction on his record is more likely than a nonfelon to engage in illegal and violent gun use."); *Kaemmerling v. Lappin*, 553 F.3d 669, 683 (D.C. Cir. 2008) ("[A] large percentage of the crimes nonviolent recidivists later commit are violent."). The Supreme Court likewise has recognized that felons, as a class, can be expected to misuse firearms. *See Lewis*, 445 U.S. at 67 ("The federal gun laws . . . [focus on] the fact of conviction . . . in order to keep firearms away from potentially dangerous persons."); *Dickerson v. New Banner Institute,*

---

[18] The *Kanter* majority supported this conclusion by pointing to three studies showing, among other things, that "of 210,886 nonviolent offenders . . . one in five were rearrested for a violent crime within three years of his or her release" and that "28.5 percent of nonviolent property offenders . . . were rearrested for a violent offense within five years of their release." 917 F.3d at 449. In her dissent, then-Judge Barrett criticized a fourth study upon which the majority relied, without commenting on the other three. *Id.* at 468.

*Inc.*, 460 U.S. 103, 119 (1983) (recognizing that persons who have been "convicted of serious crimes," as a class, can "be expected to misuse" firearms); *Barrett v. United States*, 423 U.S. 212, 220 (1976) ("The history of [Section 922(g)] reflects a . . . concern with keeping firearms out of the hands of categories of potentially irresponsible persons, including convicted felons.").

Here, there is no dispute that defendant is a convicted felon—and a violent one at that. He previously was convicted of armed robbery as well as aggravated battery, and in the instant matter, was charged with violating § 922(g)(1) after committing an armed robbery on a public train. *Supra* at 1-2. Defendant's criminal activities thus amply establish his membership in a group historically eligible for categorical disarmament—composed of individuals who present a risk to public safety if armed.

Finally, in exercising its power to disarm defendant, Congress need not require case-by-case findings of violence or dangerousness. *See Atkinson*, 70 F.4th at 1024 (directing courts to consider whether "history supports [a] call for individualized assessments"). As the district court explained when rejecting defendant's efforts to challenge § 922(g)(1) on an as-applied basis, history does not "call[] for an individualized assessment of risk" but instead "demonstrates that across-the-board disqualifications from gun ownership are a part of this nation's traditional approach to gun regulation." RSA 16. Other courts, including this one, and judges have concluded likewise. *See Skoien*, 614 F.3d at

640 ("That *some* categorical limits are proper is part of the original meaning" of the Second Amendment.); *Jackson*, 69 F.4th at 495 ("[H]istory demonstrates that there is no requirement for an individualized determination of dangerousness as to each person in a class of prohibited persons."); *Atkinson*, 70 F.4th at 1035 (Wood, J., dissenting) ("since the founding, governments have been understood to have the power to single out categories of persons who will face total disarmament"); *Kanter*, 919 F.3d at 464 (Barrett, J., dissenting) ("[T]he legislature can make that judgment [to disarm] on a class-wide basis.").[19]

The relevant question is whether the status at issue indicates that the person cannot be trusted to possess a gun without posing a risk to the public,

---

[19] Individualized assessments could also yield wildly disparate results. *See Atkinson*, 70 F.4th at 1027 (Wood, J., dissenting) (enabling individuals to seek to establish a case-specific exemption from a generally applicable criminal law would create "an arbitrary patchwork of decisions—as far from the rule of law as one could image"); *see also United States v. Quailes*, No. 1:21-CR-0176, 2023 WL 5401733, at *12 (M.D. Pa. Aug. 22, 2023) (observing that "in order for 'dangerousness' to be the standard for judging modern firearm regulations, then a clear definition will need to be determined in order to avoid endless challenges and uncertainty in applying a standard which has obvious interpretive complexity"). Further complicating matters, the opportunity for pre-trial fact-finding in criminal cases is limited by Federal Rule of Criminal Procedure 12, which makes such as-applied challenges difficult to administer and resolve before trial if individualized facts are relevant. *See, e.g.*, *United States v. Pope*, 613 F.3d 1255 (10th Cir. 2010) (Gorsuch, J.) (concluding that as-applied Second Amendment challenge to § 922(g)(9) could not be brought pre-trial because the defendant "contends the statute is unconstitutional only in light of the 'facts surrounding the commission of the alleged offense'—the very facts a court may not consider before trial" (citation omitted)); Fed. R. Crim. P. 12(b)(3) (limiting pretrial motions to motions that "can be determined without a trial on the merits").

not whether a particular person can be trusted to do so. And although loyalty oath laws allowed individualized assessments for purposes of the *restoration* of gun rights (much like the modern-day use of expungement, pardon, and clemency), disarmament was done on a categorical basis. For this reason as well, § 922(g)(1) remains constitutional on its face.

## CONCLUSION

This Court should vacate the district court's order dismissing the indictment and remand for further proceedings.

Respectfully submitted.

MORRIS PASQUAL
Acting United States Attorney

DEBRA RIGGS BONAMICI
Assistant United States Attorney
Criminal Division Counsel

*/s/ Georgia N. Alexakis*
GEORGIA N. ALEXAKIS
Assistant United States Attorney
Chief of Appeals, Criminal Division

# RULE 32 CERTIFICATION

I hereby certify that:

1. This brief complies with the type volume limitation of Federal Rules of Appellate Procedure 32(a)(7)(B) because it contains 13,911 words.

2. This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5), 32(a)(6), and Circuit Rule 32(b), because it has been prepared using the Microsoft Office Word proportionally spaced typeface of Century Schoolbook with 13-point font in the text and 12-point font in the footnotes.

Respectfully submitted.

MORRIS PASQUAL
Acting United States Attorney

By:      */s/ Georgia N. Alexakis*
GEORGIA N. ALEXAKIS
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, Illinois
(312) 353-5300

In the
# UNITED STATES COURT OF APPEALS
for the Seventh Circuit

## No. 23-3155

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

v.

GLEN PRINCE,

Defendant-Appellee.

On Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 22 CR 240 — Robert W. Gettleman, *Judge.*

# SHORT APPENDIX OF THE UNITED STATES

MORRIS PASQUAL
Acting United States Attorney
 for the Northern District of Illinois
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 353-5300

DEBRA RIGGS BONAMICI
Assistant United States Attorney
Criminal Division Counsel

GEORGIA N. ALEXAKIS
Assistant United States Attorney
Chief of Appeals, Criminal Division

# TABLE OF CONTENTS

Memorandum Opinion & Order
*United States v. Glen Prince*, 22 CR 240 (R. 73) .............................RSA 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 22 CR 240 |
| | ) | |
| v. | ) | Judge Robert W. Gettleman |
| | ) | |
| GLEN PRINCE, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION & ORDER

Defendant Glen Prince is charged with one count of being a prohibited person in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). Section 922(g)(1) prohibits possession of firearms by individuals who have been convicted of a felony. Defendant moves to dismiss the indictment, claiming that the pending charge violates his rights under the Second Amendment to the United States Constitution. For the reasons discussed below, defendant's motion to dismiss the indictment (Doc. 45) is granted.

## BACKGROUND

According to the government, on September 3, 2021, defendant allegedly approached three individuals on a Brown Line Chicago Transit Authority ("CTA") train, brandished a firearm, and robbed them at gunpoint. Among the items allegedly stolen was a cell phone and Ventra card. Over the course of the next ten days, defendant allegedly used the Ventra card to travel on the CTA, and Chicago police tracked activity on the card. On September 12, 2021, at approximately 11:28 p.m., defendant allegedly swiped the Ventra card at the Red Line CTA station, and proceeded to smoke a cigarette on the platform, which is against a Chicago Transit Board ordinance. Chicago police officers arrested defendant just after midnight, in the early

RSA 1

morning of September 13, 2021, and recovered a firearm from his person.

Defendant is charged with unlawful possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(e).  Section 922(g)(1) prohibits the possession of firearms by individuals convicted of felonies, or any person "who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year."[1]  Defendant has a criminal record that includes prior felony convictions, and a federal grand jury returned an indictment against defendant on April 25, 2022, with one count of unlawful possession of a firearm.  The grand jury returned a superseding indictment on June 27, 2023, which added that prior to defendant's alleged prohibited possession of a firearm, defendant had at least three previous convictions for offenses committed on occasions different from one another.

On August 18, 2023, less than four weeks before trial was set to begin, defendant filed the instant motion to dismiss the indictment based on an alleged violation of his rights under the Second Amendment of the United States Constitution.  He raises the issue based on the Supreme Court's ruling in New York Rifle & Pistol Assn. v. Bruen, 142 S. Ct. 2111 (2022) ("Bruen"), and the Seventh Circuit's ruling in Atkinson v. Garland, 70 F.4th 1018 (7th Cir. 2023) ("Atkinson").  Consequently, on August 22, 2023, the court granted defendant's motion to continue the trial, and ordered that the jury trial set for September 11, 2023, be stricken and reset to begin on November 28, 2023.

The Second Amendment to the U.S. Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. Amend. II.  In District of Columbia v. Heller, 554 U.S. 570

---

[1] Section 924(e) requires a mandatory minimum sentence for individuals who violate § 922(g)(1) and have three previous convictions by certain courts for a violent felony, serious drug offense, or both, which were committed on "occasions different from one another."

RSA 2

(2008), the Supreme Court determined that "the right secured by the Second Amendment is not unlimited." Id. at 626. In dicta, the Court cautioned that its decision did not cast doubt on "longstanding prohibitions on the possession of firearms by felons." Id. In McDonald v. Chicago, 561 U.S. 742 (2010), the Court further held that the Second Amendment right to keep and bear arms is fully applicable to the states by virtue of the Fourteenth Amendment. Id. at 750. Under Heller and McDonald, lower federal courts adopted a two-step, means-end framework to analyze challenges to firearms regulations under the Second Amendment. See, e.g., Ezell v. City of Chicago, 846 F.3d 888, 893 (7th Cir. 2017); see also Kanter v. Barr, 919 F.3d 437, 441–42 (7th Cir. 2019).

Recently, however, in Bruen, the Supreme Court considered the meaning of the Second Amendment and articulated an analytical framework to determine whether a firearm regulation is constitutional. The Court again emphasized that certain firearms regulations remain constitutional, and that its newly articulated framework is "consistent with Heller and McDonald." Id. at 2122. It held that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." Id. at 2126. When the Second Amendment's plain text protects certain conduct, the government can regulate such conduct only if it can "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." Id. at 2127. (Emphasis added). Otherwise, the court must conclude that the individual's firearm-related conduct is protected because it falls within the Second Amendment's "unqualified command." Id. at 2126 (internal quotations omitted).

The Bruen Court provides two avenues of historical inquiry. The first avenue of inquiry is a "straightforward historical inquiry," which applies when "a challenged regulation addresses

a general societal problem that has persisted since the 18th century." Id. at 2131. Under this inquiry, courts must identify a "distinctly similar historical regulation addressing that problem." Id. The second avenue of inquiry is by "analogy." Id. at 2132. Because "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868," there is not always straightforward correspondence, and unprecedented societal concerns or dramatic technological changes may require a "more nuanced approach." Id. Under these circumstances, the Bruen Court directed courts to consider "historical analogies" to the challenged regulation to determine whether the regulation sufficiently resembles historically acceptable restrictions. Id.

Evaluating whether a historical regulation is a proper analogue for a for a "distinctly modern" firearm regulation requires a determination of whether the two regulations are "relevantly similar." Id. The Bruen Court directed lower courts to centrally consider "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." Id. at 2133. The Court emphasized that "analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check." Id. It requires a "well-established and representative historical analogue, not a historical twin." Id. (Emphasis in original).

In Atkinson, the Seventh Circuit remanded a civil litigant's as-applied constitutional challenge to § 922(g)(1) for further analysis under Bruen. See 70 F.4th 1018, 1023 (7th Cir. 2023). The plaintiff was convicted of felony mail fraud 24 years earlier and filed his complaint pursuant to 18 U.S.C. § 925A. Id. at 1021–22. Because the district court dismissed his complaint before the Court articulated its "text and history" test in Bruen, and because the parties' appellate briefing did "not grapple with Bruen," the majority opinion in Atkinson

4

remanded the matter "to allow the district court to undertake the <u>Bruen</u> analysis in the first instance." <u>Id.</u> at 1022. The court reasoned that "<u>Bruen</u> leaves no room for doubt: text and history, not a means-end analysis, now define the controlling Second Amendment inquiry." <u>Id.</u> at 1020. It also directed the government to "develop its contention that the plain text of the Second Amendment does not protect felons and other offenders impacted by § 922(g)(1)" on remand, and to "conduct a more substantial historical analysis." <u>Id.</u> at 1024.

The Seventh Circuit instructed the government to develop a record that addresses a series of "interrelated and non-exhaustive questions" which are intended to "help focus the proper analysis on remand." <u>Id.</u> at 1023. These questions are:

1. Does § 922(g)(1) address a 'general societal problem that has persisted since the 18th century?' ... If this problem existed during a relevant historical period, did earlier generations address it with similar or 'materially different means?';

2. What does history tell us about disarming those convicted of crimes generally and of felonies in particular? Among other sources, the parties could look to commentary from the Founders, proposals emerging from the states' constitutional ratifying conventions, any actual practices of disarming felons or criminals more generally around the time of the Founding, and treatment of felons outside of the gun context (to the extent this treatment is probative of the Founders' views of the Second Amendment). When considering historical regulations and practices, the key question is whether those regulations and practices are comparable in substance to the restriction imposed by § 922(g)(1). To answer the question, the district court and the parties should consider how the breadth, severity, and the underlying rationale of the historical examples stack up against § 922(g)(1);

3. Are there broader historical analogues to § 922(g)(1) during the periods that <u>Bruen</u> emphasized, including, but not limited to, laws disarming 'dangerous' groups other than felons? The parties should not stop at compiling lists of historical firearms regulations and practices. The proper inquiry, as we have explained, should focus on how the substance of the historical examples compares to § 922(g)(1);

4. If the district court's historical inquiry identifies analogous laws, do those laws supply enough of a historical tradition (as opposed to isolated

RSA 5

instances of regulation) to support § 922(g)(1)?  On this front, the parties should provide details about the enforcement, impact, or judicial scrutiny of these laws, to the extent possible;

5.  If history supports Atkinson's call for individualized assessments or for a distinction between violent and non-violent felonies, how do we define a non-violent or a non-dangerous felony?  And what evidence can a court consider in assessing whether a particular felony conviction was violent?  For instance, can a court consider the felony conviction itself, the facts of the underlying crime, or sentencing enhancements?  Bruen shows that these distinctions should also have firm historical support.  See 142 S. Ct. at 2132–33 (explaining that the court must assess whether modern and historical regulations are 'relevantly similar,' including in terms of how and why the regulations burden gun rights)."

Id. at 1023–24.

The Atkinson court recognized that "the historical analysis required by Bruen will be difficult and no doubt yield some measure of indeterminacy."  Id. at 1024.

In dissent, Judge Wood stated that she would have upheld § 922(g)(1) as constitutional without remand.  Id. at 1025.  She explained that "[g]un ownership and use in this country (both before and after the adoption of the 1787 Constitution) have always been subject to reasonable regulations."  Id. at 1030.  These regulations make up "a vast and diverse array of gun laws stretching from the colonial period, through the Founding Era, through Reconstruction (when the Fourteenth Amendment was added to the Constitution and ultimately made the Second Amendment applicable to state regulation), up to the present day."  Id. at 1033.

According to Judge Wood, this "text, history, and tradition all point in the same direction."  Id.  Judge Wood determined that the record behind the felon disentitlement statutes "reveals that, since the founding, governments have been understood to have the power to single out categories of persons who will face total disarmament based on the danger they pose to the political community if armed."  Id. at 1035.  In support, she cited loyalty oath laws, as well as laws that disarmed persons guilty of treason and members of native tribes.  Id.  While these laws

6

would be unconstitutional today under the First and Fourteenth Amendments, Judge Wood

concluded that "they reveal conclusively the scope of governmental power that was understood

to exist at the time the Second Amendment was adopted," which included categorical

restrictions.  Id.

## **DISCUSSION**

In the instant motion, defendant argues that § 922(g)(1) is unconstitutional on its face and

as applied under the Second Amendment pursuant to the Supreme Court's recently articulated

Bruen standard.  Where lower courts have upheld § 922(g)(1) based on the now-discarded

means-end test, or have engaged in insufficient historical review, their analysis does not meet in

the standard set out in Bruen.  Thus, this court begins by evaluating whether defendant's alleged

conduct is protected by the plain text of the Second Amendment.

From the government's perspective, § 922(g)(1) remains constitutional under Bruen's

text and history test because individuals with felony convictions are not protected by the Second

Amendment's textual purview.  The government argues that Heller demonstrates that felons do

not fall within "the people" contemplated by the Second Amendment, and consequently their

"right . . . to keep and bear Arms" is not infringed by § 922(g)(1)'s prohibition on their firearm

possession.  554 U.S. 570, 580–81 (2008).  Instead, the government argues that the Second

Amendment extends only to ordinary, law-abiding citizens who are "members of the political

community."  Id. at 580.  According to the government, the Bruen majority did not deviate from

Heller's principle that the right to keep and bear arms is "not unlimited," and deliberately and

repeatedly used the phrase "law-abiding, responsible citizens" to indicate that it interprets the

Second Amendment to categorically exclude felons from its protection.  Id. at 626, 635.

Further, the government argues, when an individual commits a felony, that individual

experiences the "forfeiture of a number of rights" that are tied to membership in the political community, including the right to serve on a jury, vote, and hold elected office.  See, e.g., 28 U.S.C. § 1865(b)(5) (barring felons from serving on a federal jury); Richardson v. Ramirez, 418 U.S. 24, 56 (1974) (upholding state felon disenfranchisement); Spencer v. Kemna, 523 U.S. 1, 8–9 (1998) (noting that the consequences of a felony conviction may include deprivation of the right to hold office).  Moreover, in United States v. Yancey, 621 F.3d 681, 684–85 (7th Cir. 2010), the Seventh Circuit, per curiam, determined that "most scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'"

Defendant counters that Heller's emphasis on "law abiding citizens" was dicta, and interpreting "the people" to exclude felons is inconsistent with how courts have interpreted "the people" in other constitutional text.  For example, individuals with felony convictions continue to enjoy Fourth Amendment protection and the ability to exercise their First Amendment rights, including during time serving their sentences, because they are part of "the people."  U.S. Const. Amends. I, IV.  Although felons experience reduced constitutional protection in certain settings, such as prison cells, they are not categorically, permanently excluded from the Constitution's purview.  See, e.g., Hudson v. Palmer, 468 U.S. 517, 526 (1984).

The court agrees with defendant that Heller and Bruen did not hold that the Second Amendment categorically protects only law-abiding citizens, despite their repeated use of such qualified language as "law abiding citizens."  The Heller Court explained that "the people" as used throughout the Constitution "unambiguously refers to all members of the political community, not an unspecified subset."  554 U.S. 570, 580 (2008).  Moreover, while the Bruen majority determined that the New York statute at issue "violates the Fourteenth Amendment in

8

that it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms," 142 S. Ct. 2111, 2156 (2022), Justice Alito stated in his concurrence that Bruen "decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun." 142 S. Ct. 2111, 2157 (2022). The Court implicitly acknowledged that it did not conduct a thorough review of § 922(g)(1), which it directed lower courts to conduct in Bruen, by emphasizing that felon-dispossession statutes are only "presumptively lawful." Heller, 554 U.S. at 627, n. 26. (Emphasis added).

Similarly, the Seventh Circuit has not resolved the issue. In Atkinson, the court did not decide whether the Second Amendment's plain text presumptively protects the possession of firearms by felons. Instead, it stated that "[w]e cannot resolve the issue without the benefit of more substantial briefing on remand." 70 F.4th 1018, 1023 (7th Cir. 2023). Prior to Bruen, however, the Seventh Circuit determined in United States v. Meza-Rodriguez, 798 F.3d 664, 669 (7th Cir. 2015), that "[w]hile some of Heller's language does link Second Amendment rights with the notions of 'law-abiding citizens' and 'members of the political community,' those passages did not reflect an attempt to define the term 'people.'" (Internal citations omitted). See also United States v. Skoien, 614 F.3d 638, 640 (7th Cir. 2010) (en banc). The court decided Meza-Rodriguez without the benefit of Bruen, but the Supreme Court specifically stated in Bruen that it did not disrupt Heller, and Heller is central to the court's analysis in Meza-Rodriguez.

In light of Meza-Rodriguez, and the parties' briefing pursuant to Bruen and Atkinson, this court concludes that the government has not met its burden to prove that felons are excluded from "the people" whose firearm possession is presumptively protected by the plain text of the Second Amendment. Consequently, the court moves on to evaluate the second inquiry required

by <u>Bruen</u>.

Under <u>Bruen</u>, the government has the authority to regulate presumptively protected conduct under the Second Amendment when it can demonstrate that the statute is part of this nation's historical tradition of firearm regulation. <u>See</u> 142 S. Ct. at 2127. The government can succeed under <u>Bruen</u>'s "straightforward historical inquiry" if it can identify a "distinctly similar historical regulation" addressing a "general societal problem that has persisted since the 18th century." <u>Id.</u> at 2131. On the other hand, where a "distinctly modern" regulation is at issue, the government must offer a historical regulation that is "relevantly similar." <u>Id.</u> at 2132. Pursuant to this inquiry, this court must determine whether historical regulations "impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified" as the burden imposed by § 922(g)(1). <u>Id.</u> at 2133.

There is now a circuit split on the issue. In <u>United States v. Jackson</u>, 69 F.4th 495, 505–06 (8th Cir. 2023), the Eighth Circuit upheld § 922(g)(1) as applied to a defendant convicted of state law felonies for selling controlled substances. The court determined that the nation's historical record supported the government's ability to "prohibit possession of firearms by persons who have demonstrated disrespect for legal norms of society." <u>Id.</u> at 504. Conversely, in <u>Range v. Attorney General of the United States of America</u>, 69 F.4th 96, 106 (2023) (<u>en banc</u>), the Third Circuit held that § 922(g)(1) was unconstitutional as applied to a defendant convicted of the felony-equivalent state offense of making a false statement to obtain food stamp assistance. The court reasoned that the government did not carry its burden to show that this nation's history and tradition of firearm regulation supported disarming him. <u>Id.</u> at 98.

In the instant case, the government argues that § 922(g)(1) "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." <u>Bruen</u>, 142 S. Ct. at 2127. The

10

**RSA 10**

government does not argue about whether earlier generations addressed the general societal problem of firearm-related violence with similar or materially different means. Nor could it. As the Seventh Circuit acknowledged in United States v. Skoien, 614 F.3d 638, 640 (7th Cir. 2010) (en banc), the first federal statute disqualifying certain violent felons from firearm possession was not enacted until the Federal Firearms Act in 1938, which was 147 years after the ratification of the Second Amendment and 70 years after the ratification of the Fourteenth Amendment. See Pub. L. 75-785, §§ 1(6), 2(f), 52 Stat. 1250, 1250–51 (1938). Congress did not enact a lifetime ban on firearm possession by all felons until 1961. Pub. L. 87-342, 75 Stat. 757 (1961); see also 18 U.S.C. § 922(g)(1). There is no evidence of any law categorically restricting individuals with felony convictions from possessing firearms at the time of the Founding or ratification of the Second or Fourteenth Amendments. Instead, the government's argument is based on analogy to the modern-day statutes.

This court separately analyzes the burdens of and justifications for each type of historical regulation to determine whether § 922(g)(1) imposes a comparable burden on the right of armed self-defense and whether that burden is comparably justified. Its analysis relies on similar government briefing as other courts in this district that were, and continue to be, faced with the same difficult issue. See, e.g., United States v. Johnson, No. 18 CR 00458, 2023 WL 6690388 (N.D. Ill. Oct. 12, 2023); United States v. Johnson, No. 23 CR 156, 2023 WL 6276562 (N.D. Ill. Sept. 26, 2023); United States v. Gates, 22-CR-00397-1, 2023 WL 5748362 (N.D. Ill. Sept. 6, 2023). The government highlights two types of historical regulations that it argues are relevantly similar to § 922(g)(1): (1) laws that categorically disqualified "untrustworthy" adherents to the law from possessing firearms; and (2) laws that authorized capital punishment and estate forfeiture for certain felonies.

The government begins by arguing that the historical record shows an established tradition of broad legislative authority to categorically disqualify individuals from possessing firearms based on its judgment that certain groups could not be trusted to adhere to the rule of law. As mentioned above, the Seventh Circuit explained in United States v. Yancey, 621 F.3d 681, 684–85 (7th Cir. 2010) (per curiam), that legislatures have disarmed individuals who were deemed to be "unvirtuous citizens" as a historical practice.

First, the government offers evidence that the English government disarmed nonconformist Protestants in the seventeenth century, in addition to Catholics, when they refused to renounce their faith.[2] Such disarmament was based on the Protestant government's determination that nonconformist groups would not participate in the Church of England, which was headed by the King of England, as a matter of law. See Range v. Attn'y General of the U.S., 69 F.4th 96, 120–21 (2023) (Krause, J., dissenting) (citing Joyce Lee Malcolm, To Keep and Bear Arms: The Origins of an Anglo-American Right 45 (1994); Church of England, BBC (June 30, 2011), https://www.bbc.co.uk/religion/religions/christianity/cofe/cofe_1.shtml). Moreover, the Protestant government feared that the tenets of Catholicism necessarily included allegiance to the Pope, not the king, and Catholics could not be trusted to obey English law and its sovereign unless they renounced their faith. See An Act for the Better Secureing the Government by Disarming Papists and Reputed Papists, 1 W. & M., Sess. 1, ch. 15 (1689); see also Kanter v. Barr, 919 F.3d 437, 456–57 (7th Cir. 2019) (Barrett, J., dissenting). The same Parliament wrote

---

[2] This court agrees that English custom and tradition shed some light on the Second Amendment's purview. Quoting Heller, the Bruen Court explained that the Second Amendment "was not intended to lay down a novel principle but rather codified a right inherited from our English ancestors." Bruen, 142 S. Ct. at 2127. This court emphasizes, however, that the "language of the Constitution cannot be interpreted safely except by reference to the common law and to British institutions as they were when the instrument was framed and adopted, not as they existed in the Middle Ages." Id. at 2139 (internal quotations omitted) (emphasis in original). Accordingly, English history is more persuasive when it is closer in time to the framing and adoption of the U.S. Constitution, or otherwise tied to the Constitution.

the English Bill of Rights, which specifically stated that, "Subjects which are Protestants, may have Arms for their Defence suitable to their Conditions, and as allowed by Law." See An Act Declaring the Rights and Liberties of the Subject and Settling the Succession of the Crown, 1 W. & M., Sess. 2, ch. 2 (1689). This clause in the English Bill of Rights, which recognized that Parliament had the authority to decide which citizens were allowed to keep and bear arms by law, became the predecessor to the Second Amendment. See Bruen, 142 S. Ct. at 2141.

The American colonies similarly disarmed Catholics, in addition to enslaved people and Native Americans. See Kanter, 919 F.3d at 457–58. Of course, the legislature is now rightfully prohibited from banning firearm possession based on race, sexual orientation, religion, disability, or other protected characteristics, see U.S. Const. Amends. I, XIV, but these historical regulations are relevant to understanding the right to keep and bear arms.

Importantly, although Catholics, enslaved people, and Native Americans were prohibited from firearm possession, individuals within these groups could possess firearms under certain circumstances. For example, Catholics who were "'willing to swear undivided allegiance to the sovereign' were permitted to keep their arms" when they pledged allegiance to the United States or a particular state. Kanter, 919 F.3d at 456–58. Enslaved people could possess firearms if they had permission from their master.[3] See, e.g., The Laws of Maryland, With The Charter, The Bill of Rights, The Constitution of The State, and Its Alterations, The Declaration Of Independence, And The Constitution Of The United States, And Its Amendments, at 117–18 (1811) (1715 Md. Law) (prohibiting enslaved people from taking weapons off their master's land "without license from their said master"); A Digest of the Laws of the State of Georgia From Its First Establishment as a British Province Down to the Year 1798, Inclusive, and the Principal Acts of

---

[3] Of course, enslaved people were not considered to be citizens of the United States, and consequently were not protected by the Constitution. See United States v. Jimenez-Shilon, 34 F.4th 1042, 1047 (11th Cir. 2022).

**RSA 13**

1799, at 153–55 (1800) (1768 Ga. Law); Grants, Concessions, and Original Constitutions of the Province of New Jersey: The Acts Passed During the Proprietary Governments, and Other Material Transactions Before the Surrender Thereof to Queen Anne, at 341 (1753) (1694 N.J. law).

Moreover, the government does not provide evidence that Native Americans were prohibited from possessing firearms, except one Rhode Island law from 1677 that allowed the confiscation of guns owned by Native Americans if they did not have the necessary "ticket or order." Records of the Colony of Rhode Island and Providence Plantations, at 561 (1857) (1677 R.I. law). Instead, state legislatures typically prohibited the sale of firearms to Native Americans, not possession itself. See, e.g., Laws and Ordinances of New Netherland, 1638-1674, at 18–19 (1868) (1639 New Netherland law); Records Of The Colony Of New Plymouth, in New England, at 243 (1856) (1675 Plymouth law).[4]

In a similar manner, loyalty oath requirements allowed states to strip the right to keep and bear arms from anyone who failed or refused to take an oath throughout colonial America and the Revolutionary War. The legislature even disarmed free, Christian, white colonists (i.e., the core of the political community) whom the authorities believed could not be trusted to obey the law, such as Loyalists. During the Revolutionary War, several states (including Massachusetts, Virginia, Pennsylvania, Rhode Island, North Carolina, and New Jersey), as well as the Continental Congress, prohibited firearm possession by individuals who refused to declare a loyalty oath to the emerging government. See United States v. Jackson, 69 F.4th 495, 503 (8th Cir. 2023) (citing 4 Journals of the Continental Congress 1774–1789, at 205 (Worthington

---

[4] Indeed, members of the Native American tribes were considered to be citizens of hostile foreign nations, and thus not included in "the people" protected by the Second Amendment. See United States v. Jimenez-Shilon, 34 F.4th 1042, 1047 (11th Cir. 2022).

**RSA 14**

Chauncey Ford ed., 1906); Act of Mar. 14, 1776, ch. 21, 1775–76 Mass. Acts 479; Act of May

1777, ch. III, 9 The Statutes at Large; Being a Collection of all the Laws of Virginia 281–82

(1821); Act of June 13, 1777, ch. 756 §§ 2—4, 1777 Pa. Laws 110, 111–13; Act of June 1776,

7 Records of the Colony of Rhode Island and Providence Plantations in New England 567

(1862); Act of Nov. 15, 1777, ch. 6, 1777 N.C. Sess. Laws 231; Act of Sept. 20, 1777, ch. XL,

1777 N.J. Laws 90).  However, members of these groups could regain the ability to keep and

bear arms after taking the relevant oath.

 The historical record shows additional efforts to disarm individuals for crimes and danger

to the public during the Founding and the ratification debates.  For example, during the

Constitutional Convention in 1787, Antifederalists in Pennsylvania proposed a constitutional

amendment regarding the right to bear arms that was the predecessor to the Second Amendment.

See Bernard Schwartz, The Bill of Rights: A Documentary History 627, 628 (1971); see also

Carlton F.W. Larson, Four Exceptions in Search of A Theory: District of Columbia v. Heller and

Judicial Ipse Dixit, 60 Hastings L.J. 1371, 1374–75 (2009).  The Antifederalists proposed that

"no law shall be passed for disarming the people or any of them unless for crimes committed, or

real danger of public injury from individuals."  Bernard Schwartz, The Bill of Rights: A

Documentary History 627, 665 (1971).  Of course, the Second Amendment does not include the

same language, but some scholars have opined that the Founders might not have objected to the

lack of language explicitly excluding felons because the limitation was understood.  See Stephen

P. Halbrook, The Founders' Second Amendment: Origins of the Right to Bear Arms 273 (2008).

 This court is persuaded that the text, history, and tradition of firearm-dispossession

statutes demonstrates that the legislature has the authority to categorically regulate firearm

possession by individuals who have demonstrated that they cannot be trusted to obey the law, or

15

pose some other danger to the political community if armed.  The record shows that these categorical regulations are not isolated instances, and the Seventh Circuit has already determined that "Congress enacted the [categorical] exclusions in § 922(g) to keep guns out of the hands of presumptively risky people."  United States v. Yancey, F.3d 681, 683 (7th Cir. 2010).  The record shows that the legislature has a longstanding tradition of justifying exclusion from the right to keep and bear arms based on its assessment of that group's risk to the rule of law, whether based on mental health, criminal record, loyalty, or character.

Further, this court rejects the notion that history calls for an individualized assessment of risk, or a distinction between violent and nonviolent felonies.  The record clearly demonstrates that across-the-board disqualifications from gun ownership are a part of this nation's traditional approach to gun regulation.  This court also agrees with Judge Wood's reasoning in Atkinson that "inviting [courts] to consider the particular facts of every case, to see if the conduct underlying the conviction ought to support restrictions on gun rights . . . would impose impossible burdens on courts and prosecutors and would lead to an arbitrary patchwork of decisions—as far from the rule of law as one could imagine."  70 F.4th 1018, 1027 (7th Cir. 2023).

The inquiry required by Bruen, however, is not merely whether a dispossession statute's burden is "comparably justified," but also whether the statute imposes a "comparable burden" on the right itself.  Bruen, 142 S. Ct. at 2133 (emphasis added).  Although the historical record discussed above demonstrates this nation's tradition of "comparably justified" categorical dispossession statutes, the government has failed to meet its burden of providing evidence of a dispossession statute with a "comparable burden" to § 922(g)(1).  Specifically, this court is not persuaded that the government has met its burden to show a "distinctly similar," or even a

"relevantly similar," historical analogue to § 922(g)(1)'s permanent prohibition on firearm possession by felons, which can be lifted only by expungement, federal pardon, or other method of restoring civil rights that lifts the underlying offense from a "conviction" under § 922(g).  18 U.S.C. § 921(a)(20).  See also Buchmeier v. United States, 581 F.3d 561 (7th Cir. 2009) (examining certain "method[s] of restoring civil rights" under Illinois law after an individual's state sentence expired).  Thus, for example, if a felon with one felony conviction receives an executive pardon for that conviction, he is no longer a felon with a "crime punishable by imprisonment for a term exceeding one year" under the statute.[5]

Conversely, loyalty oath laws, which are the strongest analogue to § 922(g)(1), allowed individuals deemed "untrustworthy" to regain their right to keep and bear arms by swearing an oath to a state or the United States, or by renouncing their faith.  There is no similar opportunity under § 922(g)(1) for felons to regain their rights after demonstrating their ability to abide by the rule of law.[6]

Thus, this court concludes that § 922(g)(1) imposes a far greater burden on the right to keep and bear arms than the historical categorical exclusions from the people's Second Amendment right.  The government has not demonstrated why the modern ubiquity of gun violence, and the heightened lethality of today's firearm technology compared to the Founding, justify a different result.  This nation's gun violence problem is devastating, but does not change this result under Bruen, which this court finds rests on the severity of § 922(g)(1) rather than its

---

[5] This court respectfully disagrees with its esteemed colleague in United States v. Johnson, No. 18 CR 00458, 2023 WL 6690388, at *8 (N.D. Ill. Oct. 12, 2023), which noted that, "Once a felony is expunged, 'Illinois law restores all civil rights . . . including the right to carry a firearm.'" (Quoting United States v. Lloyd, 184 F.3d 695, 699 (7th Cir. 1999)).  As noted above, once a felony conviction is expunged, the individual is no longer a felon with a "crime punishable by imprisonment for a term exceeding one year" and, therefore, not covered by § 922(g)(1).
[6] Because a felon has no opportunity to regain the right to keep and bear arms, this court questions the extent to which rehabilitation motivates criminal lawmaking—although this court notes that criminal lawmaking is a policy determination that is better made by legislatures, not federal courts.  See Ewing v. California, 538 U.S. 11, 25 (2003).

categorical prohibition. The court does not address whether the Second Amendment would allow Congress to categorically prohibit felons from possessing a firearm for a term of years, or categorically prohibit possession but allow felons the opportunity to file a petition for restoration of their Second Amendment rights following rehabilitation and reintegration to society. Such hypothetical statutes, and their constitutionality, are not before the court today, although the court notes that there are dangers in constructing legislation that would invite courts to "consider the particular facts of every case," which Judge Wood reasonably envisioned would "pose impossible burdens on courts and prosecutors" in Atkinson. 70 F.4th 1018, 1027 (7th Cir. 2023).

This court's holding also does not change the fact that all individuals, including felons, are prohibited from using firearms to commit crimes and threaten violence, and it does not impact this nations' other restrictions, such as those on: selling or delivering "any destructive device, machinegun . . . , short-barreled shotgun, or short-barreled rifle, except as specifically authorized by the Attorney General consistent with public safety and necessity" in § 922(b)(4); the sale and disposal of firearms to other categories of individuals listed in § 922(d); or firearm possession by other categories of individuals listed in § 922(g). These regulations are likewise not before the court today.

Therefore, the court next evaluates the government's second type of historical regulations, which it argues are "relevantly similar" to § 922(g)(1): laws that authorize capital punishment and estate forfeiture for certain felonies. According to the government, the law of England leading up to the colonial era authorized capital punishment and estate forfeiture for some felony convictions, citing Blackstone. See 4 William Blackstone, Commentaries on the Laws of England at 95 (1769) (defining a felony as "an offence which occasions a total forfeiture of either lands, or goods, or both, at the common law; and to which capital or other punishment

may be superadded").  The First Congress continued this tradition, and made forging or

counterfeiting public securities punishable by death.  See An Act for the Punishment of Certain

Crimes Against the United States, 1 Stat. 112, 115 (1790).  As the D.C. Circuit noted in Medina

v. Whitaker, 913 F.3d 152, 158 (D.C. Cir. 2019), "it is difficult to conclude that the public, in

1791, would have understood someone facing death and estate forfeiture to be within the scope

of those entitled to possess arms."

 This court, however, finds that these dispossession statutes are not "comparably justified"

and do not impose a "comparabl[e] burden" to § 922(g)(1).  While this court agrees with the

D.C. Circuit in Medina that capital punishment and estate forfeiture laws imposed severe

consequences on certain felons, it also agrees with the Third Circuit in Range that these

consequences "do[ ] not suggest that the particular (and distinct) punishment at issue—lifetime

disarmament—is rooted in our Nation's history and tradition."  Range v. Attn'y General of the

U.S., 69 F.4th 96, 105 (3d Cir. 2023).  Thus, in Range, Judge Krause acknowledged in dissent

that certain severe offenses were not punishable by death or life imprisonment and, while "the

offender was stripped of his then-existing estate, including any firearms," he could "presumably

repurchase arms" "upon successfully serving [ ] his sentence and reintegrating into society."  Id.

at 127–28.  As the Third Circuit reasoned, "[t]he Government has not cited a single statute or

case that precludes a convict who has served his sentence from purchasing the same type of

object that he used to commit a crime," nor "cited forfeiture cases in which the convict was

prevented from regaining his possession, including firearms (except where forfeiture preceded

execution)."  Id. at 105.

 This court would go further than Range and recharacterize dispossession as a

"consequence" of conviction, rather than "punishment."  As the Seventh Circuit determined in

19

Yancey, Congress justified § 922(g)(1) with its determination that felons, as a group, cannot be trusted to follow the law. 621 F.3d 681, 684–85 (7th Cir. 2010) (per curiam). The court did not state that Congress justified felon firearm dispossession in § 922(g)(1) as punishment for crime. In other words, dispossession is not a "punishment" for a felon's conviction per se; it is a consequence of a felon's status as an untrustworthy, lawbreaking citizen, and his conviction not only causes this status, but is evidence of it. Conversely, historical regulations that tied an individual's felony conviction to severe consequences (capital punishment and estate forfeiture) imposed punishment for the individual's crime, making them distinct from § 922(g)(1).

This court's conclusion is clearer when placed in context. For example, as discussed above, after a felon is convicted, he can also lose the right to vote, serve on a jury, and hold elected office. The loss of these rights is not punishment for a felony-level crime; it is a consequence of the legislature's determination that, categorically, that individual is now part of group of individuals (felons) who cannot be trusted to abide by the law, or otherwise act as trustworthy members of the political community, based on their actions. If that individual is convicted of another felony, he will receive additional punishment in the form of imprisonment, which presumably punishes, deters, and/or rehabilitates him. He will not, and logically could not be stripped again of his right to vote, serve on a jury, or hold elected office, which he permanently lost following his first felony. Instead, he remains a member of that category of "untrustworthy" or otherwise "unvirtuous" individuals whose firearm possession has been historically limited.

This conclusion is bolstered by then-Judge Barrett's reasoning in dissent in Kanter v. Barr, 919 F.3d 437, 459–61 (7th Cir. 2019), which explains the diminished historical relationship between felonies and capital punishment at the Founding. She explained that, "[d]uring the

20

period leading up the founding, the connection between felonies and capital punishment started to fray," and the shifting punishment for felonies, which were not always punishable by death, "necessitated a shift in the meaning of civil death," or the loss of civic rights.[7]  Id. at 459.  She concluded that "[f]elons serving a term of terms did not suffer civil death; their rights were suspended but not destroyed."  Id. at 461.  The Kanter majority did not dispute then-Judge Barrett's explanation of the historical record; instead, it reasoned that the legislature could categorically disarm felons due to their poor, unvirtuous character, whereas then-Judge Barrett would have held otherwise.  Id. at 446.

Consequently, this court concludes that the government has not met its burden under Bruen to prove this nation's history and tradition of firearm regulation with historical evidence of laws that authorized capital punishment and estate forfeiture for felonies.[8]  Because this court determines that defendant is a member of "the people" protected by the Second Amendment, and because neither type of historical regulation offered by the government satisfies its burden to show a history and tradition of "relevantly similar" analogues to § 922(g)(1)'s permanent, categorical firearm dispossession of all felons, the court is forced to grant defendant's motion to dismiss the indictment against him under Bruen, regardless of whether he is challenging the statute as applied or on its face.

This court acknowledges that this is a close question.  The court also recognizes that gun

---

[7] Then-Judge Barrett goes on to explain that the right to keep and bear arms under the Second Amendment is an "individual" right under Heller, not a "purely civic right" that is exercised for the benefit of the community, such as voting or jury service.  Id. at 462–63.

[8] The government's unmet burden is compounded by its decision not to offer any expert historian.  As another district court stated in United States v. Bullock, No. 3:18-CR-165-CWR-FKB, 2023 WL 4232309, at *17, 31 (S.D. Miss. June 28, 2023), the "historical community's guidance and expertise" is likely to aid courts in their analyses under Bruen, although the holding in Bullock (that § 922(g)(1) was unconstitutional as applied to the defendant, who completed his sentence for aggravated assault and manslaughter over 15 years prior) is limited to the facts of that case.  It is not the court's burden to demonstrate history and tradition in this case by appointing its own independent expert, and the Court stated in Bruen that courts should "follow the principle of party presentation" and are "entitled to decide a case based on the historical record compiled by the parties."  142 S. Ct. 2111, 2130, n.6 (2022).

**RSA 21**

violence plagues our communities and that allowing those who potentially pose a threat to the orderly functioning of society to be armed is a dangerous precedent.  <u>See</u> 18 U.S.C. § 922(q)(1). However, this court is unable to uphold § 922(g)(1) as constitutional due to <u>Bruen</u>'s instruction that the government must provide evidence of a historical analogue that is both comparably justified and comparably burdensome of the right to keep and bear arms.  Although there are strong policy reasons for doing everything possible to keep guns off our streets and out of our communities—policies that could be addressed by legislation rather than judicial edict—this court can find no such historical analog.

### <u>CONCLUSION</u>

For the reasons set forth above, defendant's motion to dismiss the indictment (Doc. 45) is granted.  All other pending motions and dates set by the court are stricken as moot.

ENTER:

**Robert W. Gettleman**
**United States District Judge**

DATE:  November 2, 2023

**RSA 22**

# CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30(D)

Pursuant to Circuit Rule 30(d), I, Georgia N. Alexakis, counsel for Plaintiff-Appellant, United States of America, state that the appendix included with this brief on appeal incorporates the materials required under Circuit Rule 30(a) and (b).

Respectfully submitted.

By:     */s/ Georgia N. Alexakis*
        GEORGIA N. ALEXAKIS
        Assistant United States Attorney
        219 South Dearborn Street, 5th Floor
        Chicago, Illinois
        (312) 353-5300

**CERTIFICATE OF SERVICE**

I hereby certify that on March 12, 2024, I electronically filed the foregoing Brief and Short Appendix of the United States with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Respectfully submitted.

By:    */s/ Georgia N. Alexakis*
GEORGIA N. ALEXAKIS
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, Illinois
(312) 353-5300