IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

_____

No. 23-3155
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

v.

GLEN PRINCE,

Defendant-Appellee.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division

The Honorable Robert W. Gettleman
No. 22 CR 240

<u>RESPONSE BRIEF FOR DEFENDANT-APPELLEE</u>
<u>GLEN PRINCE</u>

FEDERAL DEFENDER PROGRAM
John F. Murphy,
Executive Director

By:    Jack Corfman
55 E. Monroe Street, Suite 2800
Chicago, IL  60603
(312) 621-8300

Attorney for Defendant-Appellee
Glen Prince

July 26, 2024

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

The undersigned counsel of record for Defendant-Appellee Glen Prince furnishes the following list in compliance with Fed. R. App. P. 26.1 and Circuit Rule 26.1:

1. The full name of the only party represented is Glen Prince.

2. Mr. Prince is a natural person and not a corporation.

3. In the district court, the Federal Defender Program was appointed to represent Mr. Prince. John F. Murphy, Executive Director of the Federal Defender Program, and its attorneys are the only attorneys expected to appear in this Court on Mr. Prince's behalf.

Respectfully submitted,
FEDERAL DEFENDER PROGRAM
John F. Murphy,
Executive Director

By: _s/ Jack Corfman_
55 E. Monroe Street
Suite 2800
Chicago, IL 60603
(312) 621-8300

*Attorney for Defendant-Appellee*

Dated: July 26, 2024

# TABLE OF CONTENTS

CIRCUIT RULE 26.1 DISCLOSURE STATEMENT ................................. i

TABLE OF CONTENTS ........................................................... ii

TABLE OF AUTHORITIES ..................................................... iv

JURISDICTIONAL STATEMENT ............................................... 1

ISSUE PRESENTED FOR REVIEW ........................................... 2

STATEMENT OF THE CASE ................................................... 3

SUMMARY OF THE ARGUMENT ............................................. 6

STANDARD OF REVIEW ....................................................... 8

ARGUMENT ....................................................................... 9

I. LEGAL BACKGROUND ...................................................... 9

A. Section 922(g)(1) broadly and permanently disarms felons, regardless of the nature or circumstances of their prior conviction. ........................................................................ 9

B. The Second Amendment protects the individual's right to bear arms over legislative interest balancing. ................................. 12

C. Section 922(g)(1)'s broad purpose and burden are facially unconstitutional, even if Section 922(g)(8)'s distinct focus was not. ................................................................................ 18

II. MR. PRINCE IS PROTECTED BY THE SECOND AMENDMENT. ................. 21

A. *Rahimi* rejected the government's argument that "the people" is limited to only "law-abiding individuals.".............................22

B. The Second Amendment protects the entire national community, including Mr. Prince. ...........................................29

III. SECTION 922(G)(1) IS NOT RELEVANTLY SIMILAR TO ANY HISTORICAL REGULATION. ...........................................................................36

A. Section 922(g)(1)'s historically novel purpose has no relevantly similar analogue.............................................................37

1. Political and social minorities were disarmed to protect against a perceived risk of rebellion, not because they were "untrustworthy adherents to the law.".................................40

2. Felony punishment was not imposed to restrict firearms possession. ........................................................................49

3. The government cannot use different historical regulations with different purposes to construct a novel, modern purpose.....52

B. Permanent disarmament is a historically unique burden. ..........56

1. No historical law provided for complete or permanent disarmament.................................................................57

2. The existence of the death penalty does not authorize any possible penalty short of execution.................................60

3. The government's counterarguments are unpersuasive. ........64

CONCLUSION ...........................................................................67

CERTIFICATE PURSUANT TO APPELLATE RULE 32(a)(7)............69

CERTIFICATE OF SERVICE.................................................70

# TABLE OF AUTHORITIES

## Cases

*Atkinson v. Garland*, 70 F.4th 1018 (7th Cir. 2023) ................... 23, 26, 28

*Bucklew v. Precythe*, 587 U.S. 119 (2019) ................................................ 18

*City of Los Angeles, Calif. v. Patel*, 576 U.S. 409 (2015) ............. 18, 20, 21

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ....................... passim

*Dreher v. United States*, 115 F.3d 330 (5th Cir. 1997) ........................... 10

*Folajtar v. Attorney General*, 980 F.3d 897 (3d Cir. 2020) ............... 38, 63

*Furman v. Georgia*, 408 U.S. 238 (1972) ................................................ 62

*Huddleston v. United States*, 415 U.S. 814 (1974) ................................. 11

*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019) ................................. passim

*Locke v. Haessig*, 788 F.3d 662 (7th Cir. 2015) ...................................... 37

*Logan v. United States*, 552 U.S. 23 (2007) ........................................... 11

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022) ................................................................................................ passim

*Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272 (1998) ..................... 65

*Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023) (en banc) ... passim

*Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*, 502 U.S. 105 (1991) ......................................................................... 61

*Texas v. Johnson*, 491 U.S. 397 (1989) ................................................. 20

*Trop v. Dulles*, 356 U.S. 86 (1958) ........................................................ 60

iv

*United States v. Alaniz*, 69 F.4th 1124 (9th Cir. 2023)...........................12

*United States v. Duarte*, 101 F.4th 657 (9th Cir. 2024) ..............26, 27, 34

*United States v. Dubois*, 94 F.4th 1284 (11th Cir. 2024) .......................27

*United States v. Ebron*, No. 3:24CR47, 2024 WL 2097228 (E.D. Va. May 9, 2024) ...................................................................................27

*United States v. Eichman*, 496 U.S. 310, 313 n.1 (1990) ......................21

*United States v. Gay*, 98 F.4th 843 (7th Cir. 2024)...........................25, 27

*United States v. Harrison*, 654 F. Supp. 3d 1191 (W.D. Okla. 2023)34, 41

*United States v. Jackson*, 60 F.4th 495 (8th Cir. 2023) ........................27

*United States v. Meldish*, 722 F.2d 26 (2d Cir. 1983) ...........................10

*United States v. Meza-Rodriguez*, 798 F.3d 664 (7th Cir. 2015) .... passim

*United States v. Neal*, No. 20CR335, __ F. Supp. 3d __, 2024 WL 833607 (N.D. Ill. 2024). .......................................................................27

*United States v. Rahimi*, 602 U.S. __, 144 S.Ct. 1889, 1903 (2024)................................................................................................ passim

*United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023) ..........................17

*United States v. Schnell*, 353 F. App'x 12 (7th Cir. 2009) .....................10

*United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) (en banc)......39, 47

*United States v. Stanko*, 491 F.3d 408 (8th Cir. 2007) ..........................10

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990)......................31

*United States v. Walden*, 146 F.3d 487 (7th Cir. 1998) ..........................61

*United States v. Williams*, __ F. Supp. 3d __, 2024 WL 731932 (E.D. Mich. Feb. 22, 2024); .............................................................. 27

*Vincent v. Garland*, 80 F.4th 1107, (10th Cir. 2023) ............................ 27

## Constitutional Provisions

U.S. Const. Amend. II ...................................................... passim

## Statutes

18 U.S.C. § 921(a)(20) ...................................................... 10

18 U.S.C. § 922(g)(1) .................................................... passim

18 U.S.C. § 922(g)(8) .................................................... passim

18 U.S.C. § 924(e) .......................................................... 3

18 U.S.C. § 925(c) ......................................................... 10

18 U.S.C. 922(g)(5) ........................................................ 31

Crimes Act of 1790, First Congress, Sess. II, Ch. 9, 1 Stat. 112, 119 .... 62

Federal Firearms Act of 1938, Pub. L. No. 75-785, ch. 850, § 2(d), 52 Stat. 1250 (June 30, 1938) ...................................................... 9

Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, § 901(a)(2), (7), 82 Stat. 225, 225, 226. ..................................... 9, 11

*Records of the Colony of Rhode Island and Providence Plantations* (1857) ...................................................................... 59

Sec'y of the Commonwealth, *Acts and Resolves of Massachusetts 1786–87* (1893) ......................................................... 60

*The Statutes at Large of Pennsylvania from 1682 to 1801* (1896) .......... 58

# Other Authorities

Adam Winkler, *Heller's Catch-22*, 56 UCLA L. Rev. 1551 (2009) .......... 39

Bernard Schwartz, The Bill of Rights: A Documentary History 758 (1971) ................................................................................................. 47

Brief for the United States, *United States v. Rahimi*, 602 U.S. __, 144 S.Ct. 1889, No. 22-915 (U.S. Aug. 14, 2023) ................................. 13, 23

C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Policy 695 (2009) ......................................................... 39, 59

Carlton F.W. Larson, *Four Exceptions in Search of A Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371 (2009) ................................................................................................. 39

Clement Fatovic, *The Anti-Catholic Roots of Liberal and Republican Conceptions of Freedom in English Political Thought*, 66 J. Hist. Ideas 37 (2005) ................................................................................. 41

Conrad Kahn, *Challenging the Federal Prohibition on Gun Possession by Nonviolent Felons*, 55 S. Tex. L. Rev. 113 (2013) .......................... 39

David Thomas Konig, *"Dale's Laws" and the Non-Common Law Origins of Criminal Justice in Virginia*, 26 Am. J. L. Hist. 354 (1982) ................................................................................................. 45

Don B Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204 (1983), ......................... 43

Edmund S. Morgan, *The Case Against Anne Hutchinson*, 10 New Eng. Q. 635 (1937) .................................................................................. 45

Emery Battis, *Saints and Sectaries: Anne Hutchinson and the Antinomian Controversey in the Massachusetts Bay Coloney* (1962) .. 58

Jacqueline Rose, *Robert Brady's Intellectual History and Royalist Antipopery in Restoration England*, 122 Eng. Hist. Rev. 1287 (2007) ............................................................................................................. 41

James F. Cooper, Jr., *Anne Hutchinson and the "Lay Rebellion" Against the Clergy*, 61 New Eng. Q. 381 (1988) ...................................44

Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249 (2020).......................................................................... passim

Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* (1994) .................................................42, 43

Katz Cogan, *The Look Within: Property, Capacity and Suffrage in Nineteenth-Century America*, 107 Yale L.J. 473 (1997)......................33

Samuel Johnson, A Dictionary of the English Language (1766)............29

Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487 (2004)....46

Stephen P. Halbrook, *The Founder's Second Amendment* (2008)..........42

Thomas Dyche & William Pardon, *A New General English Dictionary* (14th ed. 1771) .....................................................29

Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* (1868) .........................................................34

William Blackstone, *Commentaries on the Laws of England* (St. George Tucker ed. 1803) ........................................30, 42, 54

William Rawle, *A View of the Constitution of the United States of America* (1825)...............................................30, 42

## JURISDICTIONAL STATEMENT

The appellant's jurisdictional statement is complete and correct.

## ISSUE PRESENTED FOR REVIEW

Whether 18 U.S.C. § 922(g)(1), which permanently prohibits any person convicted of "a crime punishable by imprisonment for a term exceeding one year," from possessing a firearm, is consistent with this Nation's history and tradition of firearms regulation under the Second Amendment?

# STATEMENT OF THE CASE

On September 13, 2021, Chicago Police Department officers arrested Mr. Prince for smoking a cigarette on a Chicago Transit Authority platform.[1] R. 1, 48.[2] During a search incident to Mr. Prince's arrest, the government alleged that CPD officers recovered a firearm from his person.

Mr. Prince was charged first in state court, and then ultimately in federal court by indictment with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). R. 1. The government also charged Mr. Prince with a sentencing enhancement under the Armed Career Criminal Act, R. 1, which imposes a mandatory 15-year term of imprisonment for one who violates § 922(g)(1) and has 3 specified prior convictions that qualify as either a "violent felony" or "serious drug offense." 18 U.S.C. § 924(e)(2)(A)–(B). The indictment did not specify which prior convictions were alleged to trigger the Armed Career

---

[1] Because Mr. Prince's indictment was dismissed prior to trial, Mr. Prince will describe the nature of the allegations against him. However, he pled not guilty in the district court and was prepared to proceed to trial before the Court dismissed the indictment.

[2] Mr. Prince uses "R" to refer to the district court docket entries, RSA to refer to the required short appendix, and GOB to refer to the Government's opening brief, filed at docket entry No. 16.

Criminal Act, although Mr. Prince has prior convictions for armed robbery and aggravated battery.

Prior to trial, Mr. Prince filed a motion to dismiss his indictment as unconstitutional under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), both facially and as applied to his case. R. 45. In his motion, he argued that he was protected by the Second Amendment, *id.* at 5–8, and that the government could not meet its historical burden, under *Bruen*, to show a distinctly or relevantly similar historical tradition, *id.* at 8–14. The government filed a response, R. 52, in which it argued that Mr. Prince was not protected by the Second Amendment, *id.* at 10–16, and that § 922(g)(1) was historically grounded, *id.* at 17–33. Mr. Prince filed a reply that explained in detail why the government's historical analogues were inapt. R. 56.

The district court granted Mr. Prince's motion to dismiss. RSA 1; R. 73. In reaching that outcome, the district court rested on four main findings. First, the district court explained that the government had not shown that felons were categorically excluded from the Second Amendment. RSA 9. The district court relied on *United States v. Meza-Rodriguez*, 798 F.3d 664, 669 (7th Cir. 2015), to hold that the

Second Amendment included "all members of the political community," and that community was not limited by Supreme Court dicta about "law-abiding citizens." RSA 9. Second, the district court found that the government had shown that the purpose of § 922(g)(1) was sufficiently analogous to historical gun laws that targeted people "who have demonstrated that they cannot be trusted to obey the law, or pose some other danger to the political community if armed." RSA 15–16. Third, the district court rejected the availability of an as-applied challenge, finding that the historical tradition did not support one. RSA 16.

Ultimately, the district court concluded the government could not show that § 922(g)(1) imposed a "comparable burden" on the Second Amendment right. RSA 16. While loyalty statutes were the best historical analogue to § 922(g)(1), the district court concluded that those statutes allowed one to rearm by swearing the loyalty oath or renouncing the faith that prohibited the oath. RSA 17. Section 922(g)(1), by contrast, is "permanent" and its prohibition can only be lifted by altering the underlying offense. RSA 19. In other words, § 922(g)(1) provided no proper mechanism to lift its *own* prohibition. *Id.* The district court further rejected the government's argument that capital punishment and

estate forfeiture were proper historical comparators, explaining that the purposes of those punishments were distinct. RSA 20. Capital punishment, for example, was imposed as punishment for a specific act, while felony disarmament is an ongoing social exclusion from collective rights that continues after the punishment ceases. Any lingering relevance, the district court reasoned, was diminished by the reality that many felons were in fact not subjected to capital punishment or estate forfeiture, so that historical punishment shed no light on the proper tradition for those who were not executed. RSA 20–21. The district court thus dismissed the indictment against Mr. Prince.

The government timely appealed. R. 75.

## SUMMARY OF THE ARGUMENT

The government bears the burden of showing that it's restriction "is consistent with the Nation's historical tradition of firearm regulation." *United States v. Rahimi*, 602 U.S. __, 144 S.Ct. 1889, 1896 (2024). Throughout this litigation, and across the nation, the government has never cited a single law from the Founding, let alone a historical tradition, that disarmed felons after the completion of their sentences. The government has not cited a single law from the Founding that

disarmed any person permanently, without the ability to reobtain arms. And the government has not cited a single historical law motivated by the vague concern for disarming "untrustworthy adherents to the law," instead pointing only to specific groups that were excluded from the political community and posed a risk of armed rebellion.

The Second Amendment's plain text protects Mr. Prince's right to bear arms. He is among "the people" to whom the Amendment applies because "the Second Amendment right is exercised individually and belongs to all Americans." *District of Columbia v. Heller*, 554 U.S. 570, 581 (2008). As the Supreme Court recently made clear in *Rahimi*, prior dicta referring to "law-abiding, responsible citizens" merely described a group who "undoubtedly enjoy" the right and did not implicitly cabin the right's reach. 144 S.Ct. at 1903. Mr. Prince's rights can therefore only be curtailed by a governmental showing that 18 U.S.C. § 922(g)(1) complies with our Nation's historical tradition.

The government has not done so. Rather than support a tradition permanently disarming "untrustworthy adherents of the law," GOB 9, the government's history supports two distinct traditions with little in common. On the one hand, categorical disarmament of political and social

minorities was focused on risk to the state from rebellion or political unrest, not general crime control. On the other, felony punishment existed for the distinct purpose of punishing certain serious criminal law violations and had no interest in disarmament after that punishment concluded.

Moreover, the district court was right to conclude that § 922(g)(1) imposed an impermissibly high *burden* on the Second Amendment right—a "permanent prohibition" on firearm possession. RSA 18. No law the government cites is so broad. Its examples of categorical disarmaments all make exceptions for self-defense or possession within the home, or required only forfeitures of current possessions without removing any ability to acquire new arms. Even a felony conviction did not result in the disarmament of one who was not executed.

For these reasons, this Court should affirm the dismissal of Mr. Prince's indictment.

## STANDARD OF REVIEW

This Court reviews the constitutionality of a statute de novo. *United States v. Meza-Rodriguez*, 798 F.3d 664, 668 (7th Cir. 2015).

# ARGUMENT

## I. LEGAL BACKGROUND

### A. Section 922(g)(1) broadly and permanently disarms felons, regardless of the nature or circumstances of their prior conviction.

Felon-in-possession bans are a modern invention. As the government and *amici* note, the first enactments date only to the early twentieth century. States' Amicus Brief at 10. Many of those original statutes, including federal precursors to § 922(g)(1), applied only to those who had previously been convicted of a crime of violence. *Id.* at 10 n.8 (citing cases). This limitation carried over into the first federal firearms prohibition for felons, enacted in 1938. Federal Firearms Act of 1938, Pub. L. No. 75-785, ch. 850, § 2(d), 52 Stat. 1250 (June 30, 1938). In 1968, the prohibition was expanded to cover anyone who had been convicted of a crime punishable by a term of imprisonment exceeding one year. Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, 82 Stat. 225, 225, 226.

The modern iteration of § 922(g)(1) prohibits possession of a firearm in all circumstances—permanently—for any person convicted of a prior offense "punishable by imprisonment for a term exceeding one year." 18

U.S.C. § 922(g)(1). The statute does not require any specific finding about the nature of the prior conviction, the facts of that conviction, or the danger that may or may not have been posed. Nor does the statute care what sentence was actually imposed. Instead, a separate provision carves out only a few narrow exceptions. 18 U.S.C. § 921(a)(20). First, it exempts a limited set of antitrust or business practice violations, but does not include most fraud, false statement, or regulatory offenses. 18 U.S.C. § 921(a)(20)(A); *see United States v. Schnell*, 353 F. App'x 12 (7th Cir. 2009) (false tax return); *United States v. Stanko*, 491 F.3d 408, 413–414 (8th Cir. 2007) (Federal Meat Inspection Act); *Dreher v. United States*, 115 F.3d 330, 332 (5th Cir. 1997) (mail fraud); *United States v. Meldish*, 722 F.2d 26, 27 (2d Cir. 1983) (falsifying a customs declaration). Second, it exempts certain state-defined misdemeanors punishable by up to two years' imprisonment. 18 U.S.C. § 921(a)(20)(B). And third, § 921(a)(20) also carves out certain convictions that were later lifted through "pardon, expungement, or restoration of civil rights." A further separate section provides a theoretical mechanism for relief from § 922(g)(1)'s permanent disarmament through an administrative procedure. 18 U.S.C. § 925(c). Congress has suspended that provision by

defunding it since 1992. *Logan v. United States*, 552 U.S. 23, 28 n.1 (2007).

As the preceding description makes clear, § 922(g)(1)'s broad sweep is intentional. While its precursor statute limited disarmament to those specifically convicted of "crimes of violence," by 1968 Congress's focus had shifted. It no longer sought exclusively to disarm certain individuals it perceived as dangerous. Rather, it sought to reduce the availability of guns in general by disarming a much wider swath of the Nation. *Huddleston v. United States*, 415 U.S. 814, 824 (1974) (explaining that the Omnibus Crime Control and Gun Control Acts of 1968 were "thus aimed at restricting public access to firearms" generally). The law's purposes included combatting "the ease with which *any person* can acquire firearms other than a rifle or shotgun," and combatting what Congress found to be a problem of "a dumping ground of the castoff surplus military weapons of other nations," which were "largely worthless for sporting purposes . . . [but] contributed greatly to lawlessness." Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, § 901(a)(2), (7), 82 Stat. 225, 225, 226. In other words, Congress's focus was on reducing gun crime by reducing access to guns

broadly—not only for those with a history of violence or misuse of firearms in particular.

### B. The Second Amendment protects the individual's right to bear arms over legislative interest balancing.

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. Amend. II. The Amendment's plain text grants the right to "keep and bear" arms to all members of our "national community." *Heller*, 554 U.S. at 580, 595. And the history of the Nation demonstrates that "the inherent right of self-defense has been central to the Second Amendment." *Id.*

After *Heller*, the Courts of Appeals employed a two-step framework for reviewing Second Amendment claims using both history and intermediate scrutiny. *See, e.g., Kanter v. Barr*, 919 F.3d 437, 442 (7th Cir. 2019); *Bruen*, 597 U.S. at 18. Few regulations failed this "two-step" inquiry, as the second step often ended with "judicial deference to legislative interest balancing." *Bruen*, 597 U.S. at 26. In *Bruen*, the Supreme Court rejected this legislative deference in favor of a stricter test: "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer

bounds of the right to keep and bear arms." *Id*. at 19 It "may not simply posit that [a] regulation promotes an important interest." *Id.* at 17.

The Supreme Court applied this new test in *United States v. Rahimi*, 144 S.Ct. at 1897. *Rahimi* reaffirmed *Bruen*'s focus on text, history, and tradition. *Id.* It then confronted the question of whether 18 U.S.C. § 922(g)(8)(C)(i)—which disarms an individual subject to a restraining order that contained a specific finding that the person posed a credible threat to the physical safety of another—passed constitutional muster. In so doing, *Rahimi* clarified several aspects of *Bruen*'s inquiry.

First, *Rahimi* left undisturbed the Court's broad holdings about the scope of "the people" in the Second Amendment. *Bruen*'s first step looks to the text itself: if "the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." 597 U.S. at 24. *Rahimi* rejected the government's argument that the Amendment's plain text "protects only law-abiding, responsible citizens." Brief for the United States at 11–12, *United States v. Rahimi*, 602 U.S. __, 144 S.Ct. 1889, No. 22-915 (U.S. Aug. 14, 2023). The Supreme Court explained that this argument "did not derive from [the Court's] case law." *Rahimi*, 144 S.Ct. at 1903. "Responsible is a vague

term."[3] *Id.* Past cases had used that term to "describe a class of citizens who undoubtedly enjoy the Second Amendment right . . . [b]ut those decisions did not define the term and said nothing about the status of citizens who were not 'responsible.' The question was simply not presented." *Id.*

Second, the Supreme Court addressed § 922(g)(8)(C)(i)'s constitutionality using *Bruen*'s methodology: the government must provide evidence of a "historical tradition of firearm regulation" that shows the modern regulation "is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 144 S.Ct. at 1897. *Rahimi* reaffirmed that "how and why the regulation burdens the right are central to this inquiry." *Id.* at 1898. A law that imposed "similar restrictions for similar reasons" would be constitutional, while one that has a different reason or burdened the right to a greater extent would not. *Id.*; *see also Bruen*, 597 U.S. at 26, 29 (explaining that a regulation must "impose a comparable burden on the right of armed self-defense"

---

[3] At oral argument, the government appeared to suggest that it was only invoking the "responsible" prong of its "responsible, law-abiding citizens" argument as to Mr. Rahimi. Tr. Of Oral Arg. 8–9, *United States v. Rahimi*, 22-915 (U.S. Nov. 7, 2023). Although dissenting, Justice Thomas agreed with the majority in rejecting this argument and more fully discussed its errors. *Rahimi*, 144 S.Ct. at 1944–1947 (Thomas, J., dissenting). Moreover, the government's argument was indelibly tied to the entirety of the phrase "law-abiding, responsible citizen." *Id.*

and be "comparably justified"). The "why" goes to a law's purpose in achieving a regulatory goal. *Rahimi*, 144 S.Ct. at 1898; *Bruen*, 597 U.S. at 29. And the "how" goes to the weight of the law's burden. That burden includes the kind of showing needed to trigger disarmament, the temporary nature of that disarmament, and the consequences that flow from it. *Rahimi*, 144 S.Ct. at 1901–02.

A modern law must meet both prongs of the test. *Id., see also Bruen*, 597 U.S. at 29. A law that has a distinct purpose is unconstitutional even if its burden is minor. *Id.* So too is one that applies "for a permissible reason . . . [but] does so to an extent beyond what was done at the founding." *Rahimi*, 144 S.Ct. at 1898.

Third, *Rahimi* clarified that the government must meet its burden with a properly supported historical justification, rather than abstract principles. This historical tradition is primarily discerned through historical regulation itself—a law must be "'relevantly similar' to *laws* that our tradition is understood to permit." *Id.* (emphasis added). In *Bruen*, the Supreme Court carefully reviewed different historical authorities proffered by the State of New York. 597 U.S. at 39–70. The Court did the same in *Rahimi*, finding two historical analogues to support

a relevantly similar regulatory tradition: surety laws and going armed laws. Surety laws were "well entrenched in the common law," while going armed laws were authorized in at least 10 jurisdictions. *Id.* at 1900–01.

The Supreme Court explained that both historical traditions supported the same specific principle: disarmament following a level of proof of "demonstrated threats of physical violence" with a firearm. *Rahimi*, 144 S.Ct. at 1901. So too did both laws burden the Second Amendment right in similar ways to § 922(g)(8). The consequences applied only after "judicial determinations of whether a particular defendant likely would threaten or had threatened another with a weapon"—exactly what § 922(g)(8)(C)(i) requires to be in a predicate protective order, and for the same purpose. *Id.* at 1902. Like historical surety bonds, § 922(g)(8)'s restriction is temporary, tied to the restraining order that triggered it. *Id.*

Fourth, *Rahimi* did not overrule or dispute *Bruen*'s holding or articulation of the test. *Bruen*'s lessons thus remain when assessing whether a regulation is an appropriate analogue. For example, "the lack of a distinctly similar historical regulation" addressing a problem the Founders themselves confronted is "relevant evidence that the

challenged regulation is inconsistent with the Second Amendment." 597 U.S. at 26. And courts should "be careful when assessing evidence concerning English common-law rights," ensuring that they are discerning the American practice as it evolved, not the English practice left behind. *Id.* at 35. At its core, *Rahimi* reaffirmed *Bruen*'s "commonplace" analogical reasoning. *Id.* (quoting *Bruen*, 597 U.S. at 28).

Finally, the Supreme Court held that the Fifth Circuit erred when it found that historical surety laws *were* closely related to § 922(g)(8)(C)(i), but nonetheless held the statute facially unconstitutional based on § 922(g)(8)(C)(ii), which did not require a finding of dangerousness. *See United States v. Rahimi*, 61 F.4th 443, 460 (5th Cir. 2023) *rev'd by Rahimi¸* 144 S.Ct. at 1903. The Supreme Court explained that this was the wrong way around—because surety and going armed laws were clearly sufficient to sustain the prosecution against Mr. Rahimi under § 922(g)(8)(C)(i), the harder questions of subsection (C)(ii) should have been left for another day. 144 S.Ct. at 1898 ("Our analysis starts and stops with Section 922(g)(8)(C)(i)"); *id.* at 1903 ("the panel instead focused on hypothetical scenarios where Section 922(g)(8)[(c)(ii)] might raise constitutional concerns"). *Rahimi* thus

upheld a law with a clear historical analogue but had little to say directly about more complicated histories or more significant burdens of the right.

### C. Section 922(g)(1)'s broad purpose and burden are facially unconstitutional, even if Section 922(g)(8)'s distinct focus was not.

Mr. Prince brings a facial challenge. Such a challenge is sometimes said to require "establish[ing] that no set of circumstances exists under which the [challenged law] would be valid," *Rahimi*, 144 S.Ct. at 1898. At the same time, a facial challenge does not require Mr. Prince to show that the conduct alleged in the indictment is constitutionally protected from *any* prosecution—only from the law he is charged under. A facial challenge is "a claim that the law or policy at issue is unconstitutional in all its *applications*." *Bucklew v. Precythe*, 587 U.S. 119, 138 (2019) (emphasis added). Here, § 922(g)(1)'s relevant "applications" include only those facts that are needed to meet its elements and prove the violation. *See City of Los Angeles v. Patel*, 576 U.S. 409, 418 (2015) (explaining that a facial challenge considers "only applications of the statute in which it actually authorizes or prohibits conduct"). As the Supreme Court has explained, "the proper focus of the constitutional inquiry is [prosecutions] that the law actually authorizes, not those for which it is irrelevant." *Id.*

Section 922(g)(1) is facially unconstitutional because both its purpose and burden are unsupported by our Nation's history and tradition, and so whether a different, narrower tradition could justify a distinct law—like § 922(g)(8)—is insufficient here.

*Rahimi* illustrates this principle in practice. Because Mr. Rahimi was prosecuted under § 922(g)(8), his prosecution required showing both that the protective order made the specific finding "that such person represents a credible threat to the physical safety" of another, and that he was still "subject to a court order." 18 U.S.C. § 922(g)(8)(C)(i). The Supreme Court upheld this section against a facial challenge because the specific things the statute was concerned with—the dangerousness finding and the extent of the protective order—fell within the historical tradition. Like the historical surety and going armed laws, Mr. Rahimi's prosecution required a "judicial determination[] of whether a particular defendant likely would threaten or had threatened another with a weapon." *Rahimi*, 144 S.Ct. at 1902. In other words, the facial challenge in *Rahimi* did not fail because the Court found Mr. Rahimi to generally be "dangerous" or "untrustworthy;" it failed because the statute *required* a specific order prospectively finding him to be just that. *See also Heller*,

554 U.S. at 630 (explaining that the D.C. statute at issue was unconstitutional in part because a self-defense exception was "precluded by the unequivocal text").

So too in *Patel*. There, the Supreme Court confronted a statutory scheme that authorized suspicionless searches of hotel guest registers. 576 U.S. at 412. It rejected the argument that a facial challenge was impossible because *other* possible reasons might uphold a particular search, such as exigent circumstances or a valid warrant. *Id.* at 418. The Court looked at the constitutionality of the searches conducted under the challenged law, and not to distinct sources of search authorization that did not apply to the statute.

The same principle applies in constitutional challenges to criminal prosecutions. Consider flag-desecration statutes. A prosecution "*only* for flag desecration—not for trespass, disorderly conduct, or arson"—is unconstitutional. *Texas v. Johnson*, 491 U.S. 397, 412 n.8 (1989).[4] That is true even when the very same flag-burning conduct may be criminalized for some other reason, such as a breach of the peace,

---

[4] *Johnson* is an as-applied challenge, but a facial challenge is simply a discussion of a statute's applications. *Patel*, 576 U.S. at 418. And so *Johnson*'s discussion of what facts are relevant to a constitutional challenge is just as relevant to a facial analysis.

*id.* at 410, or destruction of property, *United States v. Eichman*, 496 U.S. 310, 313 n.1 (1990). If the burning of a flag is protected speech, the fact that it might also be damage to property is "irrelevant" to the prosecution *even if* a separate charge is also authorized or brought. *Patel*, 576 U.S. at 418.

Mr. Prince makes this facial showing here. Section 922(g)(1) applies to any individual with a prior conviction punishable by imprisonment exceeding one year, virtually regardless of circumstance. It is concerned with, or "actually authorizes," prosecutions of one who possessed a firearm, again regardless of circumstance. These prosecutions § 922(g)(1) authorizes are thus unconstitutional because their purpose is to broadly disarm all people with felony convictions permanently. That *some* felony convictions, or *some* conduct, might sustain a different prosecution under a different statute cannot save § 922(g)(1) after *Rahimi*.

## II.    MR. PRINCE IS PROTECTED BY THE SECOND AMENDMENT.

This Court first looks to "the plain text of the Second Amendment." 597 U.S. at 32. This text provides that the right "is exercised individually and belongs to all Americans," and not some "unspecified subset." *Heller*,

554 U.S. at 580–81. The government nonetheless argues, without any basis in text, that Mr. Prince is not among "the people" covered by the Second Amendment.[5] GOB 18–28. But as the district court acknowledged, and both this Court and the Supreme Court have repeatedly emphasized, "the people" in the Second Amendment is to be read broadly. Whatever the ultimate scope of the Second Amendment, Mr. Prince is not excluded from the right solely due to his felony convictions—a sweeping argument completely incongruent with how every other individual right operates.

## A. *Rahimi* rejected the government's argument that "the people" is limited to only "law-abiding individuals."

As it did below, the government urges this Court to hold that Mr. Prince is categorically excluded from the definition of "the people" in the Second Amendment because that right belongs only to "law-abiding" individuals. GOB 20–24. This carve-out traces back to "oft-quoted dicta," from *Heller* and *Bruen* about whether the challengers in those cases were among the people protected by the Second Amendment. *Atkinson v.*

---

[5] The government does not argue that possessing a firearm in public does not constitute "bearing arms" under the Second Amendment. This is for good reason: the "definition of 'bear' naturally encompasses public carry," and "arms" includes handguns in use today. *Bruen*, 597 U.S. at 32.

*Garland*, 70 F.4th 1018, 1022 (7th Cir. 2023). This Court has rightly observed that this language was and is dicta that does not purport to exclude enormous swaths of the Nation from the right, and the Supreme Court recently confirmed that understanding in *Rahimi*.

In *Rahimi*, the government argued at length that the Second Amendment right was limited to "law-abiding, responsible citizens." Brief for the United States at 10–27, *United States v. Rahimi*, 602 U.S. __, 144 S.Ct. 1889 (2024) (No. 22-915). Like the government here, the Solicitor General relied on language from *Heller* and *Bruen* to support its argument, along with appeals to purported historical context. *Id.* at 11; GOB 23–24.

The Supreme Court flatly rejected this argument: "Responsible is a vague term. It is unclear what such a rule would entail." *Rahimi*, 144 S.Ct. at 1903. Such a restriction did not "derive" from *Heller* or *Bruen*. *Id.* The term responsible was used "to describe the class of ordinary citizens who undoubtedly enjoy the Second Amendment right. But those decisions did not define the term and said nothing about the status of citizens who were not 'responsible.' The question was simply not presented." *Id.* That theory, in fact, was so devoid of support that the

Supreme Court only engaged with it in order to reject it completely. *See Rahimi*, 144 S.Ct. at 1944 (Thomas, J., dissenting) ("Not a single Member of the Court adopts the Government's theory.").

In doing so, *Rahimi* also functionally rejected the government's argument here that only "law-abiding" citizens are protected. GOB 20. Like in *Rahimi*, the government often uses this phrase together with responsible. GOB 9 ("the Second Amendment's protections extend only to 'law-abiding, responsible citizens.'"); GOB 23–24, GOB 34. This is because "law-abiding citizens" is the second piece of the phrase the government draws on from *Heller*. Nearly every time the word "responsible" appears in those prior cases, it appears as part of the phrase "law-abiding, responsible citizen." *See, e.g.*, *Bruen*, 597 U.S. at 70; *Heller*, 554 U.S. at 635. Even when "law-abiding" appears on its own, it is used in this same fashion to describe a general agreement over those who "undoubtedly enjoy the Second Amendment right." *Rahimi*, 144 S.Ct. at 1903. The term was never used to suggest an intent to prospectively and categorically limit the scope of the right. *Id.*; *see Heller*, 554 U.S. at 625, 635; *Bruen*, 597 U.S. at 31 ("petitioners . . . two, ordinary, law-abiding, adult citizens—are part of the people"); *see also Rahimi*, 144 S.Ct. at 1910

(Gorsuch, J., concurring) ("Nor do we purport to approve in advance other laws denying firearms on a categorical basis to any group of persons"). The Supreme Court has repeatedly emphasized that it did not intend to pass on Second Amendment issues not before it, and so "did not 'undertake an exhaustive historical analysis of the full scope of the Second Amendment.'" *Rahimi*, 144 S.Ct. at 1903 (quoting *Bruen*, 597 U.S. at 31) (ellipses omitted); *see Heller*, 554 U.S. at 626.

"Law-abiding," just like "responsible," is "a vague term" whose content would be "unclear." *Rahimi*, 144 S.Ct. at 1903. In rejecting the government's argument, *Rahimi* bolstered those lower courts that had presciently rejected an over-reliance on this language. In *Range*, for example, the en banc Third Circuit cited multiple reasons to reject this reading, including by emphasizing its vagueness. *See Range v. Attorney General*, 69 F.4th 96, 101–102 (3d Cir. 2023) (en banc), *cert. granted, vacated* No. 23-374 July 2, 2024, 2024 WL 3259661[6]. Does it include any petty offense, or just felonies? If felonies, can the legislature simply define

---

[6] Both *Range* and the Ninth Circuit's opinion in *Duarte* were decided before *Rahimi*. But their discussions of the plain text of the Second Amendment to reject a limitation imposed by "law-abiding, responsible citizens" remain highly persuasive authority. Indeed, they have been bolstered by *Rahimi*'s rejection of the Government's "responsible" argument in that case, unlike contrary Circuit authority—including *United States v. Gay*, 98 F.4th 843 (7th Cir. 2024)—which gave undue weight to that phrasing.

anything as a felony—even in contravention to another jurisdiction's own definition—to trigger the rule? Such a broad exemption simply returns "authority to legislators to decide whom to exclude from 'the people,'" and undoes *Bruen*'s focus on eliminating legislative interest balancing. *Range*, 69 F.4th at 102. *See also United States v. Duarte*, 101 F.4th 657, 671 (9th Cir. 2024) *vacated and pet. reh'g granted* July 18, 2024.

*Rahimi* thus confirms this Court's prior rejections of this dicta. In *United States v. Meza-Rodriguez*, this Court explained:

> While some of *Heller*'s language does link Second Amendment rights with the notions of "law-abiding citizens" and "members of the political community," *see Heller,* 554 U.S. at 580, 625, those passages did not reflect an attempt to define the term "people." We are reluctant to place more weight on these passing references than the Court itself did.

798 F.3d at 669. Instead—following the actual holding of the *Heller* decision—*Meza-Rodriguez* concluded that "the term 'the people' in the Second Amendment has the same meaning as it carries in other parts of the Bill of Rights[.]" *Id.* at 670. This Court rejected a renewed effort by the government in *Atkinson*. 70 F.4th at 1022 (rejecting the government's

reliance on this "oft-quoted dicta" while holding that "[n]othing allows us to sidestep *Bruen*" and avoid the historical inquiry).[7]

For similar reasons, *Rahimi* undermines this Court's recent decision in *United States v. Gay*, 98 F.4th 843 (7th Cir 2024). This Court should not rely on that flawed decision. In *Gay*, the Seventh Circuit held that Mr. Gay did not enjoy a Second Amendment right to possess a firearm and could not challenge § 922(g)(1). In rejecting Mr. Gay's constitutional claim, *Gay* relied exclusively on the fact that "*Bruen* repeatedly used the phrase 'law-abiding, responsible citizens' or a variant," and on the Supreme Court's suggestion that certain historical laws were "presumptively valid." *Gay*, 98 F.4th at 846–47; *see also id.* at 847 ("No, Gay is not a 'law-abiding, responsible' person who has a constitutional right to possess firearms."). This analysis cannot survive

---

[7]The two Circuits that squarely addressed this question following *Bruen* both reached *Bruen*'s second step. *See Range*, 69 F.4th at 106; *Duarte*, 101 F.4th at 691. The Eighth Circuit upheld § 922(g)(1) but did not explain what step of *Bruen* it invoked, although it looked to history to confirm its analysis. *United States v. Jackson*, 60 F.4th 495 (8th Cir. 2023), *cert. granted, vacated*, __ S.Ct. __, 2024 WL 3259675 (July 2, 2024). The Tenth and Eleventh Circuits have upheld § 922(g)(1) without reaching the historical section based on prior panel precedent that is now inconsistent with *Rahimi*. *Vincent v. Garland*, 80 F.4th 1107, 1202 (10th Cir. 2023), *cert. granted, vacated*, __ S.Ct. __, 2024 WL 3259668 (July 2, 2024); *United States v. Dubois*, 94 F.4th 1284, 1293 (11th Cir. 2024). And courts around the country have held that "the people" protected by the Second Amendment includes felons. *See, e.g., United States v. Ebron*, No. 3:24CR47, 2024 WL 2097228, at *3 (E.D. Va. May 9, 2024); *United States v. Williams*, __ F. Supp. 3d __, 2024 WL 731932 at *8–11 (E.D. Mich. Feb. 22, 2024); *United States v. Neal*, No. 20CR335, __ F. Supp. 3d __, 2024 WL 833607 at *6 (N.D. Ill. 2024).

*Rahimi*, which dismissed the government's argument that non-responsible citizens could be disarmed based on exactly this prior language. And no other source of reasoning could support *Gay*'s holding: *Gay* did not engage in any textual or historical reasoning to justify its conclusion.

Finally, the government briefly argues that *Bruen* implicitly blessed a law-abiding principle because it endorsed "shall-issue" licensing schemes, "many of which prohibit the issuance of licenses to felons[.]" GOB 24. But *Bruen* did not rule on the constitutionality of 43 specific state licensing regimes that were before the Court. *See Bruen*, 597 U.S. at 39 n.9. Rather, the Court merely blessed the general concept of "shall-issue" regimes. As this Court explained in *Atkinson*:

> Yes, the Court seemed to find no constitutional fault with a state requiring a criminal background check before issuing a public carry permit. But in no way did the Court suggest that its observation resolved cases like the one Atkinson brought challenging § 922(g)(1). We must undertake the text-and-history inquiry the Court so plainly announced and expounded upon at great length.

70 F.4th at 1022. And the Supreme Court has now repeatedly stated its intent, in no uncertain terms, not to rule on Second Amendment

questions not before it. *Rahimi*, 144 S.Ct. at 1903 (quoting *Bruen*, 597 U.S. at 31).

## B. The Second Amendment protects the entire national community, including Mr. Prince.

Just as precedent rejects the government's "law-abiding" gloss, precedent and history make clear that the Second Amendment is applicable to all citizens and does not exclude felons. The right "is exercised individually and belongs to all Americans." *Heller*, 554 U.S. at 581. Both the ordinary meaning of "the people" and the historical context of the Second Amendment confirm that the district court was correct to count Mr. Prince among the people protected by the right.

At the Founding, the people "signifie[d] every person, or the whole collection of inhabitants in a nation or kingdom[.]" Thomas Dyche & William Pardon, *A New General English Dictionary* (14th ed. 1771), available at https://tinyurl.com/uk4b4fxd;[8] *see also* 2 Samuel Johnson, A Dictionary of the English Language 306 (1766) (defining "people" as "[a] nation; those who compose a community"), available at https://tinyurl.com/y95erjwf; N. Bailey, *An Universal Etymological*

---

[8] The 1771 Dyche & Pardon dictionary is unpaginated. The quoted definition can be found on page 639 of the PDF file available at the attached link.

*English Dictionary* 601–02 (1770) ("the whole Body of Persons who live in a Country[] or make up a Nation"). The right belonging to the people "properly consists of armed citizens." *Heller*, 554 U.S. at 607 (quoting William Rawle, *A View of the Constitution of the United States of America* 140 (1825)). Indeed, the right of self-defense was given to "all men, without distinction." 2 William Blackstone, *Commentaries on the Laws of England*, 145 n.42 (St. George Tucker ed. 1803); *see Heller*, 554 U.S. at 594 (citing with approval).

Historical context confirms this. The "right of the people," as used in the Second Amendment, "unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580. It is a term of art that appears not just in the Second Amendment, but in the First, Fourth, and Ninth Amendments as well. *Id.* at 579. The repeated use of this term reflected a consistent meaning—namely, that these instances "unambiguously refer to individual rights, not 'collective' rights, or rights that may be exercised only through participation in some corporate body." *Id.* By contrast, "the 'militia' in colonial America consisted of a subset of 'the people'"—certain white, male, adult, and able-bodied individuals. *Id.* In rejecting the prefatory clause's more limited

scope, *Heller* squarely held that the language of the clause creates "a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Id.* at 581. Indeed, "'the people' protected by the Fourth Amendment, and by the First and Second Amendments . . . refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Id.* at 580 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)).[9]

This Court has likewise defined the "people" broadly. In *Meza-Rodriguez*, this Court concluded that "the people" is not rigidly defined by things like citizenship or civic access, but instead governed by the ties an individual has to the community. *Id.* at 670. ("The Second Amendment is not limited to such on-again, off-again protection."). It thus found that a person present in the United States without authorization, and charged with unlawfully possessing a firearm in violation of 18 U.S.C. § 922(g)(5), nonetheless could make a

---

[9] *Heller* also explicitly rejected another argument the government puts forward here, namely that "the people" appears in other parts of the Constitution with a different meaning. GOB at 27–28. Those provisions, such as Congressional elections or the preamble, involve a different context—discussion of "the exercise of reservation of powers," with a distinct meaning of "the people" from its use for individual rights. *Heller*, 570 U.S. at 580.

Second Amendment claim. Although the defendant's behavior there "left much to be desired," *Meza-Rodriguez* held that those who are present in the United States without authorization are not excluded. *Id.* As this Court has aptly stated, "No language in the Amendment supports such a conclusion nor, as we have said, does a broader consideration of the Bill of Rights." *Id.* at 672.

The government's further arguments for removing anyone with a felony conviction from "the people" are unpersuasive. The government first suggests that *Meza-Rodriguez* is not the definitive word on the subject because this Court would later discuss the "civic virtue" theory in *Kanter v. Barr*. GOB at 26; *see Kanter*, 919 F.3d at 445–446. *Rahimi* forecloses this: "civic virtue" is no more definite or administrable than "responsible," and even less tethered to Supreme Court precedent. 144 S.Ct. at 1903. By its own terms, *Kanter* did not reach this issue, ultimately relying on intermediate scrutiny instead. 919 F.3d at 447. And its historical discussion involved a broader inquiry, not a discussion of the meaning of "the people." Other than an introductory full quote of the Second Amendment's text, *Kanter* does not discuss or examine the definition of "the people" at all.

The government also argues that "the people" does not include felons because felons have historically been excluded from *collective* rights. GOB at 18–19. This theory of the Second Amendment was rejected in *Heller*. The Second Amendment "secured an individual right to bear arms for defensive purposes," gleaned from "the overwhelming weight of other evidence regarding the right to keep and bear arms for defense of the home." 554 U.S. at 602, 632. Whether collective rights normally include felons is simply not relevant to the Second Amendment's *individual* guarantee. *See Kanter*, 919 F.3d at 462–63 (Barrett, J., dissenting).

Moreover, the government misstates this history as it relates to the Second Amendment. At the Founding, property ownership was a prerequisite to voting in most states, Katz Cogan, *The Look Within: Property, Capacity and Suffrage in Nineteenth-Century America*, 107 Yale L.J. 473 (1997), as was jury service. The Second Amendment, by contrast, was not so limited, in the same way that one who did not own property still retained their individual rights. Even the government's own historical sources falter when examined for commentary about the Second Amendment in particular. For example, the government relies on

Thomas Cooley's treatise for the proposition that felons were excluded "from the people in whom is vested the sovereignty of the state." GOB 19–20. But the government's quote is from a passage discussing the scope of collective, civic rights that "doesn't actually say anything about the right to keep and bear arms" whatsoever. *United States v. Harrison*, 654 F. Supp. 3d 1191, 1207 (W.D. Okla. 2023); *see also Heller*, 554 U.S. at 579. In fact, Cooley's treatise contains an entirely separate section "exclusively devoted to the right to keep and bear arms," but which "says nothing about the exclusion of felons." *Harrison*, 654 F. Supp. 3d at 1207 n.69 (internal citation omitted). This passage even admits of uncertainty of the right's scope: "how far it may be in the power of the legislature to regulate the [Second Amendment] right we shall not undertake to say."[10] Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 350 (1868); *see also Duarte*, 101 F.4th at 676 (explaining that Cooley elsewhere endorsed the "all-citizens" approach for individual rights).

Finally, the government points to the existence of the death penalty for felonies and failed ratification proposals implying some level of

---

[10] Notably, it is *this* section, not the government's selection, that was cited with approval in *Heller*. 554 U.S. at 616.

abstract disarmament. GOB 20–22. These are, self-evidently, arguments about the historical practice, and thus more properly made at *Bruen*'s second step. The government does not even try to connect its historical examples to "the Second Amendment's plain text." *Bruen*, 597 U.S. at 24; GOB at 21–22. In a theme that will repeat, the government cites no authority that a felon was in fact disarmed if he was not executed at the Founding. Nor do ratification debates do the work the government needs. "It is dubious to rely on such history to interpret a text that was widely understood to codify a pre-existing right." *Heller*, 554 U.S. at 603. These proposals were not adopted and do not agree with *each other*, let alone on a common principle, about who could be disarmed. They also, by their own terms, imply that "the people" includes those who would later be disarmed—if all agreed a felony conviction excluded one from the definition of the people, there would be no need for the language the government relies on to specifically provide for their disarmament.

Of course, that Mr. Prince possesses the right does not mean that it is unlimited. *Rahimi*, 144 S.Ct. at 1897 (quoting *Heller*, 554 U.S. 570). But the government does not cite any historical evidence or language that "the people" categorically excludes someone with a felony conviction. This

Court should reject the government's unsupported claim, as the district court did, and hold that the plain text of the Second Amendment presumptively protects Mr. Prince's right to keep and bear arms, just as it does all Americans.

## III. SECTION 922(G)(1) IS NOT RELEVANTLY SIMILAR TO ANY HISTORICAL REGULATION.

Having confirmed that Mr. Prince is protected by the Second Amendment, the government must show that § 922(g)(1) is "relevantly similar to laws that our tradition is understood to permit." *Rahimi*, 144 S.Ct. at 1898. It has not, and cannot, do so. The government, and the district court below, did not cite a single law in the historical tradition that disarmed felons who were not executed. Instead, the government has tried to patch together two unrelated and limited historical traditions: (1) broad categorical disarmaments of disfavored political and racial minorities who were largely excluded from the national community altogether; and (2) capital punishment and estate forfeiture for felony convictions at the Founding.

Neither is a proper historical analogue for § 922(g)(1), and none of historical evidence supports the government's broad, amorphous claim that it may disarm anyone who it deems to be an "untrustworthy

adherent[] of the law."[11] GOB 29. And none of these historical laws demonstrate that permanent disarmament is appropriate for one who was not executed.

Mr. Prince will first explain why each of the government's historical arguments fails to demonstrate an appropriate tradition relevantly similar to § 922(g)(1)'s purpose, and then turn to the government's failure to show a relevantly similar burden.

## A. Section 922(g)(1)'s historically novel purpose has no relevantly similar analogue.

Recall that, to infringe on Mr. Prince's right to bear arms, the government must show that disarming him "is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 144 S.Ct. at 1898. This test "appl[ies] faithfully the balance struck by the Founding generation to modern circumstances." *Id.*; *see also Bruen*, 597 U.S. at 24 ("the government must then justify its regulation by demonstrating that

---

[11] While the district court found some laws to have a properly analogous historical purpose, this Court may "affirm on any ground supported by the record so long as the issue was raised and the non-moving party had a fair opportunity to contest the issue in the district court." *Locke v. Haessig*, 788 F.3d 662, 666 (7th Cir. 2015). It should do so here. The American historical tradition does not support permanent disarmament of felons writ large based on a general perception of untrustworthiness.

it is consistent with this Nation's historical tradition of firearm regulation.").

With these principles in mind, § 922(g)(1)'s purpose cannot be justified. Section 922(g)(1) represents an intentional broadening of felony disarmament *away* from concerns over dangerousness or misuse. The statute intentionally disarms those convicted of all felonies, regardless of any connection to rebellion, misuse of firearms, "dangerousness," or any other historically supported ground.

Neither the federal government nor any state or territory barred any person convicted of a felony *of any kind* from possessing a firearm until well into the Twentieth century. And while the status of felons in relation to the broader social compact is complex, the status of felons in relation to the Second Amendment is not. "History does not support the proposition that felons lose their Second Amendment rights solely because of their status as felons." *Kanter*, 919 F.3d at 464 (Barrett, J., dissenting). Indeed, no one has ever been able to find or cite "any case or statute from [the Founding] era that imposed or authorized such bans." *Folajtar v. Attorney General*, 980 F.3d 897, 915 (3d Cir. 2020) (Bibas, J., dissenting); *see also Range*, 69 F.4th at 104 & n.8; *United States v. Skoien*,

614 F.3d 638, 640–41 (7th Cir. 2010) (en banc) (charting this history); Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 260 (2020); Conrad Kahn, *Challenging the Federal Prohibition on Gun Possession by Nonviolent Felons*, 55 S. Tex. L. Rev. 113, 127 (2013); Carlton F.W. Larson, *Four Exceptions in Search of A Theory:* District of Columbia v. Heller *and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1375 (2009); C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Policy 695, 717 (2009); Adam Winkler, Heller*'s Catch-22*, 56 UCLA L. Rev. 1551, 1563 (2009).

Against this history, the government instead proposes two distinct groups of historical authority to support its theory: disarmament of disfavored minority groups, GOB 29–38, and felony punishment, GOB 38–40. The district court rejected the relevance of most of the government's history but agreed that one narrow slice of that history, loyalty oaths, was a proper analogue. RSA 15. This was error. As

explained below, these historical examples do not show any tradition of disarmament comparable to § 922(g)(1)'s broad and novel purpose.

1.    Political and social minorities were disarmed to protect against a perceived risk of rebellion, not because they were "untrustworthy adherents to the law."

The government's first attempt to show a tradition of "untrustworthy adherents to the law" looks to several laws that disarmed members of minority groups. These laws demonstrate a much narrower tradition: disarmament of those either excluded from the political community entirely, or who tended to be disloyal or rebel against the state. This tradition, unsurprisingly, is markedly distinct from § 922(g)(1)'s purpose to broadly disarm any person convicted of a felony for general crime control purposes. Mr. Prince will discuss the various historical sources in turn, and then explain why they do not succeed in total.

**_English history._** The government's revisionist history begins in England in 1689, when the newly restored Protestant monarchy disarmed Catholics who refused to make declarations renouncing their faith. GOB at 29. But the English Bill of Rights applied only to Protestants. _Heller_, 554 U.S. at 593. That Catholics were disarmed at the

same time thus tells us nothing about the proper scope of the English Bill of Rights tradition that Catholic disarmament was separated from. *See Harrison*, 1191 F. Supp. 3d at 1219.

The government also mischaracterizes English law as reflecting "the new government's perception that Catholics . . . could not be trusted to obey English law." GOB 30. This mild gloss badly understates the nature of the Catholic disarmament following the Glorious Revolution, when Catholics were regarded not merely as untrustworthy but as potentially rebellious enemies of the state. *See* Clement Fatovic, *The Anti-Catholic Roots of Liberal and Republican Conceptions of Freedom in English Political Thought*, 66 J. Hist. Ideas 37, 43 (2005) ("Throughout the seventeenth century it was widely believed that closet Catholics throughout the country formed a deadly fifth column lying in wait to slaughter Protestants and force their religion on the nation with Catholics."); Jacqueline Rose, *Robert Brady's Intellectual History and Royalist Antipopery in Restoration England*, 122 Eng. Hist. Rev 1287, 1289 (2007).

The government next turns the English Bill of Rights itself, which codified a qualified right to bear arms while reserving Parliament's

complete power to prescribe gun ownership "by Law." GOB at 31.

Although initially subject to Parliament, the right's scope was not set in

stone. Over time it "matured" into an individual right against the

legislature that "protect[ed] against both public and private violence."

*Heller*, 554 U.S. at 594. The American language of the

Second Amendment "is much broader" to incorporate this broader

tradition. Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an*

*Anglo-American Right* 136, 137 (1994). No less a scholar than James

Madison observed that the Second Amendment intentionally eliminated

the phrase "by Law." Stephen P. Halbrook, *The Founder's*

*Second Amendment* 252 (2008) (quoting 12 James Madison, *The Papers*

*of James Madison* 193 (F. Hobson et al. eds., 1979)); *see also* William

Rawle, *A View of the Constitution of the United States of America* 126

(1825); 1 Blackstone, *Commentaries* 143 n.40 (St. George Tucker ed.,

1803).

The government's use of this history demonstrates the need for the

Supreme Court's admonishment to "be careful when assessing evidence

concerning English common-law rights." *Bruen*, 597 U.S. at 35. In

*Rahimi¸* by contrast, the Supreme Court found going armed laws an

appropriate analogue to § 922(g)(8) because those laws had their roots in the Statute of Northampton and were *carried forward* into a related American tradition. 144 S.Ct. at 1901. Here, the American tradition discarded the prior limitation on which the government seeks to rely.

*Colonial laws.* The government then turns to colonial laws that disarmed enslaved people, Native Americans, and religious minorities. GOB at 31–34; R. 52 at 20. But like laws disarming Catholics, these laws restricted possession by groups that were perceived to have been outside the right altogether. Malcolm, *To Keep and Bear Arms* at 141; Don B Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204, 217 n.54 (1983). Many of these laws are odious to any understanding of a proper governmental function today. If the Second Amendment is not "a law trapped in amber," *Rahimi*, 144 S.Ct. at 1898, then surely these laws should be discarded. *See Range*, 69 F.4th at 104–105. Indeed, the Supreme Court has suggested as much. *Bruen* explicitly rejected any reliance on the racist purpose of "black codes" in the South to understand the scope of public carry. 597 U.S. at 63. And *Rahimi* casts doubt on the relevance of any tradition of "disarm[ing] political opponents." 144 S.Ct. at 1889.

On appeal, the government backtracks somewhat and places a greater emphasis on a small handful of colonial-era examples of disarmament based on religious intolerance. GOB 32. This tradition is insufficient under *Bruen*. 597 U.S. at 46 ("we doubt that three colonial regulations could suffice"). But even here, the government glosses over the unique nature of the interplay between religious intolerance and sedition at the Founding. In the Massachusetts Bay colony, "sedition was treated like treason and prosecuted frequently." Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 263 (2020). The disarmament of supporters of Anne Hutchinson, for example, was more akin to suppressing rebellion than punishing those who had "evinced a willingness to disobey the law." GOB 32 (quoting *Range*, 69 F.4th at 123 (Krause, J., dissenting)). Other scholarship cited by the government notes the historical consensus that the trial of Anne Hutchinson involved "a struggle for control of Massachusetts" which "carried the colony to 'the verge of armed conflict.'" James F. Cooper, Jr., *Anne Hutchinson and the "Lay Rebellion" Against the Clergy*, 61 New Eng. Q. 381, 381 (1988) (but arguing that colonial authorities overreacted and overestimated the

actual strength of the group). Hutchinson's teachings "would have done away with the state as it then existed." Edmund S. Morgan, *The Case Against Anne Hutchinson*, 10 New Eng. Q. 635, 638 (1937).

The purpose of this disarmament was not to prevent crime—it was to protect against organized rebellion. The same is true of laws targeting groups like the Moravians, who did not recognize the sovereign and were described by New Jersey's governor as "enemies of King George." *Range*, 69 F.4th at 124 n.71 (Krause, J., dissenting); GOB 32. The disarmament of Richard Barnes in 1624 for sedition is even further afield: the Virginia Council was an authoritarian ruler that operated akin to the Star Chamber. David Thomas Konig, *"Dale's Laws" and the Non-Common Law Origins of Criminal Justice in Virginia*, 26 Am. J. L. Hist. 354, 371–72 (1982). The Virginia Council retained many traditions from Dale's Laws of 1612, which had rejected the common law and severely punished any Virginian "who spoke in such a way as to pose a threat to the government." *Id.* at 372.

***Revolutionary war.*** The government again puts forth loyalty statutes, on which the district court also relied below. These laws have a plainly distinct purpose: to disarm loyalists who would not swear fealty

to the new Nation. GOB 35–38. Indeed, the government concedes that these laws "target[ed] those who failed to demonstrate loyalty to the emerging American government," GOB 36, not those who were generally viewed as untrustworthy.

As with other politically disfavored groups the government points to, it is not at all clear that Loyalists were considered to be among those protected by the right. The government's view of this practice runs headlong into *Rahimi*'s suggestion that "the Second Amendment had largely eliminated governmental authority to disarm political opponents," suggesting Loyalist disarmament was something more distinct. 144 S.Ct. at 1899.

And these statutes were not enacted for a relevantly similar reason to § 922(g)(1). *Rahimi*, 144 S.Ct. at 1898; *see also Bruen*, 142 S. Ct. at 2133; *Duarte*, 101 F.4th at 680–684. They were wartime measures that aimed to preserve the stability of the new government. Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 506–07 (2004); *see Greenlee*, *supra*, at 265 ("Like the English, and out of similar concerns of violent insurrections, the colonists disarmed those who might rebel against

them."). Nothing in the government's proffered history suggests that these laws had the amorphously broad purpose of tackling generalized crime or disarming those not trusted to obey the law. To the contrary, they were expressly imposed to disarm those who refused to join the new civic life at all. These laws are therefore much closer to the laws addressing concerns with sedition or rebellion, above, rather than § 922(g)(1)'s broader, more sweeping concern.

*Ratification proposals.* Failed ratification proposals are likewise of no help to the government's theory. GOB 37–38. None supported categorical felon disarmament. *Kanter*, 919 F.3d at 454 (Barrett, J., dissenting); *Skoien*, 614 F.3d at 648 (Sykes, J., dissenting). Only New Hampshire's proposal carried even its own delegation, and it prohibited disarmament "unless such [citizens] as are or have been in actual rebellion." 2 Bernard Schwartz, The Bill of Rights: A Documentary History 758, 761 (1971). Far from showing that it was "obvious to the Founders that persons who committed crimes would properly be subject to disarmament laws," GOB 37–38, these conflicting proposals show the opposite: the Founders could not agree among themselves.[12] The

---

[12] The government also quotes *Heller*'s description of the Pennsylvania minority's proposal as "highly influential" to imply it should be given greater weight. GOB 22. But *Heller* rejected

government offers this Court no explanation for how to parse between them, let alone define the nebulous standards included. Nor does the government cite any history to explain what tradition the language in these differing proposals was derived from that might inform their content.

Moreover, proposals like these that do not become law are not "regulation" under *Rahimi* and *Bruen*. They were not enacted and cannot demonstrate a "historical tradition of firearm *regulation*." *Rahimi*, 144 S.Ct. at 1896 (quoting *Bruen*, 597 U.S. at 24) (emphasis added). As *Heller* warned, "[i]t is always perilous to derive the meaning of an adopted provision from another provision deleted in the drafting process." 554 U.S. at 590. *Heller* specifically admonished that "the drafting history of the Second Amendment—the various proposals in the state conventions and the debates in Congress"—is a "dubious" source for Second Amendment interpretation. *Id*. at 603. So too here: the competing proposals themselves do not agree about the scope of the right.

---

reliance on these ratification amendments to elucidate the meaning of the Second Amendment, instead addressing it only to rebut Justice Stevens' dissent. 554 U.S. at 603; *see also id*. at 590 n.12 (describing reliance on the Antifederalist's reading of the amendments as "highly problematic").

Of course, if these proposals had, in fact, canvassed the pre-existing right, one would expect the government to point to Founding-era laws imposing restrictions in exactly that manner. Such evidence exists when it comes to other rights, like voting. *Kanter*, 919 F.3d at 463 (Barrett, J., dissenting) (identifying 10 early-nineteenth-century state constitutions that excluded certain convicted persons from the franchise). Yet the government has not provided any such evidence here. These proposals are simply not relevant to the inquiry under *Rahimi* and *Bruen*, and do no work in the government's efforts to meet their burden.

In sum, the government's history of categorical disarmament supports a much narrower tradition than the one they proffer—one of disarmament to protect against "treason and rebellion." *Rahimi*, 144 S.Ct. at 1935 (Thomas, J., dissenting). There is no historical evidence that individuals were ever disarmed because they were regarded as generally untrustworthy.

> 2. Felony punishment was not imposed to restrict firearms possession.

As a last source of reasoning, the government argues that because felons could be executed, they therefore had *no* rights under the Second Amendment after conviction. GOB 20–23, 38–40. The

government's argument rests on the premise that the power to impose the death penalty necessarily implies the power to let an individual live but permanently deprive them of a fundamental right in perpetuity. But felony punishment did not have as its *purpose* disarmament—only as its byproduct. As the district court rightly observed, § 922(g)(1)'s felon disarmament is a separate consequence of a felony conviction, with a distinct purpose. RSA 19.

Felony punishment does not have disarmament as a purpose. Indeed, unlike going armed laws, the government cites no law or authority that this was so. Rather, those laws have a different focus on punishing specific violations without any particular goal of disarmament. Section 922(g)(1), by contrast, *is* focused on disarmament—of any person convicted of a felony, forever. In both its briefing in the district court and here on appeal, the government made only a passing reference to surety laws and did not mention going armed laws at all. GOB 42 n.15. Neither type of law is relevantly similar to § 922(g)(1). Its distinct purpose is evident from its interaction with contemporary state laws today. Over a dozen states have felon-in-possession laws that are more nuanced than § 922(g)(1), allowing for at least limited possession after conviction after a

certain amount of time. States Amicus Brief 12–13. These statutes do not fully restore the civil rights of the individual but merely lift the firearms prohibition. Section 922(g)(1) nonetheless continues to disarm these individuals, notwithstanding their state rights. This plainly fulfills a different purpose—disarmament divorced from the punishment for the offense itself, even after the jurisdiction would lift the restriction.

The government wrongly suggests that this difference in purpose does not matter. GOB 50. But of course it must: *Rahimi* makes clear that the law's historical *reasons* must be analogous first and foremost. 144 S.Ct. at 1900. Thus, a law "imposing similar restrictions *for similar reasons*" is permissible. *Id*. at 1898 (emphasis added). To justify a historical tradition of disarmament, the government must point to historical laws that had as their purpose disarmament. In *Rahimi*, the Supreme Court relied on surety laws and "going armed" laws to support § 922(g)(8). *Id*. at 1901–02. In discussing the historical tradition, *Rahimi* emphasized that it was "important" that surety laws "targeted the misuse of firearms." *Id*. at 1900. Going armed laws likewise were specifically targeted at a certain kind of disturbance: not simply causing a disturbance generally but doing so "armed, with dangerous or unusual

weapons." *Id.* at 1901. In imposing consequences for these actions, this historical tradition had as a specific purpose of *disarming* those who had acted "dangerously."

As the district court rightly observed, disarmament was a byproduct of other felony punishments, like imprisonment or the death penalty. RSA 20. Section 922(g)(1), by contrast, prospectively prohibits re-acquiring arms, not as punishment for a person's conviction but as a separate, *federal* judgment about what that conviction reveals.

> 3. The government cannot use different historical regulations with different purposes to construct a novel, modern purpose.

Without concrete support for broad disarmament of "untrustworthy adherents of the law," the government instead seeks to build an abstract historical tradition that none of its historical traditions support individually. GOB 44–45.

*Rahimi* and *Bruen* do not allow this patchwork approach to produce an amorphous principle untethered from the actual regulation at issue. "Untrustworthy adherents of the law," like "responsible," is exactly the kind of "vague" principle the Court rejected in *Rahimi*. 144 S.Ct. at 1903. It is just as "unclear what such a rule would entail." *Id.* What governing

principles define "untrustworthy"? The government provides no historical definition or tradition for guidance. Does the historical tradition include prior convictions that were not felonious historically? The government does not say, and neither do its historical sources. Nothing in the government's proposed tradition even suggests a felony conviction is necessary—the government suggests *anyone* "deemed untrustworthy" can be disarmed.

In *Rahimi*, by contrast, the Court charted a concrete historical tradition from surety and going armed laws, explaining that they "restrict gun use to mitigate demonstrated threats of physical violence." *Id.* at 1901. The only relevant distinction in purpose between these two types of regulations was the type of harm: § 922(g)(8) was focused on a "credible threat to the physical safety" of a domestic partner, while surety and going-armed laws included credible threats to the physical safety of other groups. *Id.* at 1901–02. Section 922(g)(8) is relevantly similar to those historical laws because the core purpose is the same. Surety laws

could even be used by domestic partners against each other. *Id.* at 1900 (citing 4 Blackstone, *Commentaries* 254).

To be sure, *Rahimi* described these laws as establishing a tradition "taken together." *Id.* at 1901. It took them together because they support the same tradition of temporary disarmament after a specific finding that the person posed a danger to another. *Id.* Nowhere does the Court endorse using laws that support *different* traditions to do so. Several justices in *Rahimi*'s majority warned specifically against defining these traditions too abstractly. Justice Barrett, for example, warned against "read[ing] a principle at such a high level of generality that it waters down the right." *Id.* at 1926 (Barrett, J., concurring). And Justice Gorsuch rejected attempts to "glean from historic exceptions overarching policies, purposes, or values to guide them in future cases." *Id.* at 1908 (Gorsuch, J. concurring) (cleaned up). "Courts must proceed with care in making comparisons to historic firearms regulations, or else they risk gaming away" the right. *Id.* That is exactly what the government seeks here.

As the government observes, GOB 11, § 922(g)(1) was self-consciously an effort to broaden the reach of firearms prohibition statutes

beyond the historical norm. It was, in fact, intentionally *over*broad—expanding from those whose prior offense demonstrated a risk of violence to any felony conviction. This purpose is not relevantly similar to the government's analogues. As one oft-cited historian concluded following a survey of Founding-era session laws, "at no time between 1607 and 1815 did the colonial or state governments of what would become the first fourteen states exercise a police power to restrict the ownership of guns by members of the body politic." Churchill, *supra*, at 142. This "suggest[s] . . . that colonial and early national legislators did not see the regulation of gun ownership of citizens as a legitimate exercise of police power." *Id*. at 164–65; *see also id*. at 155 (explaining that Loyalists were disarmed under "emergency military powers").

The lack of felon disarmament is especially notable given how readily available this mechanism was to the founders. While the government suggests that the public "would have understood" disarmament to be proper, GOB 23, or that this principle would have been "obvious," GOB 37, the government's own history belies these claims. In the over two hundred or so years of history that the government attempts to canvass in support, not a *single* felon-in-

possession law exists prior to the 20th century. This void is plainly "relevant evidence that [§ 922(g)(1) is inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26. The government need not provide evidence of a historical twin, but it must provide evidence of an affirmative historical tradition it seeks to rely on. *Rahimi*, 144 S.Ct. at 1898. It simply has not done so here.

## B. Permanent disarmament is a historically unique burden.

Just as for purpose, the government puts forth no proper analogue for the burden § 922(g)(1) places on the right to bear arms. As the district court recognized, RSA 19, § 922(g)(1)'s burden is historically unprecedented because it is both a permanent and a total ban on firearm possession. Every historical law cited by the government carved out the core of the right for self-defense in some manner, was limited in time, or operated as a contemporary forfeiture without prohibiting future possession. No historical law completely and permanently prohibited an individual's ability to bear arms, and the district court was correct to find

that § 922(g)(1) uniquely burdened the right to an unconstitutional degree.

>  1. No historical law provided for complete or permanent disarmament.

Just as the government's proffered history does not provide any law that is relevantly similar to § 922(g)(1)'s purpose, the government cites no law with a comparable burden. Catholic disarmament in England, for example, supports only a more modest "regulatory tradition." As the government acknowledges, the statute permitted Catholics to retain their arms as long as they swore an oath of allegiance. GOB at 29–30 (citing 1 Wm. & Mary, Sess. 1, ch. 15, in 6 Statutes of the Realm 71 at 72 (1688)). Catholics could take the oath to regain arms at any time, even after initially refusing, and were limited only by their own choice. *Id.* And even still the law contained a self-defense exception for Catholics to obtain permission to possess firearms "for the defense of [their] House or person." *Id.* By contrast, § 922(g)(1) represents a total and permanent ban on firearm ownership without either the ability to regain the right

or obtain a special exemption for defense of the home—a far greater burden on the right.

Colonial disarmament was no more permanent. The followers of Anne Hutchinson could recant to avoid disarmament, and the statute required only the surrender of current arms—not a prohibition of future acquisition. Emery Battis, *Saints and Sectaries: Anne Hutchinson and the Antinomian Controversy in the Massachusetts Bay Colony* 212 (1962). Even laws disarming enslaved persons did not completely prohibit the possession of firearms, but rather made allowances so long as he had his "his master's special license[.]" *See*, *e.g.*, 2 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 235 (1896) (1706 Pa. law).[13] Nearly every law applicable to Native Americans simply banned white colonists from selling weapons to Native Americans, not possession. Only a 1677 Rhode Island law provided for the confiscation of guns owned by Native Americans. *Compare* 2 *Records of the Colony of Rhode Island and Providence Plantations* 561 (1857) *with*, *e.g.*, 6 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 319-20 (1899) (1763 Pa. law) (making

---

[13] For further discussion of these laws and Native American disarmament, see R. 56 at 22–23.

it a crime to "give to, sell, barter or exchange with any Indian or Indians whatsoever any guns").

Loyalist laws, too, allowed for regaining the right. Even amidst the revolution, one disarmed under a wartime statute could regain their right to bear arms at any time by swearing a loyalty oath. *See* Robert H. Churchill, *supra* at 157. Just like the disarmament of Anne Hutchinson, someone who was disarmed was still free to acquire *new*, additional firearms. *See Marshall*, *supra*, at 724 (explaining that loyalty statutes "read more like forfeiture laws than disabilities").

Post-war laws confirm the historical uniqueness of permanent disarmament. The participants in Shay's Rebellion, who committed acts "bordering on treason," including attacking a courthouse, the federal arsenal, and the militia, were required to surrender their arms. *Range*, 69 F.4th at 106 n.10; Greenlee, *supra* at 267–68. But they were not permanently disarmed. Rather, their arms were held by the state and

then returned just three years later. *Id.*; Sec'y of the Commonwealth, *Acts and Resolves of Massachusetts 1786–87*, at 178 (1893).

In short, none of the categorical disarmaments the government relies on involve *permanent* and *complete* prohibitions on the right to bear arms—a markedly different burden.

2.    The existence of the death penalty does not authorize any possible penalty short of execution.

Finally, as a last source of reasoning, the government suggests that, because felons could be executed, they therefore had *no* rights under the Second Amendment if they were not ultimately executed. GOB 20–23, 38–40. This premise is wrong, both as a matter of historical practice and as a matter of constitutional law.

"[T]he existence of the death penalty is not a license to the Government to devise any punishment short of death within the limit of its imagination." *Trop v. Dulles*, 356 U.S. 86, 99 (1958) (holding that it is unconstitutional to revoke a right to citizenship as punishment for a crime). No authority supports the government's no-rights-for-felons approach. For the other individual constitutional rights, a felon regains his constitutional rights after his release. Conviction of a felony does not strip one of his rights completely. *See Kanter*, 919 F.3d at 461–62

(Barrett, J., dissenting) ("we wouldn't say that the state can deprive felons of the right to free speech because felons lost that right via execution at the time of the founding. The obvious point that the dead enjoy no rights does not tell us what the founding-era generation would have understood about the rights of felons who lived, discharged their sentences, and returned to society."); *Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*, 502 U.S. 105, 108 (1991) (felons retain First Amendment rights); *United States v. Walden*, 146 F.3d 487, 490–91 (7th Cir. 1998) (Fourth Amendment rights). Here the Supreme Court tells us that history, not a means-end test governs the scope of the Second Amendment. That history leads to the same place: the Second Amendment is not extinguished for one who is not executed, any more than the First or Fourth Amendments are.

As a historical matter, the government badly overstates the scope of the American death penalty at the Founding. *See Kanter*, 919 F.3d at 459 (Barrett, J., dissenting) ("Throughout the seventeenth and eighteenth centuries, capital punishment in the colonies was used 'sparingly,' and property crimes including variations on theft, burglary, and robbery 'were, on the whole, not capital.'") (quoting Lawrence M.

Friedman, Crime and Punishment in American History 42 (1993));
*Furman v. Georgia*, 408 U.S. 238, 335 (1972) (Marshall, J., concurring)
("Capital punishment was not as common a penalty in the American
Colonies."). Non-violent felony offenses, in particular, were rarely
punished by death. *Kanter*, 919 F.3d at 459 (Barrett, J., dissenting). The
majority of felony offenses set forth in the very first federal criminal law,
the Crimes Act of 1790, were punishable by a term of years but not death.
Crimes Act of 1790, First Congress, Sess. II, Ch. 9, 1 Stat. 112, 119
(imposing a term of years for, among others, manslaughter, misprision of
treason, mayhem, perjury, and larceny).

Where the death penalty was not imposed, "the rights of felons
serving less than life were merely *suspended* during the term of the
sentence." *Kanter*, 919 F.3d at 461 (Barrett, J., dissenting). The Crimes
Act of 1790 specifically *prohibited* estate forfeiture as a punishment.
Crimes Act of 1790, ch. 9, § 24, 1 Stat. 112, 117. The government does not
cite any law prospectively preventing anyone, including felons who were
not executed, from repurchasing arms, only laws requiring forfeiture of
any current possessions. Rather, "once wrongdoers had paid their debts
to society, the colonists forgave them and welcomed them back into the

fold." *Folajtar*, 980 F.3d at 923 (Bibas, J., dissenting) (citing scholarly evidence). Felony punishment simply did not disarm those who were not executed after their sentences.

To be sure, in *Rahimi*, the Supreme Court explained that a punishment of imprisonment might justify the *temporary* disarmament of one who was specifically found to pose a risk of danger to others while armed. 144 S.Ct. at 1902. But this was not a blanket statement for the historical relevance of any and all punishment. Rather, the Supreme Court was making a clear historical comparison of both burden and purpose. As the Court there reasoned, "if imprisonment was permissible *to respond to the use of guns* to threaten the physical safety of others," then so was temporary disarmament. *Id. Rahimi* does not offer support for an unlimited term of disarmament after and irrespective of a felony sentence.

*Rahimi* identified the regulatory tradition—responding to the use of guns to threaten the physical safety of others, as specifically found by a court—and then identified that imprisonment was a permissible response within that tradition. 144 S.Ct. at 1902. But § 922(g)(1), as the government admits, GOB 13, is not responding to a regulatory tradition

of dangerousness, or even to a social class of people *perceived* to share some identifying trait of rebellion. While going armed laws were relevantly similar to § 922(g)(8), they are not relevantly similar to § 922(g)(1). Those laws existed to respond to discrete, highly individualized findings of dangerousness with firearms. As previously explained, felony punishment laws did not have a similar purpose to § 922(g)(1), and so the punishment that they may or may not have authorized is not relevant. Instead, it upheld § 922(g)(8) as constitutional in large part because the restriction was temporary in nature. *Id.* There, the prohibition lasted only up to two years after release from prison if the subject were incarcerated. *Id.* Section 922(g)(1) is nothing like that limited prohibition, and it provides no support for § 922(g)(1)'s constitutionality.

    3.    The government's counterarguments are unpersuasive.

The government's efforts to suggest § 922(g)(1) does not uniquely burden the Second Amendment right are unpersuasive, and the district court was correct to reject them. RSA 17.

Section 922(g)(1)'s burden is permanent and comprehensive. The government argues that the district court disregarded § 922(g)(1)'s

purported "carve outs" in finding that the burden was unconstitutionally high. GOB 48. As an initial matter, the district court did not disregard any of the limitations the government cited. *Compare* RSA 17 ("§ 922(g)(1)'s permanent prohibition on firearm possession by felons, which can be lifted only by expungement, federal pardon, or other method of restoring civil rights that lifts the underlying offense from a conviction.") *with* GOB 48 (§ 922(g)(1) explicitly excludes [those] whose convictions have been pardoned or expunged, who have received executive clemency, or whose civil rights have been restored."). Rather, the district court properly reasoned that these mechanisms for relief each lifted the status of being prohibited in the first place, and so were not mechanisms to alleviate the burden that § 922(g)(1) itself placed. RSA 17.

Further, these purported carve-outs are no such thing. The pardon power is "a matter of grace committed to the executive authority." *Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 285 (1998). A criminal conviction is no less final because of the existence of a hypothetical grant of executive clemency that may be based on any—or no—criteria. *See Bruen*, 597 U.S. at 26 (explaining the right is not subject to governmental

interest balancing). As the district court rightly observed, unlike historical authority the government relies on, these measures are targeted at the nature of the underlying conviction, not the disarmament itself. And, of course, the pardon power is longstanding, while felony disarmament is not.

The government next suggests that, at a minimum, loyalty oaths provided for a proper historical analogue as to burden. GOB 49. This overlooks how far from the historical tradition § 922(g)(1) is. Loyalty oaths worked more like forfeiture statutes, not permanent prohibitions. *Greenlee*, *supra*, at 183. Indeed, none of the categorical disarmament statutes the government relies on work prospectively. And most other disarmament laws also carved out exceptions for self-defense in the home, either by default or with permission. The district court rightly distinguished the incredibly rare availability of executive pardon from these more robust measures.

In holding that § 922(g)(1)'s criminal penalties are a greater and constitutionally significant burden, the district court was not venturing off into uncharted waters. *Bruen* explicitly distinguished the modest consequences of some historical regulations from modern criminal

penalties. 597 U.S. at 57; *see also id* (explaining that Founding-era-fines and weapon forfeiture were meaningfully lesser burdens from "significant criminal penalties") (quoting *Heller*, 554 U.S. at 633–634)). And in *Rahimi*, the Court specifically looked to the criminal consequence of going armed laws to justify § 922(g)(8), suggesting that surety laws—which did not have such a consequence—would not sufficiently support such a burden on their own. Section 922(g)(1)'s burden is simply greater along every dimension—length of time, breadth of application, and difficulty of removal—in a way that makes it completely inconsistent with our regulatory tradition. *Cf. Rahimi*, 144 S.Ct. at 1902 (explaining that "focused regulations" cannot operate as "a historical analogue for a broad prohibitory regime.").

## CONCLUSION

No law in our Nation's historical tradition supports the broad or permanent disarmament of any person with a felony conviction. Mr. Prince respectfully asks that this Court affirm the dismissal of the indictment.

Respectfully submitted,

FEDERAL DEFENDER PROGRAM
John F. Murphy,

Executive Director

By: s/*Jack Corfman*

Jack Corfman
55 E. Monroe Street
Suite 2800
Chicago, IL  60603
(312) 621-8300

*Attorneys for Defendant-Appellee*

Dated: July 26, 2024

## CERTIFICATE PURSUANT TO APPELLATE RULE 32(A)(7)

I, Jack Corfman, hereby certify that this brief complies with the type volume limitation of Federal Rule of Appellate Procedure 32(a)(7), in that Defendant-Appellee, Glen Prince's Opening Brief contains 13,303 words. This certification is based on the word count of Microsoft Word 13.0, the word processing program used in preparing Defendant-Appellees response brief.

FEDERAL DEFENDER PROGRAM
John F. Murphy
Executive Director

By: s/*Jack Corfman*
55 E. Monroe Street
Suite 2800
Chicago, IL 60603
(312) 621-8300

Dated: July 26, 2024

# CERTIFICATE OF SERVICE

I, Jack Corfman, certify that on <u>July 26, 2024</u>, I electronically filed the foregoing with the clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Respectfully submitted,

FEDERAL DEFENDER PROGRAM
John F. Murphy,
Executive Director

By: <u>*s/ Jack Corfman*</u>
55 E. Monroe Street
Suite 2800
Chicago, IL 60603
(312) 621-8300

*Attorney for Defendant-Appellee*

Dated: July 26, 2024