In the

# UNITED STATES COURT OF APPEALS
for the Seventh Circuit

## No. 23-3155

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

v.

GLEN PRINCE,

Defendant-Appellee.

On Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 22 CR 240 — Robert W. Gettleman, *Judge*.

# REPLY BRIEF OF THE UNITED STATES

MORRIS PASQUAL
Acting United States Attorney
  for the Northern District of Illinois
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 353-5300

DEBRA RIGGS BONAMICI
Assistant United States Attorney
Criminal Division Counsel

BRIAN J. KERWIN
Assistant United States Attorney
Chief of Appeals, Criminal Division

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION .............................................................................................. 1

ARGUMENT ..................................................................................................... 3

I.   This Court's Decision in *Gay* Dictates that Section 922(g)(1) is Constitutional As Applied to Defendant and Thus Facially Valid. ........ 3

II.  *Rahimi* Confirms Section 922(g)(1)'s Constitutionality. ......................... 6

III. Defendant Ignores the Supreme Court's Endorsement of Felon Dispossession Laws, Misapplies the *Bruen* Framework, and Adopts Arguments from *Rahimi*'s Dissent that the Majority Rejected. .............................................................................................. 11

    A.   Defendant Ignores the Supreme Court's Repeated Endorsement of Felon Dispossession Laws................................. 11

    B.   Defendant Misapplies the *Bruen* Framework and Repeats Arguments Rejected by *Rahimi*'s Majority. ............................... 14

IV.  No Federal Court of Appeals Has Found Section 922(g)(1) Facially Unconstitutional. .................................................................................... 21

CONCLUSION................................................................................................ 26

# TABLE OF AUTHORITIES

## CASES

*Atkinson v. Garland*, 70 F.4th 1018 (7th Cir. 2023) .......................................... 9

*Dickerson v. New Banner Institute, Inc.*, 460 U.S. 103 (1983) ........................ 10

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ........................... 3, 8, 11, 12

*Garland v. Range*, 144 S. Ct. 2706 (2024) ............................................ 4

*Jackson v. United States*, 144 S. Ct. 2710 (2024) .............................................. 24

*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019) .................................................. 10

*Lewis v. United States*, 445 U.S. 55 (1980) ...................................................... 16

*McDonald v. Chicago*, 561 U.S. 742 (2010) ....................................... 3, 8, 11, 12

*Medina v. Whitaker*, 913 F.3d 152 (D.C. Cir. 2019) ................................... 19, 24

*New York State Rifle and Pistol Association v. Bruen*, 597 U.S. 1 (2022)
.................................................................................................................passim

*Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023) .......................... 4, 21, 22

*Scarborough v. United States*, 431 U.S. 563 (1977) ........................................ 18

*United States v. Curry*, 2024 WL 3219693 (10th Cir. June 28, 2024) ............ 23

*United States v. Dorsey*, 105 F.4th 526 (3d Cir. 2024) .................................... 22

*United States v. Duarte*, 101 F.4th 657 (9th Cir. 2024) ................................... 21

*United States v. Duarte*, 108 F.4th 786 (9th Cir. 2024) ................................... 21

*United States v. Fadiga*, 2024 WL 3338304 (3d Cir. July 9, 2024) ........... 21, 22

*United States v. Gates*, 2023 WL 5748362 (N.D. Ill Sept. 6, 2023) ................. 10

*United States v. Gay*, 98 F.4th 843 (7th Cir. 2023) ....................................*passim*

*United States v. Jackson*, 69 F.4th 495 (8th Cir. 2023) .................................... 23

ii

*United States v. Jackson*, 110 F.4th 1120 (8th Cir. 2024) ..................... 9, 19, 24

*United States v. Johnson*, 2024 WL 3371414 (11th Cir. July 11, 2024) ... 22, 23

*United States v. Langston*, 110 F.4th 408 (1st Cir. 2024) .............................. 23

*United States v. Moore*, 111 F.4th 266 (3d Cir. 2024) .................................... 22

*United States v. Rahimi*, 144 S. Ct. 1889 (2024) ...................................*passim*

*United States v. Salerno*, 481 U.S. 739 (1987) ............................................... 3, 5

*United States v. Thompson*, 21 CR 284 (N.D. Ill. Feb. 21, 2024) ................... 11

*United States v. Yancey*, 621 F.3d 681 (7th Cir. 2010) ............................. 10, 20

## STATUTES

18 U.S.C. § 922(g) .......................................................................*passim*

18 U.S.C. § 3553(a)(2)(C) ............................................................. 18

## INTRODUCTION

In 1968, Congress faced a modern problem with historical roots: a wave of gun violence and other crimes involving firearms, which had shrunk in size, evolved in lethality, and grown exponentially in abundance since the time of the Nation's founding. Title 18 U.S.C. Section 922(g) was passed to stem that tide of lawlessness by keeping firearms away from discrete groups whose members posed a risk in the community—among them, felons, the mentally ill, and drug addicts.

Such categorical bans, including Section 922(g)(1)'s prohibition on possession by felons, are in keeping with our Nation's historical tradition of firearm regulation. Since the founding, the government has been empowered to keep guns away from groups who cannot be trusted to obey the law or whose possession otherwise presents a risk of danger to fellow citizens. By the same token, our tradition long has allowed the punishment of those who breach our social contract by committing felony crimes, including through imprisonment, estate forfeiture, and death—consequences that naturally include disarmament. In *United States v. Rahimi*, 144 S. Ct. 1889, 1899, 1901 (2024), the Supreme Court instructed that such "distinct legal regimes" should be "[t]aken together" in viewing the Second Amendment's contours. Defendant's brief sidesteps that teaching, and his criticism of these analogues reflects a

misguided search for a "law trapped in amber"—an approach *Rahimi* rebukes. *Id.* at 1897-98.

Indeed, the Supreme Court has described the Second Amendment right as one belonging to "ordinary, law-abiding citizens." *New York State Rifle and Pistol Association v. Bruen*, 597 U.S. 1, 9 (2022). And the Court has repeatedly emphasized that longstanding prohibitions on firearm possession by felons are "presumptively lawful." While defendant's brief ignores that well-established principle entirely, the Supreme Court reiterated it once more in *Rahimi*, 144 S. Ct. at 1902. Consistent with those pronouncements, in *United States v. Gay*, 98 F.4th 843 (7th Cir. 2023), this Court recently denied an as-applied challenge to the constitutionality of Section 922(g)(1), where a defendant unlawfully possessed a firearm after numerous felony convictions, including aggravated battery of a peace officer and possessing a weapon while in prison.

Like Gay, defendant "is not a 'law-abiding, responsible' person who has a constitutional right to possess firearms." 98 F.4th at 847. He likewise has a history that makes it obvious that he falls within a group who cannot be trusted to possess a deadly firearm in a civil society. Defendant has prior felony convictions for armed robbery and aggravated battery; now, in the instant case he is alleged to have used a semi-automatic handgun to rob three individuals at gunpoint on a public train in the City of Chicago. Defendant cannot reasonably contend that the Second Amendment precludes the government

from keeping a firearm from his hands, and any challenge to the constitutionality of Section 922(g)(1) as applied to him fails. His facial challenge necessarily fails as well, since he cannot "establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). And every federal court of appeals to entertain a facial challenge to Section 922(g)(1) has soundly rejected it.

## ARGUMENT

### I. This Court's Decision in *Gay* Dictates that Section 922(g)(1) is Constitutional As Applied to Defendant and Thus Facially Valid.

In *Gay*, 98 F.4th at 846-47, this Court rightly rejected an as-applied challenge to the constitutionality of Section 922(g)(1). As the Court observed, Gay's argument that the law violated his Second Amendment rights was "hard to square" with the Supreme Court's decision in *District of Columbia v. Heller*, which "stated that 'longstanding prohibitions on the possession of firearms by felons' are valid." *Gay*, 98 F.4th at 846 (quoting *Heller*, 554 U.S. 570, 626 (2008)). Moreover, two years after *Heller*, in *McDonald v. Chicago*, 561 U.S. 742, 786 (2010), the Supreme Court "reassured readers that all of the reservations and provisos in the *Heller* opinion retain validity." *Gay*, 98 F.4th at 846. "And in the Court's [then] most recent Second Amendment decision, *New York State Rifle and Pistol Association v. Bruen*, 597 U.S. 1 (2022), Justices Alito and Kavanaugh, whose votes were essential to the majority,

wrote separately to say that *Bruen* did not change anything about *Heller*." *Gay*, 98 F.4th at 846.

Noting a Circuit split as to the propriety of as-applied challenges to Section 922(g)(1), this Court assumed without deciding that Gay could bring one, and easily dispensed with it. 98 F.4th at 846. Given Gay's "22 felonies, including aggravated battery of a peace officer and possessing a weapon while in prison," the Court had no trouble concluding that Gay was not a "law-abiding, responsible citizen" who possessed a Second Amendment right under *Bruen*. *Id.* at 846-47. The Court also found relevant that instead of contesting Section 922(g)(1) through a declaratory-judgment action—as the successful as-applied challenger in *Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023),[1] had done—Gay "violated the law in secret and tried to avoid detection." 98 F.4th at 847.

The instant case shares all of the material features of *Gay*, dooming defendant's as-applied and facial challenges under this Circuit's precedent. Defendant used a semi-automatic pistol to rob three Chicago public transit riders at gunpoint, after having previously been convicted of multiple felony

---

[1] *Cert granted, vacated, and remanded by Garland v. Range*, 144 S. Ct. 2706 (2024).

offenses, including armed robbery and aggravated battery. Br. 1-2.[2] And rather than challenge Section 922(g)(1)'s constitutionality by bringing a declaratory action, defendant demonstrated the risk he poses to the public by misusing a firearm to terrorize others, and then complained about the law that seeks to dispossess him based on that very risk. *Gay*, which post-dates the district court's ruling on defendant's motion to dismiss, controls this case and mandates reversal.

As explained in the government's opening brief, and as *Gay* implicitly recognized, defendant does not possess a Second Amendment right, and Section 922(g)(1) is consistent with our Nation's history and tradition of disarming citizens who cannot be trusted to obey the law, including felons and others who present a risk of danger to the community. Br. 40-57. Section 922(g)(1) therefore is constitutional as applied to defendant and, necessarily then, the district court committed reversible error when it declared the law facially unconstitutional—that is, unconstitutional in all its applications. *See Rahimi*, 144 S. Ct. at 1898 (A facial challenge to a statute "is the 'most difficult challenge to mount successfully,' because it requires a defendant to 'establish

---

[2] Citations to the government's opening brief and defendant's response brief are to "Br." and "Rsp. Br.," respectively, followed by the relevant page number. Citations to the Original Electronic Record on Appeal are to "R.," followed by the document number.

that no set of circumstances exists under which the Act would be valid.'")
(quoting *Salerno*, 481 U.S. at 745).

## II. *Rahimi* Confirms Section 922(g)(1)'s Constitutionality.

*Rahimi* generally affirms the correctness of this Court's decision in *Gay*, and underscores the district court's error. In *Rahimi*, the Supreme Court upheld Section 922(g)(8)(C)(i), which prohibits gun possession by an individual who is subject to a court order, issued based upon a finding that the individual "represents a credible threat to the physical safety of such intimate partner or child," that restrains the individual from engaging in conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child. 18 U.S.C. § 922(g)(8)(A)–(C)(i). In determining whether Section 922(g)(8)(C)(i) was consistent with our "historical tradition of firearm regulation," *Bruen*, 597 U.S. at 17, the Court examined historical surety laws, which authorized magistrates to "require individuals suspected of future misbehavior to post a bond," and going armed laws, which "provided a mechanism for punishing those who had menaced others with firearms." *Rahimi*, 144 S. Ct. at 1900–01. The Court found that these laws—though "distinct legal regimes," *id.* at 1899— established that, "[s]ince the founding, our Nation's firearm laws have included provisions preventing individuals who threaten physical harm to others from misusing firearms." *Id.* at 1896. Accordingly, the Court held that, "[t]aken together, the surety and going armed laws confirm what common sense

suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Id.* at 1901.

In reaching its decision, the Court acknowledged that "Section 922(g)(8) is by no means identical to these founding era regimes," but it explained that "it does not need to be": Section 922(g)(8)'s "prohibition on the possession of firearms by those found by a court to present a threat to others fits neatly within the tradition the surety and going armed laws represent." *Id.* The Court clarified that its recent precedents were not meant to describe "a law trapped in amber." *Id.* at 1897. Instead, the Court stated, the Second Amendment "permits more than just those regulations identical to ones that could be found in 1791." *Id.* at 1897-98. The Court further explained that, when assessing whether a law complies with the Second Amendment, courts should consider "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition" by ascertaining "whether the new law is 'relevantly similar' to laws that our tradition is understood to permit." *Id.* at 1898 (quoting *Bruen*, 597 U.S. at 29).[3]

---

[3] Defendant incorrectly suggests that if a challenged law addresses a problem that existed at the founding, the presence of "distinctly similar" analogues is material to the inquiry. Rsp. Br. 16. But *Rahimi* only assessed whether "relevantly similar" analogues were instructive, indicating that *Bruen*'s passing use of the phrase "distinctly similar" did not establish a two-tiered analytical framework. *See Rahimi*, 144 S. Ct. at 1898, 1901; *Bruen*, 597 U.S. at 26. Indeed, even Justice Thomas in his dissent repeatedly invoked the "relevantly similar" standard, despite concluding that Section 922(g)(8) "addresses a societal problem . . . that has persisted since the 18th century." *Rahimi*, 144 S. Ct. at 1933, 1938, 1941, 1944 (Thomas, J., dissenting).

Under this standard, "if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations." *Rahimi*, 144 S. Ct. at 1898. But even "when a challenged regulation does not precisely match its historical precursors, 'it still may be analogous enough to pass constitutional muster,'" so long as the law "comport[s] with the principles underlying the Second Amendment." *Id.* (quoting *Bruen*, 597 U.S. at 30). As Justice Barrett explained in her concurrence, "imposing a test that demands overly specific analogues has serious problems," including "forc[ing] 21st-century regulations to follow late-18th-century policy choices," and "assum[ing] that founding-era legislatures maximally exercised their power to regulate." *Id.* at 1925 (Barrett, J., concurring).

Notably, the *Rahimi* majority made sure to reiterate that "many [firearms] prohibitions, like those on the possession of firearms by 'felons . . .' are 'presumptively lawful.'" 144 S. Ct. at 1902 (quoting *Heller*, 554 U.S. at 626, 627 n. 26). That pronouncement lends obvious support for *Gay*'s holding, which relied on similar statements by the Court in *Heller*, *McDonald*, and *Bruen*. *See Gay*, 98 F.4th at 846. But even beyond the Court's explicit endorsement of felon dispossession laws, *Rahimi*'s method of analogical reasoning confirms that

Section 922(g)(1) is consistent with our "historical tradition of firearm regulation," as required by *Bruen*, 597 U.S. at 17.

As detailed in the government's opening brief, history is flush with examples of the government disarming categories of persons who were not trusted to follow the law (which include, by definition, all felons), whether through estate forfeiture, capital punishment, or less extreme measures like simple dispossession. Br. 17-40, 51-54. Papists, outspoken critics of colonial government, Native Americans, and citizens who would not swear loyalty to the New Republic: these groups were disarmed because it was believed that they could not be trusted to heed our laws. Br. 29-36. Felons also were disarmed—and the public was kept safe from them—through penalties of death, imprisonment, or property forfeiture. Br. 20-23, 38-40. And, as *Rahimi* held, history demonstrates that the government may disarm groups who present a threat to the physical safety of others. 144 S. Ct. at 1901.

These historical practices "reveal conclusively the scope of governmental power that was understood to exist at the time the Second Amendment was adopted." *Atkinson v. Garland*, 70 F.4th 1018, 1035 (7th Cir. 2023) (Wood, J., dissenting). Standing alone, but especially "[t]aken together," these "distinct legal regimes" establish historical traditions that are "relevantly similar" to Section 922(g)(1). *Rahimi*, 144 S. Ct. at 1901. They impose a similar restriction: barring firearm possession by those who cannot be trusted to abide by the law.

And they do so for the similar reason that such individuals, if armed with deadly force, threaten the social order and present a risk to others. *See United States v. Jackson*, 110 F.4th 1120, 1128 (8th Cir. 2024) (explaining that § 922(g)(1) aims to prevent not just violence, but also "lawlessness"); *id.* at 1126 ("While the better interpretation of the history may be debatable, we conclude that either reading supports the constitutionality of § 922(g)(1) as applied to Jackson and other convicted felons, because the law 'is consistent with the Nation's historical tradition of firearm regulation.'") (quoting *Bruen*, 597 U.S. at 24).

The Supreme Court and this Court repeatedly have recognized that Section 922(g)(1) was enacted to keep firearms from felons because—as a class—they cannot be trusted with them. *E.g.*, *Dickerson v. New Banner Institute, Inc.*, 460 U.S. 103, 119 (1983) (recognizing that persons who have been "convicted of serious crimes," as a class, can "be expected to misuse" firearms); *Kanter v. Barr*, 919 F.3d 437, 448-49 (7th Cir. 2019) ("[P]rohibiting even nonviolent felons . . . from possessing firearms is substantially related to [the government's] interest in preventing gun violence" because an empirical connection exists even "between nonviolent offenders . . . and a risk of future violent crime."); *United States v. Yancey*, 621 F.3d 681, 685 (7th Cir. 2010) ("[M]ost felons are nonviolent, but someone with a felony conviction on his record is more likely than a nonfelon to engage in illegal and violent gun use.").

Especially in the modern world—where firearms are more dangerous, easier to obtain, simpler to conceal, and inflict grave harm with unprecedented frequency—history provides firm support for the government's authority to do so. *See* Br. 17-41; *see also Bruen*, 587 U.S. at 2 (instructing courts to account for "unprecedented societal concerns or dramatic technological changes" when evaluating a challenged firearms regulation); *United States v. Gates*, 2023 WL 5748362, at *8 (N.D. Ill Sept. 6, 2023) (the "rapid" advances in firearms technology have "far outstrip[ed] the firearms-related problems that legislatures had to address in 1791"); *United States v. Thompson*, 21 CR 284, Dkt. 58 at 3 (N.D. Ill. Feb. 21, 2024) ("The twentieth-century problem of gun violence is different in scale and kind from the perceived risk to the social order from firearms at the founding.").

## III. Defendant Ignores the Supreme Court's Endorsement of Felon Dispossession Laws, Misapplies the *Bruen* Framework, and Adopts Arguments from *Rahimi*'s Dissent that the Majority Rejected.

### A. Defendant Ignores the Supreme Court's Repeated Endorsement of Felon Dispossession Laws.

In his 67-page brief, defendant never once acknowledges the Supreme Court's repeated statements that felon dispossession laws—like the one he seeks to have invalidated—are "presumptively lawful." *Heller* cautioned that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill," which

11

it described as "presumptively lawful regulatory measures," *id.* at 626, 627 n. 26, with "historical justifications," *id.* at 635. *McDonald* "repeat[ed] those assurances." 561 U.S. at 786 (quoting *Heller*, 554 U.S. at 626-27). Justices Alito and Kavanaugh echoed the sentiment in *Bruen.* 597 U.S. at 72, 80-81. And in *Rahimi*, the majority reiterated that "prohibitions, like those . . . on the possession of firearms by felons . . . are presumptively lawful." 144 S. Ct. at 1902 (cleaned up). These are not "tea leaves." The Supreme Court has included these explicit statements in every one of its major Second Amendment decisions. Yet, in asking this Court to become the first Circuit to find Section 922(g)(1) facially unconstitutional—that is, unlawful in every conceivable application—defendant ignores them entirely.

While avoiding these pronouncements, defendant criticizes *Gay* by fixating on *Rahimi*'s statement that citizens may not be disarmed simply because they are not "responsible." Rsp. Br. 23-25. Defendant reasons that, in doing so, the Court "functionally rejected" the argument that "only 'law-abiding' citizens are protected by the Second Amendment" because *Bruen* and *Heller* frequently used the terms in tandem. *Id.* at 24. But *Rahimi* offered no criticism of the principle that only "law-abiding" citizens possess Second Amendment rights. Much the opposite, *Rahimi* went out of its way to restate that laws that strip the right to a firearm from *non*-law-abiding citizens are presumed *lawful*. 144 S. Ct. at 1902. And *Rahimi* stated explicitly that its

decision "does not suggest that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse." 144 S. Ct. at 1901 (citing *Heller*, 554 U.S. at 626). This, after *Heller* and *McDonald* described the Court's Second Amendment jurisprudence as casting no doubt on the validity of felon dispossession laws. *See McDonald*, 561 U.S. at 786. Defendant asks this Court to ascribe zero meaning to these clear directives—and indeed, to defy them—by overturning Circuit precedent and invalidating Section 922(g)(1) on its face. *Rahimi* offers no basis for doing so.

To the contrary, *Rahimi* renounced drawing boundaries based on a citizen's responsibility because "responsible" is a "vague term," such that if only "responsible" citizens possessed Second Amendment rights, "[i]t is unclear what such a rule would entail." 144 S. Ct. at 1903. *Rahimi*'s rejection of a rule based on vague notions of "responsibility," therefore, has no bearing on the constitutionality of a statute, like the one at issue here, that draws a clear line at adherence to criminal laws prescribing punishment of more than a year in prison. Indeed, *Bruen* described Second Amendment rights as belonging to "law-abiding" citizens at least 14 times. 597 U.S. at 9, 15, 26, 29, 30-31, 33 n.8, 38 & n.9, 60, 70, 71. As set out in the government's opening brief, that recurrent articulation bears on the meaning of "the people," as used in the Second Amendment, and it reflects our Nation's longstanding tradition of disarming

untrustworthy adherents to the law, including those—like felons—whose actions have demonstrated an unwillingness to follow it. Br. 17-40.

## B. Defendant Misapplies the *Bruen* Framework and Repeats Arguments Rejected by *Rahimi*'s Majority.

Defendant misunderstands the *Bruen* framework in several fundamental respects. First, throughout his brief, defendant criticizes the government for failing to identify a law from the Founding that mirrors Section 922(g)(1). *See, e.g.*, Rsp. Br. 6, 8, 15, 36, 47, 48, 55. That is not what *Bruen* requires, as *Rahimi* made clear. Instead, lower courts are instructed to analyze a challenged regulation by determining whether it "is consistent with the *principles* that underpin our regulatory tradition"—meaning, "laws that our tradition is understood *to permit*." *Rahimi*, 144 S. Ct at 1898 (emphasis added) (citing *Bruen*, 597 U.S. at 29).

*Rahimi* took pains to correct the error defendant makes, by stressing that "some courts have misunderstood the methodology of [the Court's] recent Second Amendment cases," which "were not meant to suggest a law trapped in amber." *Id.* at 1897. In fact, *Rahimi* stated explicitly that the Second Amendment "permits more than just those regulations identical to ones that could be found in 1791." *Id.* at 1897-98. And the *Rahimi* majority rejected Justice Thomas's dissenting view that Section 922(g)(8) ran afoul of Second Amendment tradition because "[n]ot a single historical regulation justifies the

statute at issue." *Id.* at 1903. Put simply, defendant's complaint about the absence of a "historical twin" runs counter to the Supreme Court's constitutional framework. *Id.* (quoting *Bruen*, 597 U.S. at 30).

Defendant's take on analogical reasoning is equally flawed. Rather than consider the historical record as a whole to discern principles that separate permissible and impermissible restrictions under the Second Amendment, he silos each of the many analogues presented by the government and then narrowly contrasts them with Section 922(g)(1). In doing so, defendant disregards the broader tradition of firearm regulation that history reveals. The *Rahimi* majority rejected this divide-and-conquer approach, which Justice Thomas's dissent unsuccessfully urged them to employ. *Compare* 144 S. Ct. at 1899, 1901 (holding that "two distinct legal regimes"—going armed and surety laws—justify Section 922(g)(8) when "[t]aken together"); *with id.* at 1941 (Justice Thomas's dissent criticizing the majority's "piecemeal approach" that "combin[es] aspects of surety and affray laws to justify § 922(g)(8)"), and Rsp. Br. 52 (criticizing the government's "patchwork approach" that produces "an amorphous principle untethered from the actual regulation at issue").

For instance, defendant argues that the purpose of Revolutionary-era loyalty laws (which were passed by six different colonies) differs from Section 922(g)(1) in that the colonial regulations "aimed to preserve the stability of the new government," whereas the federal felon-in-possession law seeks to curb

crime. Rsp. Br. 55. Defendant errs in comparing these purposes in isolation, which *Rahimi* counsels against. But, even standing alone, those purposes are "relevantly similar," as the district court found. R. 15-16. Just as our burgeoning government lacked confidence that those who refused to swear allegiance to the New Republic would conform to its code, felons cannot be trusted to obey our laws because they have demonstrated, through their prior conduct, a propensity to disregard them.

Along those same lines, defendant seeks to differentiate the colonies' disarmament of Catholics, Moravians, and rabble-rousers like Anne Hutchinson as "more akin to suppressing rebellion than punishing those who had 'evinced a willingness to disobey the law.'" Rsp. Br. 44. But the *Rahimi* majority found unconvincing a near-identical argument made by Justice Thomas's dissent—namely, that the English disarmed papists to prevent rebellion, whereas Section 922(g)(8) seeks to curb interpersonal violence. 144 S. Ct. at 1942.

Defendant's overly narrow focus misses the bigger picture: these groups were disarmed, because—in the early government's view—putting firearms in their hands threatened the social order. *See, e.g.*, Br. 30-35. Whereas untrustworthy adherents to colonial laws presented a risk of rebellion and treason at that early stage of our democracy, Congress passed Section 922(g)(1) in the 1960s to address a new risk to our social order that felons presented in

these modern times—namely, rampant gun crime. *Lewis v. United States*, 445 U.S. 55, 63 (1980) (Congress enacted Section 922(g)(1) to address proliferation in gun violence, including a "precipitous rise in political assassinations, riots, and other violent crimes involving firearms"). These purposes are analogous, particularly when considering *Bruen*'s directive to account for "unprecedented societal concerns or dramatic technological changes" in drawing the comparison. *Bruen*, 587 U.S. at 27.

In seeking to distinguish the historical disarmament of these groups, defendant, much like the district court, takes a skewed view of the burden that Section 922(g)(1) imposes. *See* R. 19; Rsp. Br. 56-60. Section 922(g)(1) disarms a class of citizens who—by committing a serious crime—have revealed themselves as unwilling to act according to law. Much the same, various groups in colonial times who refused to take an oath of allegiance to our government were disarmed because—in not taking the oath—they demonstrated an unwillingness to abide by the community's laws and legal constructs. *See* Br. 31-34. That those who *took* the oath could possess firearms is irrelevant in comparing these burdens, because oath takers were not members of the distrusted class. Similarly, modern-day citizens who elect not to engage in felonious conduct are unaffected by Section 922(g)(1)'s firearm ban, as they are not members of the class of untrustworthy people.

Defendant distinguishes Section 922(g)(1) from the disarmament of non-oath takers on the grounds that the latter group's ban was not "permanent and complete," since they could take the oath and "regain their right to bear arms." Rsp. Br. 60. But felons' rights also can be regained, through expungement, pardon, and civils rights restoration. Br. 12-13. Moreover, for those who refused to take the oath in the relevant historical periods, there was no restoration process at all. In any event, *Rahimi* counsels that loyalty oath laws need not be a "dead ringer" for 922(g)(1) and should be viewed "together" with other relevant traditions to discern the full scope of permissible firearm regulation. 144 S. Ct. at 1898, 1901. When viewed in conjunction with felony punishment laws, historical support for disarming felons further crystallizes.

Defendant's siloed critique of felony punishment laws loses the forest for the trees. He discounts each of those analogues (imprisonment, estate forfeiture, and the death penalty) on the grounds that they "did not have as its *purpose* disarmament—only as its byproduct." Br. 50 (emphasis in original). But it is axiomatic that a central objective of criminal punishment—whether imprisonment, death, or otherwise—is to protect the public from criminals. *See, e.g.*, 18 U.S.C. § 3553(a)(2)(C). And that is precisely what Section 922(g)(1) aims to do. *Scarborough v. United States*, 431 U.S. 563, 572 (1977) (holding that the legislative history of 922(g) supports the view that Congress sought to

disarm those who may not be "trusted to possess a firearm without becoming a threat to society").

Critically, defendant ignores that in *Rahimi* the majority found persuasive that historical "going armed laws provided for imprisonment," because "if imprisonment was permissible to respond to the use of guns to threaten the physical safety of others, then the lesser restriction of temporary disarmament that Section 922(g)(8) imposed is also permissible." 144 S. Ct. at 1902. Applying the Supreme Court's logic here: if imprisonment, and even death, were acceptable punishments for felons at the founding, then surely the founders would approve of the lesser sanction of disarmament. *See Jackson*, 110 F.4th at 1127 ("[I]t is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess firearms.") (quoting *Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019)).

When considered alongside the historical disarmament of even non-felons whom the government distrusted to adhere to our laws, these traditions provide an even closer fit than the two "distinct legal regimes" in which *Rahimi* had "no trouble" finding support for Section 922(g)(8). 144 S. Ct. at 1902. Neither analogue specifically barred a person's future firearm possession. *Id.* at 1933, 1939, 1943. As noted, historical surety laws "require[d] individuals suspected of future misbehavior to post a bond," and if he "broke the peace, the

19

bond would be forfeit." *Id.* at 1900. "Going armed" laws "prohibited riding or going armed, with dangerous or unusual weapons, to terrify the good people of the land." *Id.* at 1901 (cleaned up). Although Justice Thomas's dissent argued that the purposes and burdens of those laws were too different to justify Section 922(g)(8), which seeks to prevent "interpersonal violence in the home," *id.* at 1933, 1939, 1942, 1943, the *Rahimi* majority rejected that view, finding that such differences were immaterial, because when "[t]aken together, the surety and going armed laws confirm what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Id.* at 1901.

Here, defendant makes similar critiques of loyalty oaths, estate forfeiture laws, capital punishment, and the disarmament of seditionists, Catholics, and other minorities, in an attempt to distinguish their purposes and burdens from those of Section 922(g)(1). *See* Rsp. Br. 40-59. But when, "taken together," these analogues confirm that when an individual has breached our laws by committing a felony crime, he cannot be trusted to act in accordance with our laws and, consistent with historical tradition, may be disarmed. Especially at a time when firearms are more dangerous, more widely available, and far easier to conceal than they were in 1791, Section 922(g)(1) is consistent with the principles underlying these historical analogues that disarmed various untrustworthy groups and that executed, imprisoned, and

stripped felons of property. As in *Rahimi*, this Court should have "no trouble" finding Section 922(g)(1) facially constitutional in light of such history. *See Rahimi*, 144 S. Ct. at 1902; *id.* ("[P]rohibitions, like those on the possession of firearms by felons . . . are presumptively lawful.") (cleaned up). *See also Bruen*, 587 U.S. at 27 ("cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach"); *Yancey*, 621 F.3d at 685 ("someone with a felony conviction on his record is more likely than a nonfelon to engage in illegal and violent gun use").

## IV. No Federal Court of Appeals Has Found Section 922(g)(1) Facially Unconstitutional.

At least six federal courts of appeals have considered constitutional challenges to Section 922(g)(1) since *Bruen*, and several have revisited the issue since *Rahimi*. None has granted a facial challenge. And though two sister circuits have granted as-applied challenges to Section 922(g)(1) in cases involving non-violent offenders, one of them—the Ninth Circuit—has since voted to vacate its opinion in *United States v. Duarte*, 101 F.4th 657 (9th Cir. 2024), in favor of rehearing en banc, *see* 108 F.4th 786 (9th Cir. 2024), while the other—the Third Circuit—has made clear that its now-vacated decision in *Range*, 69 F.4th at 99, would not provide relief in a case like this one. *See United States v. Fadiga*, 2024 WL 3338304, at *3 (3d Cir. July 9, 2024).

The Third Circuit's post-*Rahimi* reasoning mirrors that of this Court in *Gay*. In *Range*, 69 F.4th at 99, 106, the Third Circuit had granted injunctive relief to a civil plaintiff with a prior felony conviction for lying to get food stamps, who sought to enjoin enforcement of Section 922(g)(1) in order to buy a rifle for hunting and a shotgun for self-defense in his home. In *Fadiga*, however, the Third Circuit concluded that defendant presented no nonfrivolous Second Amendment claim, because "[n]either *Bruen* nor *Range* called into question § 922(g)(1)'s facial constitutionality or addressed the constitutionality of § 922(g)(1) in the criminal prosecution context." 2024 WL 3338304, at *3. The Third Circuit stressed that "*Bruen* did not cast doubt on longstanding prohibitions on the possession of firearms by felons." *Id.* (cleaned up). And the Court emphasized that

> Range and Fadiga are different. Range had (1) a single, decades-old welfare fraud conviction; (2) received no prison time; and (3) showed that the wished to possess firearms for self-defense and hunting, *Range*, 69 F.4th at 98-99, whereas Fadiga is a criminal defendant who had (1) numerous criminal convictions; (2) served several stints in prison and committed this offense while on probation; and (3) not sought relief before illegally possessing firearms.

*Id.* The Third Circuit's logic could hardly bear more resemblance to this Court's reasoning in *Gay*. *See* 98 F.4th at 846. And, given that *Fadiga* post-dates *Rahimi*, it further undercuts defendant's claim that *Rahimi* somehow undermines *Gay*'s holding or compels a different outcome. *See* Rsp. Br. 36. *See also United States v. Dorsey*, 105 F.4th 526, 532 (3d Cir. 2024) (rejecting an as-

applied challenge to Section 922(g)(1), on plain-error review, because defendant was not similarly situated to the defendant in *Range*); *United States v. Moore*, 111 F.4th 266, 273 n.5 (3d Cir. 2024) (rejecting a facial challenge because Section 922(g)(1) is constitutional as applied to a defendant serving a term of federal supervised release).

Several other Circuits have explicitly stated that *Rahimi* does nothing to question the validity of Section 922(g)(1). In *United States v. Johnson*, 2024 WL 3371414, at *3 (11th Cir. July 11, 2024), the Eleventh Circuit rejected a claim that the statute is inconsistent with our Nation's historical tradition because, the defendant contended, "at the time that the Second Amendment was enacted there was 'no federal or state law precluding the possession of firearms by a convicted felon.'" On plain error review, *Johnson* held that *Rahimi* did not alter its prior decisions upholding the constitutionality of Section 922(g)(1) and stressed that—to the contrary—the Supreme Court "once again declared that the prohibition on the possession of firearms by felons . . . is presumptively lawful." *Id.* (cleaned up).

The First Circuit echoed the same sentiment in *United States v. Langston*, 110 F.4th 408, 413 (1st Cir. 2024), finding no plain error in the district court's refusal to dismiss a Section 922(g)(1) charge *sua sponte*, because "[n]o case from the Supreme Court . . . holds that § 922(g)(1) is unconstitutional in any of its applications" and, in fact, "the Supreme Court has stated

repeatedly over sixteen years, from *Heller* to *Rahimi*, that felon-in-possession laws are presumptively lawful." And in *United States v. Curry*, 2024 WL 3219693, at *4 n.7 (10th Cir. June 28, 2024), the Tenth Circuit rejected a preserved facial challenge to Section 922(g)(1), because *Rahimi* "does not indisputably and pellucidly abrogate" its prior decisions upholding the statute.

Notably, after *Rahimi*, the Supreme Court vacated and remanded the Eighth Circuit's decision in *United States v. Jackson*, 69 F.4th 495 (8th Cir. 2023), *cert granted, vacated, and remanded by Jackson v. United States*, 144 S. Ct. 2710 (2024), which rejected a defendant's as-applied challenge to Section 922(g)(1) after *Bruen*. In a fresh decision, the Eighth Circuit recently announced that *Rahimi* does not alter that conclusion, explaining:

> Th[e] historical record suggests that legislatures traditionally possessed discretion to disqualify categories of people from possessing firearms to address a danger of misuse by those who deviated from legal norms, not merely to address a person's demonstrated propensity for violence. This conclusion is bolstered by the Supreme Court's repeated statements in *Bruen* that the Second Amendment protects the right of a "law-abiding citizen" to keep and bear arms. *See* 597 U.S. at 8, 15, 26, 29-31, 33 n.8, 38, 60, 70, 142 S.Ct. 2111. As stated by the D.C. Circuit, "it is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms." *Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019); *cf. Rahimi*, 144 S. Ct. at 1902 ("[I]f imprisonment was permissible to respond to the use of guns to threaten the physical safety of others, then the lesser restriction of temporary disarmament that Section 922(g)(8) imposes is also permissible.").

> On this view, for which there is considerable support in the historical record, Congress did not violate Jackson's rights by enacting § 922(g)(1). He is not a law-abiding citizen, and history supports the authority of

Congress to prohibit possession of firearms by persons who have demonstrated disrespect for legal norms of society.

*United States v. Jackson*, 110 F.4th 1120, 1127 (8th Cir. 2024). This Court should adopt the Eighth Circuit's logic here.

*   *   *   *   *   *

Defendant is not a law-abiding citizen with a Second Amendment right. He is a violent felon who used a firearm to threaten and victimize others. Consistent with this Nation's history and tradition of disarming groups that legislatures distrust to obey the law, Congress enacted Section 922(g)(1) to prevent such lawlessness and danger to the community. In light of the principles underlying our traditions, defendant's facial and as-applied challenges to Section 922(g)(1) both fail. *See Rahimi*, 144 S. Ct. at 1898 (a facial challenge is "the most difficult challenge to mount successfully because it requires a defendant to establish that no set of circumstances exists under which the Act would be valid") (cleaned up).

# CONCLUSION

For the foregoing reasons, and the reasons set forth in the opening brief, the government respectfully requests that this Court reverse the district court's ruling that 18 U.S.C. § 922(g)(1) is facially unconstitutional, reject defendant's as-applied challenge, and reinstate the indictment.

Respectfully submitted.

MORRIS PASQUAL
Acting United States Attorney

DEBRA RIGGS BONAMICI
Assistant United States Attorney
Criminal Division Counsel

/s/ *Brian J. Kerwin*
BRIAN J. KERWIN
Assistant United States Attorney
Chief of Appeals, Criminal Division

# RULE 32 CERTIFICATION

I hereby certify that this brief complies with the type volume limitation of Federal Rule of Appellate Procedure 32(a)(7)B) and Circuit Rule 32(c) because it contains 5,969 words. It complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5), 32(a)(6), and Circuit Rule 32(b), because it has been prepared using the Microsoft Office Word proportionally-spaced typeface of Century Schoolbook with 13-point font in the text and 12-point font in the footnotes.

Respectfully submitted.

MORRIS PASQUAL
Acting United States Attorney

By:      /s/ *Brian J. Kerwin*
BRIAN J. KERWIN
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 886-1328

**CERTIFICATE OF SERVICE**

I hereby certify that on September 16, 2024, I electronically filed the foregoing Reply Brief of the United States with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Respectfully submitted.

By:     /s/ *Brian J. Kerwin*
        BRIAN J. KERWIN
        Assistant United States Attorney
        219 South Dearborn Street, 5th Floor
        Chicago, Illinois 60604
        (312) 886-1328